# EXHIBIT 1

Tiffanie L. McDowell (State Bar No. 288946)
CROWELL & MORING LLP
3 Park Plaza, 20th Floor
Irvine, CA 92614
Telephone: (949) 263-8400
Facsimile: (949) 263-8414
TMcDowell@crowell.com

**ELECTRONICALLY FILED**
Superior Court of California
County of Ventura
07/29/2025
K. Bieker
Executive Officer and Clerk

By: _____ Deputy Clerk

Maryssa Padilla

*Attorneys for Plaintiff Blue Cross and Blue Shield of Kansas City*

(Additional Counsel for Plaintiff on Signature Page)

SUPERIOR COURT OF THE STATE OF CALIFORNIA
COUNTY OF VENTURA

| | |
|---|---|
| BLUE CROSS AND BLUE SHIELD OF KANSAS CITY,<br><br>        Plaintiff,<br><br>    v.<br><br>AMGEN INC., AMGEN MANUFACTURING LIMITED LLC, AND IMMUNEX CORPORATION,<br><br>        Defendants. | Case No.  2025CUAT048283<br><br>**COMPLAINT**<br><br><br>JURY TRIAL DEMANDED |

Ventura Superior Court transmitted through eFiling 07/29/2025 07:20:06 PM

CROWELL
& MORING LLP
ATTORNEYS AT LAW

## TABLE OF CONTENTS

INTRODUCTION ................................................................................................ 4

PARTIES ........................................................................................................... 10

JURISDICTION AND VENUE .......................................................................... 12

REGULATORY AND ECONOMIC BACKGROUND ........................................ 14

    A. The Relevant Federal Regulatory Structure Encourages Competition Among Pharmaceutical Companies. ........................................................................ 14

    B. Biosimilar Competition Lowers Drug Prices. ............................................ 16

FACTS ............................................................................................................... 17

    A. Etanercept Is a Biologic Prescription Medication That Reduces the Symptoms of Inflammatory Diseases. .......................................................... 17

    B. In the 1980s, Researchers at Roche and Immunex Raced to Develop and Patent TNFR Technologies to Treat Autoimmune Conditions. ........................ 20

        1. Roche scientists were the first to sequence the p55 TNFR and create TNFRIg fusion proteins, paving the way for new treatments. ........................ 20

        2. Immunex scientists also develop a p75 TNFR fusion protein. ............... 22

    C. Immunex Launches Enbrel and Obtains a Non-exclusive License to Roche's Competing Patent Rights to Etanercept. ................................................... 23

        1. The FDA approves Enbrel as the first TNF inhibitor monotherapy to treat rheumatoid arthritis. ...................................................................... 23

        2. Immunex seeks and obtains from Roche a non-exclusive license to Roche's competing patent rights. ................................................................ 24

        3. Enbrel becomes a phenomenal commercial success for Immunex, with $762 million in annual sales by 2001. ............................................... 25

    D. Biotech Giant Amgen Acquires Immunex and Adds Enbrel to Its Waning Portfolio. ...... 27

        1. The FTC requires Amgen and Immunex to license certain TNFR patents to avoid reducing innovation and potential competition. ............................ 28

        2. Amgen reaps the rewards of its Immunex acquisition as Enbrel becomes one of the most profitable drugs in the world. ....................................... 29

    E. With Patent Expiration and Etanercept Competition for Enbrel on the Horizon, Amgen Buys Out Roche's Competing Patent Rights. .......................... 31

    F. Amgen Uses the 2004 Exclusive License Agreement to Obtain the '182 and '522 Patents. ...................................................................................... 35

    G. Amgen Uses its Control of Roche's Patent Rights Under the 2004 Exclusive License Agreement to Block Would-be Competitors from Launching Less Expensive Biosimilars. ............................................................................ 37

        1. Amgen successfully sues Sandoz for infringing Roche's '182 and '522 Patents and blocks the launch of Sandoz's Enbrel biosimilar. ................. 38

        2. Amgen sues Samsung Bioepis for infringing Roche's '182 and '522 Patents and blocks the launch of Bioepis's Enbrel biosimilar. ............... 39

    H. Amgen Exploits Its Enbrel Monopoly with Annual Price Hikes and Sees It Net Revenues Spike to $86 Billion. ............................................................ 40

    I. Amgen Wields Its Control Over Roche's Rights Under Their 2004 Exclusive License Agreement to Unlawfully Entrench and Extend Its Monopoly. .......... 42

COMPLAINT

CROWELL
& MORING LLP
ATTORNEYS AT LAW

MARKET DEFINITION AND MONOPOLY POWER ............................................................... 46
    A. Direct Evidence Demonstrates Amgen's Market and Monopoly Power. ......................... 46
    B. Indirect Evidence Demonstrates Amgen's Market and Monopoly Power ....................... 48
MARKET EFFECTS AND DAMAGES ............................................................................ 49
ANTITRUST IMPACT .................................................................................................. 51
CLAIMS FOR RELIEF ................................................................................................. 51
DEMAND FOR RELIEF ............................................................................................... 68
JURY DEMAND ......................................................................................................... 69

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

CROWELL
& MORING LLP
ATTORNEYS AT LAW

COMPLAINT

Plaintiff Blue Cross and Blue Shield of Kansas City ("Plaintiff" or "Blue KC") brings this civil action against Defendants Amgen Inc., and wholly owned subsidiaries Amgen Manufacturing Limited LLC and Immunex Corporation ("Immunex") (collectively, "Amgen"). Plaintiff's allegations are based on (a) personal knowledge, (b) the investigation of counsel, (c) publicly available information, and (d) information and belief.

## INTRODUCTION

1.    Plaintiff, which provides healthcare benefits to millions of Americans, brings this case against Amgen for unlawfully excluding competition for its blockbuster drug, Enbrel. Enbrel is Amgen's branded form of the biologic medicine, etanercept. For upwards of two decades, Amgen has reaped supracompetitive profits from its unlawful efforts to obtain and entrench its monopoly over etanercept. Despite launching in the United States more than a quarter-century ago, Enbrel remains a crown jewel of Amgen's $28-billion-a-year portfolio—and the only etanercept medicine on the U.S. market. That lack of competition stems from Amgen's unlawful conduct, which has enabled Amgen to continue to raise Enbrel's shockingly high prices nearly every single year. As of 2025, a patient's Enbrel treatment can now exceed $7,000 each month. In total, Amgen has amassed more than $70 billion from its U.S. sales of Enbrel, making it one of the highest grossing drugs ever sold in the United States.

2.    At the heart of Amgen's anticompetitive conduct is a 2004 deal it struck with F. Hoffmann-La Roche AG ("Roche"). Roche is another large pharmaceutical company, whose scientists conducted parallel research resulting in its own competing patent rights related to etanercept. Roche was a competitor to Amgen, until they both agreed not to compete. Amgen and Roche entered an exclusive patent license agreement in 2004 (the "2004 Exclusive License Agreement"). Under that agreement, Amgen unlawfully acquired control over Roche's patent rights related to etanercept, including the rights to then-pending patent applications and any resulting patents issued from those applications. And Roche thereby agreed not to compete against Amgen in the United States. Along with preventing U.S. competition from Roche itself, this agreement also enabled Amgen to prevent Roche from sublicensing Roche's etanercept-related rights to another competitor. Amgen also wielded and enforced Roche's competing patent

COMPLAINT

1    rights to directly exclude all other competition for etanercept, well past Amgen's original patent

2    term. But for this unlawful agreement and acquisition of control over Roche's rights, other

3    competitors would have commercially launched competing etanercept biosimilar products during

4    the two decades that followed. And entry of these biosimilars would have driven down prices for

5    prescriptions of Enbrel taken by millions of patients each year to treat inflammatory diseases like

6    rheumatoid arthritis, juvenile idiopathic arthritis, ankylosing spondylitis, psoriasis, and psoriatic

7    arthritis. This competition would have allowed patients and health plans to purchase lower-cost

8    biosimilar etanercept drugs, provided doctors and their patients additional treatment options, and

9    alleviated the financial burden posed by the supracompetitive, ever-increasing prices Amgen has

10   charged.

11         3.      From the mid-1980s to mid-1990s, the medical and pharmaceutical community

12   was advancing its understanding of inflammatory diseases, the role of tumor necrosis factor

13   ("TNF") and other cytokines in those diseases, and the potential for the use of TNF inhibitors to

14   treat them. This research eventually led to the invention of etanercept, the active ingredient in

15   Enbrel. Between 1990 and 1995, Roche and Immunex were racing to develop soluble human

16   receptor proteins that could act as TNF inhibitors, and both filed a series of patent applications

17   covering aspects of their research. Immunex was the first to obtain U.S. patents claiming

18   etanercept, and to secure regulatory approval from the Food and Drug Administration ("FDA")

19   for the drug. Immunex commercially launched etanercept in the United States under the brand

20   name Enbrel in 1998.

21         4.      But Immunex then learned that Roche's pending patent applications may also

22   cover etanercept. In 1999, Immunex secured a license from Roche to its patent rights related to

23   etanercept—including Roche's pending patent applications and any patents that issued from

24   them—to make, use, and sell etanercept, retroactive to Enbrel's commercial launch the year

25   before (the "1998 License Agreement"). Immunex thus ensured it could continue selling Enbrel

26   without concern about Roche's competing patent rights. The license to Immunex was non-

27   exclusive, which meant Roche retained the right to commercialize a competing etanercept drug

28   itself, or to sublicense that right to a third party.

CROWELL
& MORING LLP
ATTORNEYS AT LAW

5

5.      Enbrel was an immediate success for Immunex, and Immunex and its prized drug soon caught the eye of Amgen. During this period, Amgen, like Immunex and Roche, had also been researching TNF inhibitors to try to develop its own treatment for inflammatory diseases. Indeed, as disclosed in its annual investor filings, Amgen relocated an important inflammation research and development program to its Thousand Oaks, California headquarters to continue focusing on TNF research. And by the year 2000, Amgen had successfully developed a second-generation soluble TNF-receptor and completed a phase 1 study in patients with rheumatoid arthritis. But in 2002, rather than continuing to develop its own treatment, Amgen acquired Immunex, sensing the impending potential for massive Enbrel profits.

6.      Before the parties closed their deal, the Federal Trade Commission ("FTC") stepped in to investigate possible anticompetitive effects. The FTC's investigation identified several competitive concerns with the deal. The FTC explained that, because the companies were two of the few companies then engaged in clinically developing several types of treatments, including TNF inhibitors for treatment of inflammatory diseases, the acquisition may harm competition and patients by "reducing innovation competition" and "eliminating potential competition" for TNF inhibitors. The FTC filed a complaint. In response, Amgen agreed to license certain patent rights to a third party, Serono, which had been conducting its own research on soluble TNF receptor proteins that could serve as TNF inhibitors.

7.      Once it settled with the FTC, Amgen closed its acquisition of Immunex, which soon proved to be a goldmine. Revenue from Enbrel surged, and in the first year after the acquisition, Enbrel's sales grew by 175%, to $1.25 billion. Serono was unable to develop a product that might compete with Amgen's etanercept product. Nevertheless, Amgen feared that competition from other companies could undermine the Enbrel revenue stream, given that Roche was free to either compete against Amgen in the United States or to sublicense its etanercept-related patent rights to other potential competitors.

8.      One Amgen executive later described this threat from Roche: Amgen feared that "there were storm clouds on the horizon," and that Amgen was "going to be crosswise with

1   Roche in the not-too-distant future."[1] This fear was particularly acute for etanercept because—as

2   that same Amgen executive explained—it was concerned that Roche's pending patent

3   applications gave Roche legal priority related to etanercept. Amgen would later assert, in

4   executives' testimony and court filings, that "scientists at Roche were the first to invent

5   etanercept" and "Roche's invention of etanercept was…fully described in Roche's original patent

6   applications."[2] Based on the same research and original patent applications, Roche had secured

7   patents over etanercept in Europe in 2003. Amgen expressed concern that Roche "could get

8   similar rights in the United States."[3]

9          9.      So Amgen approached Roche in 2004 to eliminate that competitive threat. Amgen

10   and Roche agreed to restructure their deal to ensure that they would not compete against each

11   other in the United States. Under their new agreement, Roche received a lump sum payout

12   totaling $150 million for its patent rights to etanercept worldwide. And Roche granted Amgen

13   broad and extensive control over Roche's U.S. patent rights to etanercept that Amgen did not

14   have under the 1998 License Agreement that Immunex had originally reached with Roche.

15          10.     Specifically, under the terms of the new 2004 Exclusive License Agreement,

16   Amgen obtained an exclusive license to sell etanercept under Roche's patent rights. That part of

17   their agreement now blocked Roche from competing against Amgen in the United States with its

18   own etanercept product. More than that, it also prohibited Roche from licensing Roche's rights to

19   any other companies that were seeking to launch a biosimilar competitor to Enbrel. In other

20   words, Amgen effectively ensured that Roche's etanercept-related patent rights could not be used

21   commercially by Roche, by Roche's sublicensee, or anyone other than Amgen—upending the

22   competitive status quo under the non-exclusive license Immunex had obtained from Roche in the

23   1998 License Agreement. But the new 2004 Exclusive License Agreement went further, giving

24   Amgen control of the right to prosecute Roche's competing patent rights, as well as the right to

25

26   ───────────────
     [1] Trial Testimony, Stuart Watt, *Immunex Corp. et al v. Sandoz Inc. et al*, No. 2:16-cv-01118-
     CCC-JBC, Docket No. 730 (D.N.J. 2018).
27   [2] Brief in Opposition to Petition for Writ of Certiorari, *Sandoz Inc. et al v. Immunex Corp. et al.*,
     (2021) (No. 20-1110).
28   [3] Trial Testimony, Stuart Watt, *Immunex Corp. et al v. Sandoz Inc. et al*, No. 2:16-cv-01118-
     CCC-JBC, Docket No. 730 (D.N.J. 2018).

enforce those rights through patent litigation against any suspected infringer.

11.    Thus, this new agreement between Amgen and Roche now allowed Amgen to blockade all competition to Enbrel in the United States, for the remaining term of Amgen's existing patents. But that only solved Amgen's competition problem until 2014, when the last of its own principal Enbrel patents was set to expire (and until 2019, for the use of etanercept to treat psoriatic arthritis). So, Amgen and Roche further agreed to structure their deal in a way that enabled Amgen to extend its etanercept monopoly for an extra decade or more.

12.    To do that, Amgen had to evade the "double patenting" bar. Under that bar, a patent owner cannot extend the time frame of its existing patent monopoly with subsequent patents that anticipate or obviously cover the same invention covered by the owner's initial patents. Amgen knew that any patent obtained using Roche's patent rights to claim etanercept would cover the same technology as Amgen's patents. So, Amgen could not acquire Roche's rights via an outright transfer or assignment. However, the double patenting bar would not apply to any patents that issued with Roche as the owner because at the time of the new agreement, Roche did not own any prior patents to etanercept. Amgen and Roche thus agreed to structure their 2004 Exclusive License Agreement as a "license" to rights that were still owned by Roche. Amgen was later able to use its control over those rights to successfully obtain two additional patents to etanercept. These patents were issued in Roche's name, but under the 2004 Exclusive License Agreement, they remain under Amgen's control, extending Amgen's monopoly until those patents expire in 2028 and 2029. Thus, this deal structure had the same immediate effect as an acquisition in terms of Amgen's control over the sale of etanercept, but it also allowed Amgen to then use Roche's competing patent rights to secure an additional ten years or more of patent monopoly, which would not have been allowed following an outright acquisition.

13.    Amgen and Roche's new 2004 Exclusive License Agreement was thus facially anticompetitive in both intent and effect. Because of the agreement, Roche was no longer a competitive threat to Amgen in the United States; nor were potential competitors that otherwise could have sought to sublicense Roche's etanercept-related rights. And Amgen's U.S. etanercept monopoly will continue at least until 2028 and 2029, when the additional patents secured using

CROWELL
& MORING LLP
ATTORNEYS AT LAW

Roche's patent rights finally expire. This results in both backward-looking and forward-looking harm, as it cut off all avenues for competitive market entry from 2004 onward and extended Amgen's patent monopoly by at least *ten years longer* than would have been the case absent the unlawful agreement with Roche.

14.     With its monopoly unlawfully entrenched and extended, Amgen has wielded its control over Roche's patent rights under the 2004 Exclusive License Agreement to bar all competition from other etanercept biosimilar manufacturers that attempted to market their products after Amgen's own original patents expired. Since 2016, Amgen has sued every drug company that has tried to launch a competing biosimilar etanercept product. In back-to-back federal lawsuits, Amgen used *Roche's* patent rights (notably not its own Enbrel patents that it obtained when its acquired Immunex) to block two new competitors—Sandoz and Samsung Bioepis—from selling lower-cost biosimilar drugs in the United States. Additional companies have also been developing competing biosimilar drugs, but they have been forced to wait on the sidelines, reluctant to launch their products in fear that a patent litigation assault by Amgen would follow. They fully expect that Amgen will continue its campaign to dominate the etanercept market by blocking all biosimilar competitors and extending its monopoly through at least 2029, extracting supracompetitive pricing the entire time.

15.     There was no legitimate or lawful reason for Amgen and Roche to agree not to compete and to allow Amgen to blockade all other U.S. competition. At the time the 2004 Exclusive License Agreement was entered, Enbrel had been on the market for several years, Amgen had made over a billion dollars in sales, and Amgen already had a co-exclusive license from Roche ensuring it could continue marketing Enbrel without the prospect of patent infringement claims lodged by Roche. There simply was no reason for Amgen to acquire exclusive control over Roche's competing patent rights other than to exclude competition from Roche (and others) and unlawfully entrench and extend its dominance.

16.     Comparing the U.S. market to the market overseas illustrates the massive and deleterious impact of Amgen's unlawful conduct. Amgen has maintained its chokehold on the U.S. market for more than 26 years—and counting. In Europe by contrast, biosimilar versions of

CROWELL
& MORING LLP
ATTORNEYS AT LAW

etanercept launched in 2016, *nine years ago*. And after this competition commenced, Enbrel's price in Europe plummeted. By 2018, prices had dropped by nearly half, and biosimilar competitors had gained about 40% market share. And two years later, by 2020, etanercept biosimilars had acquired 51% market share. But in the United States, there are no biosimilar, lower-cost competitors to Enbrel due to Amgen's conduct. And the price of Enbrel has continued to climb.

17.     Put simply, Amgen's conduct has allowed it to unlawfully acquire, maintain, and entrench its monopoly on etanercept for at least ten years longer than originally provided for under the patent laws. But for its unlawful actions, Amgen's patent exclusivity on etanercept would have expired by 2014 for most indications (and by 2019, at the latest, for all others); other biosimilar drugs would have entered the U.S. market and driven down prices; and patients and plans would have paid far less for Enbrel. Accordingly, Amgen's conduct has already harmed and is continuing to harm competition for etanercept, and to impose massive costs on the U.S. healthcare system. And it has caused massive damages to health plans, including Plaintiff, which has paid and continues to pay supracompetitive prices for Enbrel.

18.     Plaintiff alleges violations of state antitrust, consumer protection, and common laws and seeks monetary relief for overcharges caused by Amgen's wrongdoing, which, where appropriate, should be doubled or trebled under various state laws.

## **PARTIES**

19.     Plaintiff Blue Cross and Blue Shield of Kansas City is a Missouri not-for-profit health corporation. Blue KC has its principal place of business in Kansas City, Missouri, and is an independent licensee of the Blue Cross and Blue Shield Association. Blue KC provides a full spectrum of health care plans and services, including prescription drug coverage. Blue KC insures risk for prescription drug costs for approximately one million members.

20.     Blue KC operates its business through a variety of health plans and other subsidiaries, all of which have assigned their relevant claims in this action to Blue KC.[4]

---

[4] These assignor subsidiaries include Blue-Advantage Plus of Kansas City, Inc. and Missouri Valley Life and Health Insurance Company.

21.     Blue KC also provides "Administrative Services Only" ("ASO") services to self-funded health plan customers. Many of these ASO customers provide members with prescription drug benefits, under which claims for Enbrel were submitted and paid. The ASO agreements between Blue KC and its ASO customers, all of which were entered into before the filing of this Complaint, contain contractual provisions that permit Blue KC to pursue claims for overcharges incurred in connection with payments and/or reimbursements for Enbrel dispensed to ASO customers' members. Blue KC has standing pursuant to these contractual provisions to assert claims on behalf of its ASO customers for overpayments related to Enbrel.

22.     Blue KC also has independent standing to assert claims on its own behalf for overcharges incurred in connection with payments and/or reimbursements made for Enbrel dispensed to each ASO group's members because Blue KC makes the initial payment for these ASO group members' Enbrel.[5]

23.     As a Part D sponsor, Blue KC is bound by law and by its contracts with CMS to detect, prevent, and correct overpayments in the healthcare system caused by fraud, waste, and abuse. In such efforts, Part D sponsors must seek to recover the damages associated with its payments for pharmaceuticals associated with such misconduct.

24.     At all times relevant to this Complaint, Blue KC was (and is) contractually responsible under various prescription drug benefit plans for making payments for Enbrel and its biosimilar etanercept, when any of Blue KC's members filled a prescription of Enbrel at a pharmacy. Over the relevant time period, Blue KC has paid a substantial share of the cost of those drugs. As a result, Blue KC has paid millions of dollars to pharmacies for Enbrel dispensed to its members in 23 states. Blue KC seek recovery of all overcharges incurred in connection with those payments, including payments made for members who are enrolled in Medicare Advantage, Part D, and commercial plans.

---

[5] Accordingly, Blue KC brings all claims asserted in this Complaint on its own behalf and on behalf of its ASO customers. Blue KC has compiled a list of ASO customers on whose behalf Blue KC asserts claims in Appendix A, to be incorporated into this Complaint. This list is a trade secret as defined in Cal. Civ. Code, § 3426.1, subd. (d). Blue KC intends to move to seal Appendix A pursuant to Cal. Rules of Court 2.550 and 2.551. Appendix A will be provided to Amgen as soon as a protective order and an order on the motion to seal are in place.

25.     Defendant Amgen Inc. is a corporation organized and existing under the laws of the State of Delaware, with its principal place of business at One Amgen Center Drive, Thousand Oaks, California 91320.

26.     Defendant Amgen Manufacturing Limited LLC is a limited liability company existing under the laws of the Territory of Bermuda, with its principal place of business at Road 31 Km 24.6, Juncos, Puerto Rico 00777. Amgen Manufacturing Limited LLC is a wholly owned subsidiary of Amgen Inc.

27.     Defendant Immunex Corporation is a corporation organized and existing under the laws of the State of Washington with its principal place of business at One Amgen Center Drive, Thousand Oaks, California 91320. Amgen Inc. acquired Immunex in July 2002, and Immunex became a wholly owned subsidiary of Amgen Inc.

28.     In this complaint, Amgen Inc., Amgen Manufacturing Limited LLC, and Immunex Corporation are collectively referred to as "Amgen."

## JURISDICTION AND VENUE

29.     This action alleges violations of state antitrust, consumer protection, and common laws and seeks monetary relief under the Cartwright Act and, alternatively, other state laws.

30.     This Court has subject matter jurisdiction over this action pursuant to Code of Civil Procedure § 395.

31.     This Court has general personal jurisdiction over Amgen Inc. because it has a principal place of business in California. This Court also has specific personal jurisdiction over Amgen Inc. pursuant to Code of Civil Procedure § 410.10 because Amgen Inc. has purposefully availed itself of the benefits of doing business in California, Plaintiff's claims arise out of or are based on Amgen Inc.'s connections with California, and jurisdiction is consistent with the notions of fair play and substantial justice.

32.     Amgen Inc. has purposefully availed itself of the benefits of doing business in California by taking actions in California to manufacture, distribute, and commercialize Enbrel. Additionally, Amgen Inc. has manufacturing facilities in California where it manufactures and distributes Enbrel, as well as its corporate headquarters.

33.     This Court has general personal jurisdiction over Immunex Corporation because it has a principal place of business in California. After Amgen Inc. acquired Immunex Corporation in 2002, Amgen Inc. moved Immunex Corporation's principal place of business from Washington State to Thousand Oaks, California. This Court also has specific personal jurisdiction over Immunex Corporation pursuant to Code of Civil Procedure § 410.10 because Immunex Corporation has purposefully availed itself of the benefits of doing business in California, Plaintiff's claims arise out of or are based on Immunex Corporation's connections with California, and jurisdiction is consistent with the notions of fair play and substantial justice.

34.     Immunex Corporation, as a wholly-owned subsidiary of Amgen Inc., has purposefully availed itself of the benefits of doing business in California by taking actions in California to manufacture, distribute, and commercialize Enbrel.

35.     This Court has specific personal jurisdiction over Amgen Manufacturing Limited LLC pursuant to Code of Civil Procedure § 410.10 because Amgen Manufacturing Limited LLC has purposefully availed itself of the benefits of doing business in California, Plaintiff's claims arise out of or are based on Amgen Manufacturing Limited LLC's connections with California, and jurisdiction is consistent with the notions of fair play and substantial justice.

36.     Amgen Manufacturing Limited LLC has established an ongoing contractual relationship with Amgen Inc. in California and secured substantial economic benefits as a result of this relationship. Furthermore, upon information and belief, Amgen Manufacturing Limited LLC manufactures and distributes Enbrel across the United States, including to California.

37.     Venue is proper and appropriate in this district pursuant to Code of Civil Procedure § 395.5 because, during the period of Amgen's unlawful conduct, Amgen Inc.'s principal place of business, its corporate headquarters, has been located in this district. Accordingly, Amgen resided, transacted business, was found, or had agents in this district, and a substantial portion of the alleged activity affecting interstate trade and commerce discussed below has been carried out in this district.

38.     During the relevant period, Amgen manufactured, sold, and shipped Enbrel in a continuous and uninterrupted flow of interstate commerce, which included sales of Enbrel in this

CROWELL
& MORING LLP
ATTORNEYS AT LAW

13

COMPLAINT

district, advertisement of Enbrel in media in this district, monitoring prescriptions of Enbrel by prescribers within this district, and employment of product detailers in this district, who, as agents of Amgen, marketed Enbrel to prescribers in this district. And, as alleged above and below, Plaintiff purchased Enbrel for its members who are located within this district. Because of Enbrel's high treatment persistence rate and the chronic nature of the diseases it treats, Plaintiff anticipates continuing to purchase Enbrel for members located in this district.

39.    Aside from sales of Enbrel, Amgen transacts substantial business in this district, including business related to the promotion and development of Enbrel and to the unlawful conduct alleged here. Amgen Inc.'s headquarters is in Thousand Oaks in Ventura County within this district, and Amgen worked for many years on TNF research in Thousand Oaks within this district. Indeed, as of today, Amgen has major research and development facilities in this district and a substantial majority of its clinical manufacturing activities are undertaken at its Thousand Oaks facility within this district. Amgen also manufactures product candidates, and distributes existing products like Enbrel, from facilities in California and this district.

40.    Amgen has transacted business, maintained substantial contacts, and committed overt acts in furtherance of its illegal conduct in California and this district. Amgen's unlawful conduct has had a direct, substantial, and reasonably foreseeable effect across the country and within this district. Indeed, by reason of the unlawful activities alleged herein, Amgen has substantially injured and continues to cause injury to Plaintiff. Amgen, directly and through its agents, has engaged in and continues to engage in activities to enforce its unlawful agreement with Roche, suppress competition, artificially inflate its Enbrel sales, and fix, raise, maintain, and/or stabilize the price of Enbrel in the United States. This conduct has unreasonably restrained trade in, monopolized, and adversely affected the market for the sale and purchase of etanercept, including in this district, and continues to do so.

## REGULATORY AND ECONOMIC BACKGROUND

A.    **The Relevant Federal Regulatory Structure Encourages Competition Among Pharmaceutical Companies.**

41.    Biological products, or "biologics," include a wide range of products, such as

COMPLAINT

vaccines, blood and blood components, allergenics, somatic cells, gene therapy, tissues, and recombinant therapeutic proteins. Biologics can be composed of sugars, proteins or nucleic acids, or complex combinations of these substances, or may be living entities such as cells and tissues. Biologics are isolated from a variety of natural sources—human, animal, or microorganism—and may be produced by biotechnology methods and other cutting-edge technologies. For example, gene-based and cellular biologics often are at the forefront of biomedical research and may be used to treat a variety of medical conditions for which no other treatments are available. Different from small molecule drugs, which are chemically synthesized and have a known structure, most biologics are complex mixtures that are not easily identified or characterized.

42.     In March 2010, President Obama signed the Patient Protection and Affordable Care Act ("PPACA") into law, which amends the Public Health Service Act ("PHSA") to create an abbreviated approval pathway for biological products that are demonstrated to be "highly similar" (*i.e.*, biosimilar) to or "interchangeable" with an FDA-approved biological reference product. These new statutory provisions are referred to as the Biologics Price Competition and Innovation Act of 2009 ("BPCIA").

43.     The BPCIA was intended to be similar to the Drug Price Competition and Patent Term Restoration Act of 1984 (a.k.a the "Hatch-Waxman Act"), which created abbreviated pathways for the approval of generic drug products under the Food, Drug, and Cosmetic Act ("FDCA"). The BPCIA is consistent with the FDA's longstanding policy and Congress's goal of permitting reliance on what is already known about a drug, thereby saving time and resources and avoiding unnecessary duplication of human or animal testing. To help encourage innovation, however, the statute also provides for 12 years of exclusivity after a reference biological product is first licensed by the government.[6] During this exclusivity period, no biosimilar or interchangeable products may enter the market.

44.     Under the BPCIA, a sponsor may seek approval of a "biosimilar" product under new section 351(k) of the PHSA by submitting an abbreviated biologics license application ("aBLA") to the FDA. A biological product may be demonstrated to be "biosimilar" if data show

---

[6] 42 U.S.C. § 262(k)(7)(A).

CROWELL
& MORING LLP
ATTORNEYS AT LAW

the product is "highly similar" to the reference product, notwithstanding minor differences in clinically inactive components, and there are no clinically meaningful differences between the biological product and the reference product in terms of safety, purity, and potency.[7]

45.    To be approved for the higher interchangeability standard, a sponsor must demonstrate that the biosimilar product (i) is biosimilar to the reference product, (ii) can be expected to produce the same clinical result as the reference product in any given patient, and (iii) for a biological product that is administered more than once to an individual, the risk in terms of safety or diminished efficacy of alternating or switching between use of the biological product and the reference product is not greater than the risk of using the reference product without such alternation or switch.[8] Interchangeable products may be substituted for the reference product by a pharmacist without the intervention of the prescribing healthcare provider who prescribed the reference product.[9] The first interchangeable biosimilar product approved by the FDA for a reference product may be entitled to a period of exclusivity.[10]

**B.    Biosimilar Competition Lowers Drug Prices.**

46.    Biosimilar competition is a relatively recent source of healthcare savings, with the FDA approving the first biosimilar in 2015. As of April 2025, the FDA had approved only 70 biosimilars, including two etanercept biosimilars, Erelzi (in 2016) and Eticovo (in 2019).[11]

47.    While there are some differences in distribution, pharmacy-counter substitution, and prescription writing practices between biosimilar and generic drugs, the same general economic principle applies: biosimilar competition, like generic competition, lowers drug prices and saves healthcare dollars. The 2023 *U.S. Generic and Biosimilar Medicines Savings Report* found that "biosimilars, on average, are priced more than 50 percent lower than the brand biologic[] price at the time of biosimilar launch."[12] And the "[b]rand biologics respond to

---

[7] 42 U.S.C. § 262(a)(2)(C)(i)(I).
[8] 42 U.S.C. § 262(k)(4).
[9] 42 U.S.C. § 262(i)(3).
[10] 42 U.S.C. § 262(k)(6).
[11] Biosimilar Product Information, FDA, https://www.fda.gov/drugs/biosimilars/biosimilar-product-information (last visited June 29, 2025).
[12] Assoc. for Accessible Medicines, *The U.S. Generic & Biosimilar Medicines Savings Report* at 30 (2023), https://accessiblemeds.org/wp-content/uploads/2024/11/AAM-2023-Generic-Biosimilar-Medicines-Savings-Report-web.pdf.

biosimilar entry by lowering their prices to date."[13]

48.    A recent RAND review from 2022, projecting U.S. savings from biosimilar entry from 2021 to 2025, found that total estimated savings from 2014 to 2025 would amount to $102.5 billion, $38.4 billion of which was projected savings from 2021 through 2025 from expanded biosimilar competition.[14]

49.    The 2023 *U.S. Generic and Biosimilar Medicines Savings* report also found that biosimilars generated $23.6 billion in savings since 2015, including over $9.4 billion in 2022 alone.[15] And another study estimated that biosimilar entry could result in $100 billion in savings between 2020 and 2024.[16] These results were also confirmed by the 2022 RAND study published in the *American Journal of Managed Car*e and a 2023 IQVIA study. Assuming a higher biosimilar entry probability ($46.5 billion), higher biosimilar volume share ($48.3 billion), lower biosimilar prices ($52.8 billion), and lower prices for reference biologics ($82.4 billion), the study found potential savings could reach $124.2 billion between 2021 and 2025.[17] In 2023, IQVIA concluded that savings from biosimilars would only keep growing, ballooning to $181 billion between 2023 and 2027.[18]

## **FACTS**

A.    **Etanercept Is a Biologic Prescription Medication That Reduces the Symptoms of Inflammatory Diseases.**

50.    Enbrel is a brand-name biologic medication approved by the FDA for the treatment of rheumatoid arthritis, polyarticular juvenile idiopathic arthritis, ankylosing

---

[13] *Id.*
[14] Andrew W. Mulcahy & Christine Buttorff, *Projected US Savings from Biosimilars, 2021–2025*, 28 Am. J. Managed Care 329, 331 (2022), https://www.ajmc.com/view/projected-ussavings-from-biosimilars-2021-2025.
[15] Assoc. for Accessible Medicines, *The U.S. Generic & Biosimilar Medicines Savings Report* at 27 (2023), https://accessiblemeds.org/wp-content/uploads/2024/11/AAM-2023-Generic-Biosimilar-Medicines-Savings-Report-web.pdf.
[16] IQVIA, *Biosimilars in the United States: 2020–2024* at 17 (2020), https://www.iqvia.com/insights/the-iqvia-institute/reports/biosimilars-in-the-united-states-2020-2024 ("IQVIA Biosimilars Report").
[17] Mulcahy & Buttorff, *supra* note 11, at 334.
[18] IQVIA, *Biosimilars in the United States: 2023–2027* at 29 (2023), https://www.iqvia.com/insights/the-iqvia-institute/reports-and-publications/reports/biosimilars-in-the-united-states-2023-2027.

spondylitis, psoriatic arthritis, and plaque psoriasis. It is sold in single-dose prefilled syringes that patients generally self-administer via weekly injections (typically, one 50-mg injection per week). The active ingredient in Enbrel is etanercept.

51.    Rheumatoid arthritis, juvenile idiopathic arthritis, ankylosing spondylitis, psoriatic arthritis, and plaque psoriasis are autoimmune disorders which result from malfunctions of the body's immune system that cause it to attack its own cells or tissues. These internal attacks can take various forms, including prolonged inflammatory responses that can damage the body's vital organs. As many as 50 million Americans—80% of whom are women—have an autoimmune disease.

52.    Rheumatoid arthritis, which affects more than 1.3 million Americans, occurs when the immune system attacks the lining of the joints, leading to chronic inflammation that can cause pain, stiffness, swelling and, over time, bone erosion and joint deformity. It can also cause fatigue, fevers, and loss of appetite and affect the heart, lungs, blood, nerves, eyes, and skin.

53.    Juvenile idiopathic arthritis ("JIA") includes several chronic disorders in children involving inflammation of the joints, causing pain, swelling, warmth, stiffness, and loss of motion. While the origins of JIA are not understood, it begins with inflammation caused by overactivation of the immune system. JIA can last for only a few months or years, but in some cases becomes a lifelong disease requiring treatment into adulthood.

54.    Ankylosing spondylitis causes inflammation in the joints and ligaments of the spine, resulting in back pain, stiffness, and loss of flexibility. In severe cases, it can cause the vertebrae to fuse, making the spine rigid and inflexible. People with ankylosing spondylitis can suffer from severe, ongoing pain and may also develop inflammatory diseases of the eye, skin, or gut.

55.    Plaque psoriasis is a chronic condition in which the immune system causes skin cells to multiply too quickly, causing patches of skin to become scaly and inflamed. Some people with psoriasis develop psoriatic arthritis ("PsA"), which causes pain, swelling, and stiffness of the joints, tendons, and ligaments. Psoriasis also increases the risk of cardiovascular events like heart attack and strokes, mental health problems, certain cancers, Crohn's disease, diabetes, metabolic

CROWELL
& MORING LLP
ATTORNEYS AT LAW

1    syndrome, obesity, osteoporosis, eye inflammation, liver disease, and kidney disease.

2        56.    TNF, a cytokine, is a messenger protein that helps initiate an immune response

3    when it binds to receptors ("TNF receptors" or "TNFRs") on the surface of human cells. While

4    TNF is beneficial, too much TNF can trigger several known autoimmune disorders, including

5    rheumatoid arthritis, PsA, ankylosing spondylitis, and JIA.

6        57.    TNFRs include an extracellular region, which is outside the cell and binds to TNF.

7    This extracellular region may split from the cell surface and become a soluble TNFR ("sTNFR")

8    that binds TNF away from the cell surface. In the late 1980s to 1990, pharmaceutical scientists

9    were focused on studying whether blocking TNF from binding to its cell-surface receptors would

10   provide a therapeutic effect. At least two different TNFRs were known: a smaller p55 TNFR

11   (weighing approximately 55 kilodaltons ("kDa")), and a larger p75 TNFR (weighing

12   approximately 75 kDa).

13       58.    Antibodies are proteins produced by the body's immune system to defend against

14   antigens—foreign substances that enter the body, such as viruses, bacteria, and yeasts. Another

15   term for an antibody is immunoglobulin, or "Ig." There are five classes of immunoglobulin, of

16   which immunoglobulin G ("IgG") is the most common, making up about 70% to 75% of all

17   antibodies in the human body. IgG has four subclasses in humans: IgG1, IgG2, IgG3, and IgG4.

18   IgG antibodies are large molecules with a molecular weight of approximately 150 kDa and

19   include two heavy polypeptide chains (each approximately 50 kDa) and two light chains (each

20   approximately 25 kDa). Within the light chains are variable regions, and the remainder light

21   chains and heavy chains are constant regions.

22       59.    Etanercept combines the extracellular portion of a p75 TNF receptor with the

23   hinge-CH2-CH3 portion in the constant region of a human IgG1 protein. Like sTNFR, etanercept

24   binds TNF so that it cannot bind to TNFRs on the cells surface and trigger an immune response,

25   thus reducing inflammation in patients with excess TNF.

26

27

28

**B.      In the 1980s, Researchers at Roche and Immunex Raced to Develop and Patent TNFR Technologies to Treat Autoimmune Conditions.**

**1.      Roche scientists were the first to sequence the p55 TNFR and create TNFRIg fusion proteins, paving the way for new treatments.**

60.      In the mid-1980s, advances in understanding the role of TNF in inflammatory diseases, along with the development of new molecular tools enabling scientists to study TNF expression and regulation, generated significant interest in the study of TNF, and potential therapeutic applications for inhibiting its ability to bind to TNFRs.

61.      A Roche research team led by Dr. Werner Lesslauer made fundamental contributions to the development of TNFR fusion proteins. This Roche team was the first to experimentally prove the existence of two distinct human TNFRs, the p55 and p75, and set out to isolate, purify, sequence, and clone them. In April 1990, the Roche scientists published the amino acid sequences for the p55 TNFR and its encoding DNA. Just months later, in July 1990, Roche published the same for the p75 TNFR.

62.      Roche's scientists were also the first to investigate combining the extracellular regions of TNFRs with portions of immunoglobulins to inhibit inflammatory immune responses and ultimately succeeded in creating fusion proteins using both p55 and p75 TNFRs. While the Roche team's initial fusion protein used IgG3, its experimental work also contemplated the creation of fusion proteins with IgG1 and IgG2.

63.      On August 31, 1990, the Roche scientists filed European Patent Application No. 90116707.2 (the "EP '707 Application"), claiming priority to three earlier applications Roche had filed in Switzerland.[19] An application that properly claims priority to an earlier-filed patent application receives the filing date of the earlier-filed application, which determines what prior art references can and cannot be asserted against the application during its examination. These Swiss Roche applications disclosed and taught the concept of fusing the extracellular regions of the TNFRs with a specific region of a human IgG heavy chain. The applications in this patent family came to be known as the "Brockhaus Patent Applications" (named after another Roche scientist

---

[19] Swiss Application Nos. 3319/89 (filed September 12, 1989), 746/90 (filed March 8, 1990), and 1347/90 (filed April 20, 1990).

CROWELL
& MORING LLP
ATTORNEYS AT LAW

involved in Roche's TNFR research) and the patents that would issue from them as the "Brockhaus Patents." All rights to those applications and any patents that later issued from those applications were collectively defined by Immunex and Roche in their 1998 License Agreement as the "Brockhaus Patent Rights." These Brockhaus Patents Rights gave rise to what the parties recognized as competing claims directed to etanercept, and ultimately spurred Immunex to obtain a co-exclusive license from Roche to those rights. The relationships between the Brockhaus Applications and Brockhaus Patents are depicted in Figure 1 below.



Figure 1. Brockhaus Patent Family*



*The Brockhaus Patent Family also includes U.S. Pat. App. No. 08/444,797, filed May 19, 1995, and U.S. Pat. App. No. 10/715,609, filed Nov. 18, 2023, but both applications were abandoned

64.     On September 13, 1990, Roche filed U.S. Patent Application No. 07/580,013 (the "'013 Application"), claiming priority to the EP '707 Application.

65.     Roche abandoned the '013 Application and, on July 21, 1993, filed U.S. Application No. 08/095,640 (the "'640 Application") as a continuation. During prosecution, the U.S. Patent and Trademark Office ("PTO") placed a restriction requirement on the '640

CROWELL
& MORING LLP
ATTORNEYS AT LAW

COMPLAINT

Application: because it claimed multiple distinct inventions (related to the p55 and p75 fusion proteins), Roche would be limited to only one of the claimed inventions unless it elected to pursue only claims related to one of the fusion proteins in the application. Roche decided to pursue claims related to the p55 fusion protein in the '640 Application, which later issued as U.S. Patent No. 5,610,279 (the "'279 Patent"). In order to pursue the non-elected claims, *i.e.*, those related to the p75 fusion protein, Roche was required to file separate divisional applications. Roche therefore filed two divisional applications on May 19, 1995: (1) U.S. Patent Application No. 08/444,790 (the "'790 Application"), which would later issue as U.S. Patent No. 8,063,182, and (2) U.S. Patent Application No. 08/444,791 (the "'791 Application"), which would later issue as U.S. Patent No. 8,163,522.

66.　When later defending the validity of the patents ultimately granted under Roche's original '790 and '791 Applications before the U.S. Supreme Court, Amgen argued that: "Roche not only invented etanercept but described it in its original patent applications, which included claims covering etanercept, long before Immunex arrived on the scene."

### 2.　Immunex scientists also develop a p75 TNFR fusion protein.

67.　Meanwhile, Immunex was independently researching TNFRs and TNFR fusion proteins, focusing on the p75 TNFR. In May 1990—two months before Roche—Immunex scientists published the amino acid sequence for the p75 and reported that they had isolated a cDNA clone of its receptor.

68.　In late 1990, Immunex successfully combined the extracellular portion of a p75 receptor with the hinge-CH2-CH3 portion of a human IgG1—*i.e.*, the fusion protein etanercept, the active ingredient in what became Enbrel.

69.　Immunex obtained a series of patents directed to etanercept and methods of using etanercept stemming from various continuations-in-part of U.S. Patent Application No. 07/403,241, filed September 5, 1989 (abandoned).

70.　On May 10, 1990, Immunex filed U.S. Patent Application No. 07/523,635, which issued as U.S. Patent No. 5,395,760 (the "'760 Patent") on March 7, 1995. Entitled "DNA Encoding Tumor Necrosis Factor-α and -β Receptors," the '760 Patent claims specified isolated

CROWELL & MORING LLP

ATTORNEYS AT LAW

DNA sequences that encode soluble human TNFRs, including the p75. This patent expired on March 7, 2012.

71.     On November 29, 1994, Immunex filed U.S. Patent Application No. 08/346,555, which issued as U.S. Patent No. 5,712,155 (the "'155 Patent") on January 27, 1998. Entitled "DNA Encoding Tumor Necrosis Factor-α and -β Receptors," the '155 Patent claims specified isolated DNA sequences that encode soluble human TNFRs, including the p75. This patent expired on March 7, 2012.

72.     On February 8, 1995, Immunex filed U.S. Patent Application No. 08/383,229, which issued as U.S. Patent No. 5,605,690 (the "'690 Patent") on February 25, 1997. The '690 Patent, entitled "Methods of Lowering Active TNF-α Levels in Mammals Using Tumor Necrosis Factor Receptor," claims methods of treating TNF-dependent inflammatory diseases in mammals by administering a TNF antagonist such as a soluble TNFR. This patent expired on February 25, 2014.

73.     Immunex also filed U.S. Patent Application No. 09/602,351 (the "'351 Application") on August 13, 1999, which was a continuation-in-part of U.S. Patent Application No. 09/373,828, filed April 19, 1999. Amgen later obtained three patents all claiming priority to the '351 Application: (1) U.S. Patent No. 7,915,225 (the "'225 Patent"), filed on February 27, 2009 and issued on March 29, 2011; (2) U.S. Patent No. 8,119,605 (the "'605 Patent"), filed February 4, 2011 and issued on February 21, 2012; and U.S. Patent No. 8,722,631 (the "'631 Patent"), filed on February 12, 2013 and issued on May 13, 2014 (collectively, the "Psoriasis Patents"). The Psoriasis Patents each claims a method of treating psoriasis, psoriatic arthritis, and/or plaque psoriasis using "TNFR:Fc." The Psoriasis Patents were each subject to a terminal disclaimer and all three expired on August 13, 2019.

**C.     Immunex Launches Enbrel and Obtains a Non-exclusive License to Roche's Competing Patent Rights to Etanercept.**

**1.     The FDA approves Enbrel as the first TNF inhibitor monotherapy to treat rheumatoid arthritis.**

74.     On November 2, 1998, the FDA approved Enbrel for the treatment of moderate to severe rheumatoid arthritis in patients with an inadequate response to one or more disease-

CROWELL & MORING LLP
ATTORNEYS AT LAW

modifying, antirheumatic drugs. Immunex launched Enbrel in the United States on November 6, 1998.

75.    Enbrel was hailed as a breakthrough in rheumatoid arthritis treatment. Before its launch, the gold standard for rheumatoid arthritis treatment was low-dose methotrexate, which had favorable responses in only 30% of patients and often could not be tolerated for extended periods. More recent rheumatoid arthritis therapies like Remicade and Anakinra were either used in combination with methotrexate or targeted a later disease stage. Enbrel, therefore, "st[ood] alone as an adult and juvenile rheumatoid arthritis treatment that can be used with or without" methotrexate, including in early stages of the disease, and had "no real competitor."[20]

**2.    Immunex seeks and obtains from Roche a non-exclusive license to Roche's competing patent rights.**

76.    On November 6, 1998, Immunex launched Enbrel for the treatment of early and moderate to severely active rheumatoid arthritis. At the time, Immunex neither owned nor had a license to Roche's EP '707 Application.

77.    Immunex learned that Roche's EP '707 Application and corresponding U.S. application may give Roche priority to the technology used to create Enbrel. So Immunex sought and obtained from Roche a license to Roche's competing patent rights to etanercept—*i.e.*, all "patents and patent applications that issue from or that claim priority of Swiss Patent Application Nos. 3319/89, 746/90, and/or 1347/90, including, but not limited to, European Application No. 90116707.2 and U.S. Patent Application No. 07/580,013."[21]

78.    Roche and Immunex executed the 1998 License Agreement on September 15, 1999, with an effective date of November 6, 1998 (the date of Enbrel's launch). Under the 1998 License Agreement, Roche granted Immunex a co-exclusive license under Roche's Brockhaus Patent Rights to commercialize etanercept—to make, have made, use, sell, offer for sale, and import etanercept—worldwide. "Co-exclusive" meant that Immunex and Roche each had the right to commercialize etanercept globally. Roche also had the right to grant its co-exclusive

---

[20] Debra Robertson, *Immunex Takes Premature Step to Guarantee Enbrel Market Share*, 19 Nature Biotech. 108, 109 (Feb. 2001).
[21] Ex. 1, 1998 License Agreement, ¶¶ 1.2 (defining the "Brockhaus Patent Rights") & 2.1.

CROWELL
& MORING LLP
ATTORNEYS AT LAW

rights in each country to (a) one licensee in lieu of or in collaboration with Roche, (b) a single third party to distribute etanercept within that country in lieu of Roche and its licensee, and (c) a contract manufacturer to manufacture etanercept for use, sale, importation, and/or distribution by Roche and its licensee.[22] In other words, Roche in 1998 maintained the right to commercialize etanercept itself, or to allow a non-Immunex third party to do so.

79.     The 1998 License Agreement also expressly provided that Roche retained ownership and control of its competing patent rights related to etanercept, which came with an owner's typical control over those rights. For example, Roche remained responsible at its sole discretion for the prosecution and maintenance of the Brockhaus Patent Rights.[23] Roche also retained the sole right to address any infringement of those rights, including initiating suit, while Immunex agreed to provide reasonable assistance to Roche in taking any such steps and had the right to join any infringement litigation initiated by Roche and to obtain any damages awarded, including lost profits.[24] In other words, Roche in 1998 maintained all core patent rights—the right to prosecute, maintain, and enforce its Brockhaus Patent Rights.

80.     In exchange for the non-exclusive license grant, Immunex agreed to pay royalties of 2% for claims under the Brockhaus Patent Applications, and of 4% under any issued Brockhaus Patents, of Immunex's net sales of etanercept products.[25] Roche, which had remained focused in its research and development efforts on p55 TNFR fusion proteins, also received an option to obtain a worldwide, nonexclusive license from Immunex to certain of Immunex's patent rights relating to p55 TNFR fusion proteins, subject to certain conditions.[26]

**3.     Enbrel becomes a phenomenal commercial success for Immunex, with $762 million in annual sales by 2001.**

81.     Enbrel was an immediate blockbuster, earning Immunex $13 million in U.S. sales in just its first few weeks on the market. In its 1998 annual report, Immunex touted Enbrel's launch as a "key milestone event" and predicted that Enbrel would "drive a revenue 'step change'

---

[22] *Id.* at ¶ 2.1.
[23] *Id.* at ¶¶ 3.1, 3.4.
[24] *Id.* at ¶ 3.5.
[25] *Id.* at ¶ 5.2.
[26] *Id.* at ¶ 2.2.

for Immunex" that would "provide substantial cash flow and fuel the company's growth."[27]

82.    Seeking to expand Enbrel sales, Immunex obtained FDA approval of Enbrel for the treatment of polyarticular JIA on May 27, 1999, making it the first FDA-approved therapy for this indication. Immunex also announced in 1999 that it was conducting pilot studies and clinical trials to investigate the use of Enbrel for additional indications, and partnered with American Home Products Corporation (which later changed its name to Wyeth) to expand manufacturing capacity.[28] By year end, Enbrel had become an "unprecedented commercial success for Immunex, with $367 million in U.S. sales."[29]

83.    In June 2000, the FDA approved an expanded indication for Enbrel, adding reduction of the signs and symptoms and delay of the progression of structural damage in patients with moderately to severely active rheumatoid arthritis. It also eliminated the need for patients to demonstrate an insufficient response to one or more other rheumatic drugs before starting Enbrel treatment—allowing more patients to access Enbrel sooner.

84.    Immunex continued "[q]uarter for quarter" to "set new records for sales of Enbrel."[30] By November 2000, there were more than 1,000 patients on a waiting list for the drug; total sales by year end exceeded $650 million. Sales in 2001 increased 17% to $762 million, cementing Enbrel's launch as the most successful ever for a biologic product. As Immunex put it, as a "targeted, potent intervention for inflammation, Enbrel has changed the practice of rheumatology."[31]

---

[27] Immunex Corp., *Annual Report* at 11, 13 (1998), https://digitalcollections.lib.washington.edu/digital/collection/reports/id/24178.
[28] American Home Products Corporation/Wyeth owned a majority stake in Immunex, which it reduced to roughly 40% in 2000.
[29] Immunex Corp., *Annual Report* at 23–24 (1999), https://digitalcollections.lib.washington.edu/digital/collection/reports/id/24288.
[30] Immunex Corp., *Annual Report* at 1 (2002), https://www.sec.gov/Archives/edgar/vprr/0202/02029646.pdf.
[31] *Id.*

CROWELL
& MORING LLP
ATTORNEYS AT LAW

COMPLAINT



Figure 2. Immunex's U.S. Sales of Enbrel, 1999-2001

85.    Immunex also steadily increased the price of Enbrel. When Immunex launched Enbrel in 1998, it set its Wholesale Acquisition Cost (WAC) price at $220 per 50-mg dose ($886 per month). By 2002, Immunex was charging $249 per 50-mg dose ($996 per month). All the while, Immunex paid royalties of 2% on its Enbrel sales to Roche pursuant to their 1998 License Agreement.

**D.    Biotech Giant Amgen Acquires Immunex and Adds Enbrel to Its Waning Portfolio.**

86.    Watching Enbrel's huge success, Amgen, already the largest biotechnology company in the world, set its sights on Immunex and its new blockbuster drug. During this period, Amgen—which had not launched a significant drug of its own in a decade—was itself conducting research into a potential new drug to treat inflammation. Amgen's sales of its aging blockbusters Epogen (an anemia treatment) and Neopogen (used to prevent infections in cancer patients undergoing chemotherapy) were sagging. And while Amgen had invested years in inflammation research, its planned TNF inhibitor, pegsunercept, remained in development. Yet Amgen's new CEO, Kevin Sharer, appointed in 2000, had promised investors at least 20% annual growth in sales and earnings per share, and revenues of $8-9 billion by 2005. The clock was ticking.

87.    So Amgen turned to Enbrel, viewing Immunex's new blockbuster drug as the solution to its problems. Rather than continuing its own efforts to innovate and develop another

CROWELL
& MORING LLP
ATTORNEYS AT LAW

27

treatment for inflammatory diseases, Amgen decided to buy Immunex and its existing treatment instead. In December 2001, Amgen announced that it had reached a deal to buy Immunex for $16 billion in cash and stock—then the highest sum ever paid for a biotech acquisition. Amgen executives boasted that it was "enthusiastic about the long-term potential of Enbrel," which it predicted would hit $3 billion in annual sales by 2005.[32]

**1.      The FTC requires Amgen and Immunex to license certain TNFR patents to avoid reducing innovation and potential competition.**

88.      Amgen's acquisition of Immunex drew immediate antitrust scrutiny from the FTC. The FTC's Bureau of Competition, which is empowered to investigate and potentially block anticompetitive acquisitions, initiated an investigation and intervened before the parties could close the deal. The FTC filed a complaint against Amgen and Immunex explaining that the "effects of the Merger, if consummated, may be to lessen competition and to tend to create a monopoly" in violation of federal antitrust law by "reducing innovation competition" and "eliminating potential competition" for TNF inhibitors.[33] The complaint noted that Amgen and Immunex were the only two firms in the United States developing soluble TNF receptor products and two of only five firms developing any type of TNF inhibitors to treat rheumatoid arthritis and other inflammatory diseases.[34] Because of the significant difficulty, cost, and time required to develop TNF inhibitors, the FTC concluded that the consolidation of Amgen's and Immunex's intellectual property also could "create large and potentially insurmountable barriers to entry."[35]

89.      Amgen and Immunex settled the FTC's antitrust charges by entering a consent order requiring them to license certain patents to Serono—a Swiss pharmaceutical company that was attempting to develop another soluble TNF receptor product using recombinant human p55 TNF-binding protein, onercept, for use in Europe but which did not "possess the patent rights

---

[32] Andrew Pollack, *Amgen Reports Its Takeover of Immunex*, N.Y. Times, July 17, 2002, https://www.nytimes.com/2002/07/17/business/amgen-reports-its-takeover-of-immunex.html#:~:text="Some%20of%20the%20things%20we,million%20in%20sales%20last%20year.

[33] Compl. at ¶ 25, *In re Amgen Inc. & Immunex Corp.*, Docket No. C-4053 (F.T.C. July 12, 2002).

[34] *Id.* at ¶ 20; Decision & Order § III.A, *In re Amgen Inc. & Immunex Corp.*, Docket No. C-4056 (F.T.C. Sept. 3, 2002).

[35] *Id.* at ¶¶ 22–24.

CROWELL
& MORING LLP
ATTORNEYS AT LAW

necessary to market the product in the United States."[36] Notably, the rights licensed by Amgen to Serono did not include rights relating to etanercept.

90.     The FTC announced on July 12, 2002, that it would allow the acquisition to proceed under the terms of the consent agreement, and the acquisition was completed four days later. On July 16, 2002, Amgen acquired Immunex and all of its rights to Enbrel in the United States and Canada. Unfortunately, given Amgen's subsequent anticompetitive conduct, the FTC's action was unable to constrain Amgen's ongoing monopolization of the U.S. market for etanercept.

91.     During or after its acquisition of Immunex, Amgen also entered a joint marketing agreement with Wyeth, which amended and restated a 1997 Enbrel promotional agreement between Wyeth and Immunex. Under their new agreement, Amgen and Wyeth agreed to jointly market and sell Enbrel in the United States and Canada for all approved indications other than oncology, which was reserved exclusively for Amgen. This marketing agreement also restricted Wyeth's ability to sell or distribute competing pharmaceutical products in the United States and Canada that were "directly competitive with Enbrel."[37]

**2.     Amgen reaps the rewards of its Immunex acquisition as Enbrel becomes one of the most profitable drugs in the world.**

92.     Once in control of Enbrel, Amgen set out to maximize its return—and make good on its CEO's promise to investors—by increasing Enbrel sales, including by obtaining FDA approval to use Enbrel to treat new immunological conditions, and by raising Enbrel's price.

93.     Amgen's return on investment was almost immediate. By December 2002, Amgen itself recorded $362.1 million in Enbrel sales, with Enbrel's total sales for 2002 (including those before the Immunex deal) amounting to $770 million. With an estimated 80,000 people taking Enbrel, supply constraints began impacting sales. To keep up with demand, Amgen quickly

---

[36] *Id.* at ¶ 20.
[37] Under this provision, if Wyeth decided to sell such a drug, it had to provide Amgen prior notice and enter new negotiations with Amgen about co-promotional rights to the competing drug, Wyeth's royalty rate for marketing Enbrel, and the structure of their deal. If these negotiations were unsuccessful, Amgen would be entitled to terminate the marketing agreement and reacquire from Wyeth all marketing rights to Enbrel in the United States and Canada. Wyeth was later acquired by Pfizer Inc., and its joint marketing agreement with Amgen expired in 2013.

1    opened an additional Enbrel manufacturing facility.

2        94.    By the time Amgen's acquisition of Immunex was complete, the FDA had

3    approved Enbrel for the treatment of psoriatic arthritis, which was then the only FDA-approved

4    treatment for this condition. While touting that Enbrel had "the broadest range of indications of

5    any biologic therapy in rheumatic diseases," Amgen set out to obtain even more indications to

6    further bolster sales of the blockbuster.[38] In 2003 and 2004, Amgen obtained FDA approval for

7    the use of Enbrel to reduce signs and symptoms of ankylosing spondylitis, to treat moderate to

8    severe plaque psoriasis, and to induce a major clinical response (*i.e.*, high level of disease control)

9    in active rheumatoid arthritis. Amgen also introduced new dosing regimens and formulations and

10    obtained approvals for new age groups.

11        95.    The expanded indications ushered in new rheumatology and dermatology patients,

12    and Enbrel sales skyrocketed to $1.25 billion in 2003—a 175% increase from the year before. Its

13    2004 sales increased another 46% to $1.83 billion.

14        96.    As Amgen was expanding Enbrel's indication list, it also kept raising its price.

15    Every single year after acquiring Immunex, Amgen increased what it charged for Enbrel—all

16    without losing sales to other therapeutic alternatives. These high prices set Amgen up to enjoy

17    high profit margins from Enbrel sales.

18        97.    From its launch in November 1998 through 2004, Enbrel enjoyed high profit

19    margins generated by supracompetitive pricing and annual price increases. Immunex and then

20    Amgen reaped monumental proceeds from their monopoly in the U.S. etanercept market. With

21    future sales of Enbrel projected to exceed $3 billion per year, protecting its new blockbuster drug

22    became a crucial priority for Amgen. Amgen thus set out to neutralize potential competitive

23    threats and entrench its patent-protected dominance over Enbrel long into the future.

24        98.    For one, Amgen tried to construct a patent thicket around Enbrel by filing dozens

25    of patent applications claiming Enbrel manufacturing processes, formulations, methods of use,

26

27

28    _____

[38] Press Release, Amgen, Amgen Submits Data to FDA Supporting Once-Weekly Dosing of Enbrel (Dec. 23, 2002), https://www.amgen.com/newsroom/press-releases/2002/12/amgensubmits-data-to-fda-supporting-once-weekly-dosing-of-enbrel.

CROWELL
& MORING LLP
ATTORNEYS AT LAW

COMPLAINT

and administration devices.[39] But Amgen knew none of these patents was likely to prevent competing biosimilars from launching after the expiration of Amgen's key Enbrel patents in 2014 (indeed, as explained below, all of these patents were ultimately abandoned in later patent litigation). And Enbrel's monopoly position would not remain secure even before then, as Amgen faced the more immediate prospect that Roche itself—or a third party sublicensed by Roche—could commercialize a competing etanercept product in the meantime. Amgen thus turned back to Roche to revisit the 1998 License Agreement and the co-exclusive license Roche had previously agreed to with Immunex. This time around, Amgen would seek from Roche full control over Roche's competing patent rights, to empower Amgen to slam the door on competition for Enbrel.

**E.     With Patent Expiration and Etanercept Competition for Enbrel on the Horizon, Amgen Buys Out Roche's Competing Patent Rights.**

99.     As Amgen was enjoying the massive proceeds from its acquisition of Immunex, it also began to fear threats to those proceeds. Under the terms of the 1998 License Agreement with Roche, Amgen was exposed to potential competitive entry from other players, as Enbrel could soon face competition from a competing etanercept product launched either directly by Roche or by another competing company that obtained a license from Roche under its competing patent rights related to etanercept.

100.     Thus, in 2004, Amgen undertook steps to further entrench its U.S. etanercept monopoly by preventing any such competitive entry. On June 7, 2004, Amgen and Roche entered their new 2004 Exclusive License Agreement—deemed an "Accord & Satisfaction"—that this time gave Amgen what the original 1998 License Agreement between Immunex and Roche did not: exclusive control over Roche's competing rights to etanercept. This new 2004 Exclusive License Agreement covered the same Brockhaus Patent Rights that were the subject of the 1998

---

[39] *See* Jonathan Gardner, *A Three-Decade Monopoly: How Amgen Built a Patent Thicket Around its Top-Selling Drug*, BioPharma Dive (Nov. 1, 2021), https://www.biopharmadive.com/news/amgen-enbrel-patent-thicket-monopoly-biosimilar/609042/; Jeffrey Wu & Claire Wan-Chiung Cheng, *Into the Woods: A Biologic Patent Thicket Analysis*, 19 Chi.-Kent J. Intell. Prop. 93 (2020). A 2018 report found that 72% of the at least 57 applications for patents on Enbrel were filed after the product was approved and launched. *See* I-Mak, *Overpatented, Overpriced Special Edition: Enbrel* (2020), https://www.i-mak.org/wp-content/uploads/2018/12/i-mak.enbrel.report-2018-11-30F.pdf.

License Agreement. But in their new agreement, Roche gave Amgen a "paid-up, irrevocable, exclusive" license, with the "sole right" to "make, have made, use, sell, offer for sale and import" etanercept under Roche's patent rights, for the life of those rights.[40] Roche thereby agreed that it would not compete with Amgen in the United States by commercializing its own etanercept product, nor would it license that ability to another party. Roche's only reservation of license rights under its Brockhaus Patent Rights was for its internal, non-clinical research.[41]

101.    The 2004 Exclusive License Agreement thus effectuated a significant change in the ability to commercialize etanercept under Roche's patent rights and, in doing so, significantly altered the competitive landscape for etanercept. By granting Amgen a paid-up, irrevocable, exclusive license to the Brockhaus Patent Rights, the 2004 Exclusive License Agreement ensured that Amgen alone would have rights to commercialize etanercept in North America.[42] In other words, for the first time ever, neither Roche nor anyone else *but Amgen* could use Roche's competing patent rights to develop and commercialize etanercept.

102.    On top of that, Roche agreed to turn over to Amgen control of other fundamental aspects of its competing etanercept rights, further solidifying Amgen's U.S. etanercept monopoly. Whereas under the 1998 License Agreement, Roche had sole discretion over whether and how to prosecute its Brockhaus Patent Rights,[43] the 2004 Exclusive License Agreement now obligated Roche to continue prosecuting its pending U.S. applications—and to do so at *Amgen's* "sole direction" and for *Amgen's* sole benefit.[44] Thus, as of 2004, Amgen also now controlled the prosecution of the pending Brockhaus Patent Applications.

103.    Under its 1998 License Agreement with Immunex, Roche had retained the right to

---

[40] *See* Ex. 2, 2004 Exclusive License Agreement. Wyeth, a pharmaceutical company acquired by Pfizer in 2009, and its wholly owned subsidiary AHP Manufacturing, were Amgen's marketing partners for Enbrel. The 2004 Exclusive License Agreement granted Wyeth the "exclusive right to distribute products comprising Etanercept outside North America" and the right to "co-promote products comprising Etanercept within North America." *Id.* at 1. Further, the 2004 Exclusive License Agreement assigned to Wyeth "(a) all right, title and interest in and to all Ex-North America Brockhaus Patents; and (b) the right to sue and recover for any acts of infringement of any Ex-North America Brockhaus Patents." *Id.* at 3.
[41] *Id.* at 4, ¶ 3.2.
[42] *Id.* at 4, ¶ 3.1.
[43] Ex. 1, 1998 License Agreement, ¶ 3.4.
[44] Ex. 2, 2004 Exclusive License Agreement, ¶ 3.3.

CROWELL
& MORING LLP
ATTORNEYS AT LAW

32

remove infringement of its patent rights, including by initiating a lawsuit;[45] in the 2004 Exclusive License Agreement, Roche also agreed to give Amgen "sole control" over enforcement of Roche's Brockhaus Patent Rights—*i.e.*, Amgen had the right to sue other drug companies whose products (like biosimilar etanercept) Amgen believed infringed any patents later issued under those rights.[46] Amgen would also keep any award of damages or lost profits resulting from such an infringement suit. Roche was obligated to cooperate in these patent suits, including by participating as a party to the extent required by the court or by providing evidence and testimony in connection with any proceeding affecting the validity of the patents-in-suit.[47]

104.    For these new terms, Amgen paid Roche a lump-sum payment of over $45 million, as part of a total payment to Roche under the 2004 Exclusive License Agreement totaling $150 million.[48]

105.    The description of the 2004 Exclusive License Agreement as an "Accord & Satisfaction" is, and appears intended by Amgen to be, misleading. In an accord and satisfaction, parties simply settle a previous unliquidated debt. Roche and Amgen could have accomplished that goal by simply agreeing to a lump sum payment in exchange for future royalties without fundamentally changing the nature of the underlying license rights. But Roche and Amgen did not stop there.

106.    The intended and effectuated goal was for Amgen—then the only seller and already a monopolist in the U.S. market for etanercept—to extend and further entrench its monopoly position by foreclosing competition in the U.S. etanercept market by Roche or another

---

[45] Ex. 1, 1998 License Agreement, ¶ 3.5.

[46] Ex. 2, 2004 Exclusive License Agreement, ¶ 3.5.

[47] *Id.* at ¶ 3.4. As part of the 2004 Exclusive License Agreement, Roche retained the secondary right, but not obligation, to sue if Amgen fails to rectify infringement or initiate an action for patent infringement within 180 days after written notification by Roche. *Id.* at ¶ 3.6. The 2004 Exclusive License Agreement further provides that, once Roche's secondary right to sue is triggered, Roche may, at its sole expense and under its sole control and direction, initiate suit and may retain the entirety of any award of damages or lost profits as a result of such suit. *Id.* Of course, this secondary right would only be triggered in the (exceedingly unlikely) event that Amgen opted, after six months of careful consideration, not to enforce its highly profitable U.S. etanercept monopoly.

[48] *Id.* at ¶ 6.1. This $150 million payout included $67,500,000 paid to Roche Basel by Wyeth's European affiliate, which obtained an exclusive assignment of Roche's Brockhaus Patent Rights outside the United States and Canada. *Id.*, Art. 2. The balance of the $82,500,000 paid to Roche in the United States was paid by Amgen's co-promotional partner, Wyeth.

CROWELL
& MORING LLP
ATTORNEYS AT LAW

33

company to which Roche could have granted a license under its Brockhaus Patent Rights. Through the 2004 Exclusive License Agreement, Amgen bought up Roche's retained co-exclusive rights to commercialize a competing etanercept product and, as a result, obtained the ability to use Roche's competing patent rights to preclude competitors from entering the market.

107.    The 2004 Exclusive License Agreement was also falsely labeled because, although it moved effective control of Roche's Brockhaus Patent Rights in the United States to Amgen, it was structured to leave Roche with nominal back-up rights. This gave Amgen the ability to argue, in later proceedings, that Amgen did not "own" the Brockhaus Patent Rights to avoid the "double patenting" bar, which prohibits a patent owner from extending the temporal scope of its patent monopoly with subsequent patents that obviously cover the same invention as the owner's initial patents. As one observer put it, the 2004 Exclusive License Agreement enabled Amgen to argue that it "went right up to the line of ownership without actually crossing it."[49] Amgen thus extended Enbrel's patent protection by wielding Roche's Brockhaus Patent Rights to secure later-expiring patents for etanercept that clearly covered the same material as Amgen's original Enbrel patents, without obviously running afoul of the double patenting doctrine.

108.    One other striking feature of Amgen and Roche's 2004 Exclusive License Agreement underscores this artifice. It gave Amgen—then raking in an average of roughly $5.2 million per day from sales of Enbrel—the right to convert its exclusive license to an assignment upon request and payment of a relatively trivial sum of $50,000. (If "requested . . . Roche shall execute an assignment of" the patents.[50]) Thus, Amgen made sure it could, at any point it chose, end Roche's nominal remaining ownership and acquire Roche's etanercept-related patent rights outright, for a nominal payment. Yet the 2004 Exclusive License Agreement, under which Roche retains nominal ownership of the Brockhaus Patent Rights but Amgen exercises control over all aspects of those rights that matter to maintaining and enforcing its etanercept monopoly, remains in force to this day.

---

[49] Doug Robinson., *End of The Enbrel Battle: How Amgen Beat Sandoz*, BIOSIMILAR DEVELOPMENT (Sept. 8, 2020), https://www.biosimilardevelopment.com/doc/end-of-the-enbrel-battlehow-amgen-beat-sandoz-0001.
[50] *Id.* at ¶ 3.3.

109.    The purpose and effect of Amgen and Roche's agreement, as reflected in their 2004 Exclusive License Agreement, was wholly anticompetitive. It slammed the door shut on competitive entry as of 2004 and enabled Amgen to secure additional patents that effectively extended the life of its patent protection over etanercept—an extension that it never would have been able to secure absent the 2004 Exclusive License Agreement. Amgen and Roche's agreement that Roche would not compete and instead would hand control of Roche's competing etanercept rights over to Amgen, had no procompetitive justifications or benefits.

110.    *First*, Amgen had its own patents, which had been issued to and acquired from Immunex, that the companies in turn had used to launch Enbrel and protect their sales.[51] Amgen could use those patents during the full period of its patent monopoly to protect against other etanercept competition, other than from Roche or its sublicensee.

111.    *Second*, Immunex had obtained a co-exclusive license from Roche to its Brockhaus Patent Rights to sell Enbrel under the 1998 License Agreement, and Amgen acquired those license rights when it acquired Immunex. Immunex and then Amgen thus had been selling Enbrel—and making blockbuster sales—under those co-exclusive rights for nearly six years. And that license could not be terminated by Roche, except in the event that *Amgen* chose to challenge the validity of Roche's Brockhaus Patent Rights.[52] As a result, at the time it entered the 2004 Exclusive License Agreement, Amgen had all it needed from Roche to continue selling Enbrel. Amgen's problem was that the 1998 License Agreement did not give it what it needed to entrench its Enbrel monopoly.

112.    Put simply, Amgen and Roche's 2004 Exclusive License Agreement was intended to, and did in fact, further maintain, extend, and entrench to this day Amgen's existing etanercept monopoly. Their agreement was anticompetitive with no procompetitive benefits.

**F.    Amgen Uses the 2004 Exclusive License Agreement to Obtain the '182 and '522 Patents.**

113.    As part of the 2004 Exclusive License Agreement, Amgen obtained all rights to

---

[51] *See* U.S. Patent No. 5,606,690; U.S. Patent No. 5,395,760; U.S. Patent No. 5,712,155; U.S. Patent No. 11,491,223; U.S. Patent No. 10,307,483; U.S. Patent No. 8,119,604.
[52] Ex. 1, 1998 License Agreement, ¶ 2.1(d).

CROWELL
& MORING LLP
ATTORNEYS AT LAW

COMPLAINT

1   control the prosecution of Roche's '790 and '791 Applications, which had been filed in 1995.[53]

2   With Roche now obligated to continue prosecuting these applications, at Amgen's sole direction,

3   Amgen set out to finish their prosecution. In October 2004, only a few months after executing the

4   2004 Exclusive License Agreement, Amgen notified the PTO that Amgen's lawyers would be

5   acting as Roche's representatives in the patent prosecutions.

6        114.    The timing and targeting of the prosecution of the Brockhaus Patent Applications

7   were no coincidence. The '790 and '791 Applications had been filed on May 19, 1995, a few

8   weeks before a critical statute—the Uruguay Round Agreements of the General Agreement on

9   Tariffs and Trade ("GATT")—took effect.[54] GATT impacted how long patent exclusivity terms

10  would run and how they were calculated. As a result of the GATT amendment, patents that issue

11  from applications filed after June 8, 1995 receive a 20-year term from their effective filing date.

12  Patents claiming priority to applications filed before June 8, 1995, however, are entitled to a term

13  that is the greater of 20 years from the filing date of the application *or* 17 years from the date of

14  patent *issuance*. Thus, the belated issuance of any patents from pending Brockhaus Patent

15  Applications that had been filed pre-GATT (in 1995) would be an incredible boon for Amgen.

16       115.    Amgen prosecuted the '790 and '791 Applications for roughly seven years. After

17  various delays and successful appeals to the Board of Patent Appeals, the PTO approved both

---

[53] After abandoning the '013 Application, Roche filed the '640 Application as a continuation on July 21, 1993. During prosecution of the '640 Application, the examiner issued a restriction requirement requiring Roche to choose between the p55 and p75 fusion proteins. Roche elected to pursue claims related to the p55 fusion protein only in that application, which issued as the '279 Patent on March 11, 1997. Roche then filed two divisional applications on May 19, 1995—the '790 Application and the '791 Application—to pursue non-elected claims from the '640 Application. *See supra* ¶ 65 & Figure 1.

[54] Before June 1995, 35 U.S.C. § 154 provided that the term of a utility or plant patent ended seventeen years from the date of patent grant. To comply with Article 33 of the Trade-Related Aspects of Intellectual Property Rights (TRIPS) Agreement resulting from GATT, the United States was required to establish a minimum term for patent protection ending no earlier than twenty years from the date the application was filed. Thus, the Uruguay Round Agreements Act amended 35 U.S.C. § 154 in June of 1995 to change the term of utility and plant patents from ending 17 years from the date of patent grant to ending 20 years from the filing date of the application (or 20 years from the earliest filing date claimed under 35 U.S.C. §§ 120, 121, or 365(c)). With this change, 35 U.S.C. § 154 was also amended to provide for patent term extension in the event that issuance of the application as a patent was delayed due to secrecy order, interference, or successful appellate review, subject to a five-year cap on any patent term extension under 35 U.S.C. § 154(b).

CROWELL
& MORING LLP
ATTORNEYS AT LAW

applications.[55] It approved the '790 Application on November 22, 2011 and issued the '182 Patent (entitled "Human TNF Receptor Fusion Protein"), to Roche, with an expiration of November 22, 2028.[56] It approved the '791 Application on April 24, 2012, and issued the '522 Patent (entitled "Human TNF Receptor"), to Roche, with an expiration of April 24, 2029.[57]

116.    By the time the '182 and '522 Patents issued, Enbrel had already been on the U.S. marketplace since 1998, about 13 years. Sales were in the billions of dollars nearly every year. With the pre-GATT filing date permitting an additional 17 years of patent protection, use of these patents would mean Amgen could protect sales of Enbrel and avoid competition from any biosimilar versions for *more than 30 years*.

117.    Soon after the '182 Patent issued, analysts at Sanford C. Bernstein estimated that *this one* patent alone added $6 per share to Amgen's stock price.[58] With approximately 870 million outstanding shares, this single patent issuance potentially added about $5 billion to Amgen's value.

**G.    Amgen Uses its Control of Roche's Patent Rights Under the 2004 Exclusive License Agreement to Block Would-be Competitors from Launching Less Expensive Biosimilars.**

118.    After securing the new '182 and '522 Patents using its control over Roche's '790 and '791 Applications, Amgen then used them to block biosimilar entrants into the U.S. market for etanercept, to further unlawfully entrench and extend its monopoly.

---

[55] Because Amgen already possessed its own patents to Enbrel and a massively profitable etanercept monopoly, and under the 2004 Exclusive License Agreement would now be able to enforce for its exclusive benefit the 17-year patent term for any patents that issued from Roche's Brockhaus Patent Rights, Amgen could welcome any delay in the prosecution of these applications. Each day that passed before patents issued ultimately meant another day added to the backend of its patent monopoly.

[56] The claims in the '182 Patent (those that Amgen would later assert) define a fusion protein consisting of parts of two different proteins: the extracellular region of p75 fused to all of the domains of the human IgG1 constant region other than the first domain.

[57] The claims in the '522 Patent that Amgen would later assert define a method of producing the fusion protein defined in the '182 Patent.

[58] *See* Staff of H. Comm. on Oversight and Reform, *Drug Pricing Investigation: Amgen—Enbrel and Sensipar* at 24 (Oct. 2020), https://oversightdemocrats.house.gov/sites/evo-subsites/democrats-oversight.house.gov/files/Amgen%20Staff%20Report0%2010-1-20.pdf; *see also New Patent Could Be Worth $6 a Share to Amgen*, Forbes, Nov. 28, 2011, www.forbes.com/sites/matthewherper/2011/11/28/new-patent-could-be-worth-6-a-share-to-amgen/#4be44a7a46e1.

1.   **Amgen successfully sues Sandoz for infringing Roche's '182 and '522 Patents and blocks the launch of Sandoz's Enbrel biosimilar.**

119.   Sandoz, a major pharmaceutical manufacturer, became the first potential Enbrel competitor when, on September 29, 2015, the FDA accepted Sandoz's aBLA seeking authorization to market Erelzi, a biosimilar version of Enbrel. Having worked on its etanercept biosimilar continuously since 2006, Sandoz fully expected to have the freedom to launch its product globally in 2015, until it learned about Amgen's unlawful conduct.

120.   On February 26, 2016, Immunex and Amgen Manufacturing Limited LLC (two subsidiaries of Amgen), along with Roche, filed a lawsuit against Sandoz (the "*Sandoz* case").[59] Amgen asserted infringement of the '182 and '522 Patents, as well as the three Psoriasis Patents. Amgen sought an injunction to prohibit Sandoz from commercializing its biosimilar etanercept prior to the expiration of all the patents.

121.   Over the course of the litigation, Amgen narrowed its infringement claims against Sandoz to the '182 and '522 Patents, dropping its claims over Amgen's own Psoriasis Patents and relying exclusively on the patents secured using Roche's competing patent rights to block competition from Sandoz in the etanercept market.

122.   On August 11, 2016, subject to the terms of a confidential stipulation, Amgen obtained a preliminary injunction prohibiting Sandoz from commercializing Sandoz's etanercept product.

123.   On August 30, 2016, the FDA approved Erelzi, but Sandoz could not launch its biosimilar under Amgen's injunction.

124.   On September 10, 2018, the *Sandoz* court entered an order which stated that commercialization of Sandoz's biosimilar etanercept product would infringe Roche's '182 and '522 Patents.

125.   On August 9, 2019, and after a bench trial, the *Sandoz* court issued a decision

---

[59] *Immunex Corp. v. Sandoz Inc.*, No. 16-cv-1118 (D.N.J.). Immunex was the owner of the Psoriasis Patents and the exclusive licensee of the '182 and '522 Patents, while Amgen Manufacturing Limited LLC was the exclusive sublicensee of the '182 and '522 Patents; therefore, Immunex and Amgen Manufacturing Limited LLC had the right and ability to enforce these patents.

1    upholding the validity of the '182 and '522 Patents. As part of its decision, the court found that

2    there was no sufficiently new matter added to the Brockhaus Patent Applications after 2004—*i.e.*,

3    after Amgen acquired the right to control Roche's Brockhaus Patent Rights—because Roche's

4    original patent applications had sufficient written description to cover p75 and etanercept.[60] On

5    July 1, 2020, the Federal Circuit affirmed the district court judgment, upholding the validity of

6    the '182 and '522 Patents and the finding that Roche's original patent applications had sufficient

7    written description to cover p75 and etanercept.[61]

8         126.    Exercising the exclusive control over Roche's competing patent rights that Amgen

9    unlawfully obtained under their 2004 Exclusive License Agreement, Amgen was also able to

10   block Sandoz from competing in the market. Absent the 2004 Exclusive License Agreement,

11   Amgen could not have done so; Sandoz instead would have been in the market competing and

12   driving down prices for most applications as early as 2016, when the FDA approved Erelzi, and

13   no later than 2019 for certain indications (when Amgen's Psoriasis Patents expired).

14                    **2.    Amgen sues Samsung Bioepis for infringing Roche's '182 and '522**
                      **Patents and blocks the launch of Bioepis's Enbrel biosimilar.**
15

16        127.    The next potential competitor thwarted by Amgen and its unlawful agreement with

17   Roche was Samsung Bioepis Co., Ltd. ("Bioepis").

18        128.    On April 25, 2019, the FDA approved Bioepis's aBLA for its etanercept product

19   Eticovo (etanercept-ykro), another biosimilar to Enbrel.

20        129.    On April 30, 2019, Amgen subsidiaries Immunex and Amgen Manufacturing

21   Limited LLC, along with Roche, sued Bioepis (the "*Bioepis* case"), alleging infringement of the

22   '182 Patent and the '522 Patent and the same three Psoriasis Patents (the '225, '605, and '631

23   Patents) that were originally asserted against Sandoz.

24        130.    On December 23, 2019, Amgen amended its complaint against Bioepis. Amgen

25   maintained the allegations regarding the '182 Patent and the '522 Patent but withdrew the

26   _____

27   [60] *Immunex Corp. v. Sandoz Inc.*, 395 F. Supp. 3d 366, 386–89 (D.N.J. 2019), *aff'd*, 964 F.3d
     1049 (Fed. Cir. 2020), *cert. denied sub nom.*, *Sandoz Inc. v. Immunex Corp.*, 141 S. Ct. 2623
     (2021).

28   [61] *Immunex Corp. v. Sandoz Inc.*, 964 F.3d 1049, 1064 (Fed. Cir. 2020), *cert. denied sub
     nom.*, *Sandoz Inc. v. Immunex Corp.*, 141 S. Ct. 2623 (2021).

allegations regarding the Psoriasis Patents.

131.    The *Sandoz* case had a significant impact on the *Bioepis* case. On November 3, 2021, Amgen successfully used its control over Roche's Brockhaus Patent Rights to preclude biosimilar entry by Bioepis when the *Bioepis* court entered judgment finding that Bioepis had infringed the '182 and '522 Patents. Bioepis was permanently enjoined from commercializing in the United States any product containing etanercept. Bioepis was also required to immediately destroy any Bioepis etanercept product that had been imported into the United States. The injunction terminates on April 24, 2029, once both the '182 Patent and the '522 Patent expire.

132.    Once again, Amgen had wielded its control over Roche's competing patent rights that it had unlawfully obtained under their 2004 Exclusive License Agreement to keep another competitor off the market and extend its Enbrel monopoly. Absent Amgen's 2004 Exclusive License Agreement with Roche, Amgen could not have done so; Bioepis instead would have been in the market competing and driving down prices since 2019.

**H.    Amgen Exploits Its Enbrel Monopoly with Annual Price Hikes and Sees It Net Revenues Spike to $86 Billion.**

133.    Amgen has capitalized on its monopolist position by continuously raising the per unit price of Enbrel.

134.    In 2020, the House of Representatives' Committee on Oversight and Reform found during an investigation into Amgen's Enbrel pricing that, since acquiring the rights to Enbrel in 2002, Amgen raised Enbrel's price 27 times, including by nearly 30% within one 12-month period. By 2020, a 50-mg dose of Enbrel cost $1,414 per unit, $5,556 per month, or $72,240 a year: a 457% increase from the date Amgen acquired it.

CROWELL
& MORING LLP
ATTORNEYS AT LAW

COMPLAINT

**Figure 3. Price Per 50-mg Dose of Enbrel, 2002–2024[62]**



135.    Since 2020, Amgen has increased the price of Enbrel at least six more times. A 50-mg dose of Enbrel now costs patients $7,401.83 per month: *643% more* than it cost when launched in 1998, and roughly 600% more than when Amgen acquired Enbrel from Immunex in 2002.

136.    These price increases fueled Amgen's massive profits from Enbrel sales. Its Enbrel revenues increased every year from 2002 to 2016, reaching $5.72 billion in 2016. One case study found that 100% of Enbrel's revenue growth between 2011 and 2021 came from price increases alone. And despite recent declines in prescription volumes, Amgen has continued to reap billions annually, earning $3.65 billion in 2023.

137.    All told, Amgen has grossed more than $86.33 billion in sales of Enbrel. Amgen continues to rely on its control over Roche's patent rights under the 2004 Exclusive License Agreement to sell Enbrel without competition.[63]

---

[62] WAC per 50-mg dose of Enbrel for NDC 58406-0435-01 for 2002–2022 period and for NDC 58406-0021-01(pre-filled syringe) for 2023–2024 period.

[63] Amgen's February 26, 2025 update to its patent marking document for Enbrel, for example, continues to rely on the '182 and '522 patents to assert that Enbrel "or the process of [Enbrel's] manufacture may be covered by one or more U.S. Patents[.]" https://pat.amgen.com/pdf/Enbrel_Virtual_Marking__Feb_2025.pdf (last visited June 29, 2025). The purpose of such patent marking is to give notice to the public that a product is protected by a patent and that potential infringers, including competitors, could face an infringement lawsuit and the prospect of monetary damages. *See also* https://www.accessdata.fda.gov/drugsatfda_docs/label/2024/103795s5600lbl.pdf (last visited June



**I.    Amgen Wields Its Control Over Roche's Rights Under Their 2004 Exclusive License Agreement to Unlawfully Entrench and Extend Its Monopoly.**

138.    Were it not for Amgen's unlawful conduct and agreement with Roche, one or more Enbrel biosimilar products would have entered the U.S. market at least as early as 2016, and no later than 2019, increasing competition and driving down prices. Amgen's ceaseless efforts to thwart such competition run afoul of state antitrust, consumer protection, and common laws.

139.    *First*, absent Amgen's acquisition of exclusive rights to control Roche's competing patent rights under their 2004 Exclusive License Agreement, Roche would have retained the "co-exclusive" rights to commercialize etanercept itself or to license them to another competitor. Unable (under the law) to sell those highly valuable rights to Amgen (who already was a monopolist in the etanercept market), Roche could have monetized those rights by licensing them to another manufacturer or could have considered launching its own competing product.

140.    *Second*, Sandoz and Bioepis had invested significant time and money into developing and securing FDA approval (in 2016 and 2019, respectively) for biosimilar versions of etanercept. If it had not used or sublicensed its co-exclusive rights to commercialize etanercept even earlier, Roche could then have licensed them to any pharmaceutical company that sought to launch a competing biosimilar, including Sandoz, and if not Sandoz, Bioepis, both of whom had demonstrated a commitment to investing in a competing biosimilar product. Indeed, Roche already had several long-term manufacturing and other agreements with biosimilar companies, including Bioepis.

141.    *Third*, were it not for Amgen's unlawful acquisition of the exclusive rights to control Roche's Brockhaus Patent Rights and their prosecution, the '182 and '522 Patents would likely never have issued and Amgen could not have relied on them to successfully block biosimilar entry in the *Sandoz* and *Bioepis* cases. Thus, absent Amgen's unlawful conduct and agreement with Roche, at least two biosimilars would likely have entered the market by 2019. Sandoz would have launched its etanercept biosimilar, Erelzi, at least as early as August 16, 2016

29, 2025) (Enbrel label, most recently submitted for approval in March 2024, relying on patent marking identifying Roche's '182 and '522 patents).

(for most indications, when the FDA granted approval of Sandoz's aBLA) or at the latest by August 13, 2019 (when the Psoriasis Patents expired). Bioepis would have launched its etanercept biosimilar, Eticovo, at least by August 13, 2019, as well, but potentially as early as April 25, 2019 (when the FDA granted approval of Bioepis's aBLA). And U.S.-based pharmaceutical company Mylan and its partner Lupin received approval for its biosimilar, Nepexto, from Germany in 2020; it too likely would have sought approval from the FDA and entered in the United States by now absent Amgen's conduct and its 2004 Exclusive License Agreement with Roche.

142.    Amgen knew that biosimilar entry would have an immediate adverse effect on Enbrel sales and warned its investors about biosimilar entry. As it explained in its public filings, with multiple biosimilar competitors entering the market, "competition [would] intensif[y] rapidly, resulting in greater net price declines for both the reference and biosimilar products and a greater effect on product sales."[64]

143.    Erelzi and Eticovo would likely have launched at Wholesale Acquisition Cost (WAC) prices significantly lower than Enbrel's and captured substantial market shares shortly after entry—saving purchasers hundreds of millions in the first year alone. Uptake of the etanercept biosimilars would have continued to increase over time, capturing upwards of 75% of the market after three years, saving purchasers nearly $1 billion annually.[65] Had both biosimilar competitors launched on August 13, 2019, purchasers of etanercept collectively would have saved billions of dollars to date.[66] And if Sandoz launched in 2016 (at least for most indications) when it was approved for commercialization by the FDA, these savings would have been even greater.

144.    Amgen has acted with the intent of keeping prices high—after all, Amgen itself acknowledges the extraordinary benefits of biosimilar entry for purchasers of branded products like Enbrel: "The introduction of new biosimilars creates a competitive marketplace that helps

---

[64] Amgen Inc., Annual Report (Form 10-K) at 18 (Feb. 27, 2024).
[65] *See* Amgen, *2022 Biosimilar Trends Report* at 14 (Oct. 2022), https://www.amgenbiosimilars.com/commitment/2022-Biosimilar-Trends-Report ("Amgen 2022 Biosimilar Trends Report") ("For therapeutic areas with biosimilars launched in the last 3 years, the average share was 75%.").
[66] A 30% WAC discount and market share of 25% after the first year and increasing to 60% the fifth year would result in a savings of $2.66B in total sales.

reduce healthcare costs and expand treatment options for patients."[67] Amgen has further observed:

> Since the first biosimilar entered the US marketplace in 2015, 39 biosimilars have been approved, 22 of which have been launched. Biosimilars have gained significant share in the majority of therapeutic areas where they have been introduced. The US marketplace is poised to see further growth in the number of biosimilars approved and welcome many new biosimilars in the years to come. Additional competition may lead to significant savings for the healthcare system, and these savings can be deployed to newer, innovative treatments.[68]

145.    Amgen admits that "[c]ompetitive mechanisms are in place to support biosimilar uptake" and that "[b]iosimilars have the potential to reduce healthcare costs by providing significant wholesale acquisition cost (WAC) and average sales price (ASP) savings at launch and through price competition, resulting in the opportunity for additional savings over time."[69] It notes that the "rate of biosimilar uptake is generally increasing over time" and that "first-to-launch biosimilars tend to capture a greater portion of the segment compared to later entrants."[70] It notes that, for "therapeutic areas with biosimilars launched in the last 3 years, the average share was 75%" and "the cumulative savings in drug spend for classes with biosimilar competition is estimated to have been $21 billion over the past 6 years."[71] And in its most recent annual investor report, issued in February 2025, Amgen again identified "increasing competition from biosimilars" as a competitive risk to its business, explaining specifically that such increased competition will put "downward pressure on our product prices and sales." In fact, Amgen explicitly states that in markets for drugs with incoming biosimilars, it fully expects "sales erosion driven by biosimilar competition."

146.    The fact that Amgen has been able to block biosimilar entry for etanercept for

---

[67] Development and Adoption of Biosimilars for a Stronger Healthcare System, https://www.amgen.com/science/biosimilars/-/media/Themes/CorporateAffairs/amgencom/amgen-com/downloads/science/biosimilars/Amgen-Biosimilars_Mini-Trends-One-Pager_Digital_FINAL.pdf.
[68] Amgen 2022 Biosimilar Trends Report at 6.
[69] *Id.* at 6, 12.
[70] *Id.* at 14.
[71] *Id.* at 14-15.

CROWELL
& MORING LLP
ATTORNEYS AT LAW

many years is egregious given that such entry should and likely would have marked the first biosimilar drug in the extraordinarily costly autoimmune therapeutic area. In 2021, global sales of autoimmune drugs totaled more than $40 billion. As Amgen has remarked about the autoimmune space, "the planned launches of biosimilars to Humira [a different autoimmune drug used to treat inflammatory diseases] in 2023 could be a pivotal moment."[72] But that pivotal moment could, and should, have first occurred with Enbrel. And as Amgen has admitted, "More biosimilars to treat autoimmune conditions will be coming to market this decade, offering an opportunity to inject competition and reduce healthcare costs."[73]

147.    The absence of a biosimilar for Enbrel in the U.S. is particularly disturbing considering that a biosimilar product was first developed and approved *nine years ago*. Despite companies with biosimilar versions of Enbrel that have undergone a thorough FDA approval process (and having devoted substantial resources to do so), they remain unable to enter the market.

148.    The 2004 Exclusive License Agreement remains in full force and effect. Roche cannot terminate that agreement for any reason, but Amgen (along with Wyeth) may terminate it without cause at any time.[74] Amgen and Roche continue to adhere to and enforce their unlawful agreement; and Amgen continues to exercise control over Roche's U.S. patent rights related to etanercept pursuant to that agreement, and to use that control to continue to make sales of Enbrel at artificially inflated prices well above those that it could charge absent that agreement.

149.    Under Amgen and Roche's unlawful agreement not to compete and to instead give Amgen exclusive control over Roche's competing etanercept rights, purchasers continue to be overcharged hundreds of millions of dollars per year for etanercept purchases. For more than 26 years—from November 1998 (Enbrel's launch) through the filing of this Complaint—Amgen has enjoyed exclusive sales of Enbrel and, due to its unlawful conduct and agreement with Roche, will continue to do so until 2029.

150.    Amgen has even wielded its unlawful Enbrel monopoly to enhance or protect its

---

[72] *Id.* at 24.
[73] *Id.*
[74] Ex. 2, 2004 Exclusive License Agreement, ¶¶ 9.2 & 9.3.

COMPLAINT

CROWELL
& MORING LLP
ATTORNEYS AT LAW

competitive position in other pharmaceutical markets. Just two months ago, a federal jury in Delaware found Amgen liable for monopolization and unreasonable restraint of trade in violation of federal and state antitrust laws—including California's Cartwright Act—by leveraging its monopoly over Enbrel to force health plans to purchase Amgen's high-priced anti-cholesterol drug rather than lower-cost alternatives offered by competing manufacturers, including plaintiff Regeneron. The jury determined that Enbrel possessed market power in a relevant product market, and that Amgen's anticompetitive practices had frozen out Regeneron. It ultimately awarded Regeneron over $400 million in combined compensatory and punitive damages, plus attorneys' fees.

151.    In sum, Amgen, through its unlawful agreement with Roche, knowingly and willfully acquired exclusive control over Roche's competing etanercept patent rights for the purposes of delaying competition from would-be etanercept biosimilar competitors and further extending and entrenching its etanercept monopoly. Amgen's acts were intended to, and have had the effect of, unlawfully extending and maintaining Amgen's monopoly in the U.S. market for etanercept.

## MARKET DEFINITION AND MONOPOLY POWER

152.    The relevant geographic market is the United States and its territories.

153.    The relevant product market is the market for etanercept.

154.    At all times relevant to this civil action, Amgen had monopoly power—and well more than the degree of market power necessary for it to cause harm to competition—in the market for etanercept in the United States.

**A.    Direct Evidence Demonstrates Amgen's Market and Monopoly Power.**

155.    *Supracompetitive prices*. At all times relevant to this civil action, Amgen has charged supracompetitive prices for Enbrel—*i.e.*, prices that were and are markedly higher than those Amgen could have charged had there been biosimilar competition for etanercept. Amgen also steadily *increased* the price of Enbrel over the years. In fact, from 1998 to the present, Amgen *never* lowered Enbrel prices or lost sales volume in response to the existence or pricing of other drugs, even though other biologic products were available in the United States to treat

rheumatoid arthritis, JIA, ankylosing spondylitis, psoriasis, and PsA, confirming that Enbrel sales and pricing are not constrained by any other products.

156.    *Supracompetitive profit margins.* At all times relevant to this action, Amgen enjoyed extraordinarily high profit margins from the sale of Enbrel.

157.    *Combination of patent protection and other entry barriers*. From Enbrel's 1998 launch through the filing of this Complaint, Amgen has enjoyed and continues to enjoy patent protection for etanercept—an impenetrable barrier to market entry. As a result, Amgen has the power to exclude competition from etanercept biosimilars.

158.    *Lack of interchangeability*. Etanercept is not readily interchangeable with other treatments for rheumatoid arthritis, JIA, ankylosing spondylitis, psoriasis, or PsA. Etanercept is a unique treatment for these diseases, ostensibly offering advantages over other available treatments for these conditions.

159.    *Biosimilar competition*. Recent reports regarding biosimilars confirm that biosimilar competition has a significant effect in lowering prices among equally effective therapies.

160.    Recent biosimilars have achieved high market volume share, reaching more than 60% of a given biologic's volume within the first three years on the market. In certain therapeutic areas, biosimilars already have claimed 80% or more of the market. And in the case of etanercept specifically, biosimilars in Europe already have secured over 50% of the total market. The introduction of biosimilars frequently leads to higher utilization of the treatment as lower costs improve patient access.

161.    Introduction of lower cost biosimilars precipitates reductions in overall drug costs per unit at invoice prices over time. Some biosimilars have been priced as much as 80% lower than their competing branded drug. And such competition typically lowers the per unit cost of both the brand and biosimilar drug, with costs typically down between 18% and 50% per unit for drugs with biosimilars. And this development again has proven to be true for etanercept specifically in Europe. The entry of multiple biosimilar products overseas has caused Amgen to cut Enbrel's price by half.

162.    Amgen, in its 2022 Biosimilar Trends report, admitted that biosimilar entrants typically succeed at taking market share from the reference biologic drug. Amgen's report states: "Biosimilars have gained significant share in the majority of therapeutic areas where they have been introduced."[75] Amgen further remarked: "For therapeutic areas with biosimilars launched in the last 3 years, the average share was 75%."[76]

163.    A 2022 study published in the *Journal of the American Medical Association* found that "[b]iosimilars in the US that entered the market more recently were estimated to experience a faster uptake (as measured by the market share 1 year after launch) …."[77]

164.    The effects of biosimilar competition in the U.S. market for etanercept would also have substantial downward pressure on the price of etanercept. Indeed, Amgen warned investors specifically in its most recent annual report, issued in February 2025, that increased biosimilar competition will put "downward pressure on our product prices and sales."

165.    Direct evidence shows that Amgen has market and monopoly power over the sale of etanercept in the United States and that entry of a biosimilar etanercept would cause significant downward pressure on price, resulting in more affordable and accessible etanercept products.

**B.    Indirect Evidence Demonstrates Amgen's Market and Monopoly Power.**

166.    To the extent Plaintiff is legally required to prove market and/or monopoly power through circumstantial evidence by first defining a relevant market, the relevant market is the market for etanercept and biosimilars of etanercept in the United States and has, thus far, consisted solely of Enbrel. Biosimilar versions of etanercept will also be in the relevant market once they are available. At all relevant times, Amgen's market share in the market was and remains 100%.

167.    Amgen, at all relevant times, enjoyed high barriers to entry with respect to competition in the relevant market due, in large part, to legally and illegally created patent protections as described above.

---

[75] *Id.* at 14.
[76] *Id.*
[77] David L. Carl, Yannic Laube & Miguel Serra-Burriel, *Comparison of Uptake and Prices of Biosimilars in the US, Germany, and Switzerland*, 5 JAMA Netw. Open 1, 6 (2022).

CROWELL & MORING LLP
ATTORNEYS AT LAW

COMPLAINT

168.    Enbrel does not exhibit significant, positive cross-elasticity of demand with any other medication. The existence of non-etanercept products that may be used to treat similar indications as etanercept has not constrained Amgen's ability to raise or maintain Enbrel prices without losing substantial sales. As a result, those other drug products do not occupy the same relevant antitrust market as Enbrel.

169.    Amgen needed to control only etanercept, and no other products, to maintain a supracompetitive price for Enbrel while preserving all or virtually all of its sales. Only market entry of a competing, biosimilar etanercept would undermine Amgen's ability to keep Enbrel prices high without losing substantial sales.

170.    Indirect evidence shows that Amgen had market and monopoly power in an antitrust market of the sale of etanercept in the United States.

## MARKET EFFECTS AND DAMAGES

171.    In the absence of the anticompetitive conduct alleged above, multiple manufacturers would have entered the market with etanercept biosimilars at least as early as August 2016 for most indications, and no later than August 2019.

172.    Instead, Amgen willfully and unlawfully maintained and extended its market and monopoly power in the U.S. market for etanercept by (i) entering the 2004 Exclusive License Agreement with Roche, under which Amgen acquired exclusive control over Roche's competing patent rights to etanercept and Roche thus agreed not to compete against Amgen in the United States or to license those rights to another competitor to Amgen, and (ii) using the control over Roche's etanercept patent rights that Amgen acquired under the 2004 Exclusive License Agreement to exclude competition from would-be etanercept biosimilar competitors, thereby further buttressing and entrenching its monopoly. Amgen's unlawful agreement with Roche is the violation of the antitrust laws; Amgen's subsequent prosecution and enforcement of Roche's competing U.S. patent rights pursuant to the 2004 Exclusive License Agreement were further anticompetitive effects of that agreement, which caused substantial anticompetitive harm.

173.    Amgen's conduct had, and continues to have, the purpose and effect of preventing biosimilar competition, permitting Amgen to maintain supracompetitive monopoly prices for

CROWELL
& MORING LLP
ATTORNEYS AT LAW

1  Enbrel and enabling Amgen to sell Enbrel without competition. Absent Amgen's conduct,

2  biosimilar versions of etanercept would have been available sooner—and no later than 2019.

3       174.    Competition among drug manufacturers enables all purchasers of their drugs to

4  buy biosimilar versions of the drugs at substantially lower prices and/or to buy the reference

5  biologic products at reduced prices. Consequently, reference (*i.e.*, brand) biologic manufacturers

6  have a strong incentive to delay biosimilar competition. Purchasers experience substantial cost

7  inflation from that delay.

8       175.    If competition from biosimilar manufacturers had not been restrained and

9  forestalled in the case of etanercept, end payors like Plaintiff would have paid less for etanercept

10  by: (i) purchasing and providing reimbursement for biosimilar versions of etanercept instead of

11  the more expensive Enbrel, and (ii) purchasing and providing reimbursement for Enbrel at lower

12  prices.

13       176.    As a result, Amgen's conduct has forced and will continue to force Plaintiff to pay

14  more for Enbrel and biosimilar etanercept than they would have paid absent Amgen's

15  misconduct.

16       177.    Plaintiff has provided payments and/or reimbursements for prescriptions of Enbrel

17  dispensed to its members in 23 states. Between 2019 and 2024, Plaintiff paid more than $61

18  million for members' Enbrel prescriptions. Plaintiff continues to cover Enbrel today and expects

19  to pay millions of dollars more for Enbrel prescriptions until biosimilar competition eventually

20  enters the market—which now will not occur until 2029 at the earliest, when Amgen's unlawfully

21  extended monopoly finally expires.

22       178.    Each time Plaintiff paid an overcharge for Enbrel—*i.e.*, each time payment was

23  made at a higher price than would have been paid absent Amgen's unlawful conduct—a new

24  cause of action accrued for that overcharge.

25       179.    Prior to the filing of this Complaint, Plaintiff was an absent member of the putative

26  classes in *Carefirst of Maryland, Inc. v. Amgen Inc.*, No. 24-cv-00484, pending in the Eastern

27  District of Virginia. Pursuant to the U.S. Supreme Court decision in *American Pipe Construction*

28  *Co. v. Utah*, 414 U.S. 538 (1974), and its progeny, the class action complaint tolled the applicable

CROWELL
& MORING LLP
ATTORNEYS AT LAW

statute of limitations as to the claims asserted by Plaintiff. Accordingly, Plaintiff is entitled to recover overcharges (and treble damages) for indirect purchases made starting at least four years prior to the filing of that class action.

## ANTITRUST IMPACT

180.    The effect of Amgen's conduct was to net Amgen billions of dollars in revenue at the expense of end payors, including Plaintiff, who will pay hundreds of millions, if not billions, of dollars in unlawful overcharges. And that conduct is continuing today—and still causing significant harm.

181.    During the relevant period, Plaintiff purchased substantial amounts of Enbrel indirectly from Amgen.

182.    As a direct and proximate result of Amgen's anticompetitive conduct, Plaintiff has paid and will continue to pay supracompetitive prices for etanercept because (1) the price of Enbrel was and is artificially inflated by Amgen's anticompetitive conduct and (2) Plaintiff was and is deprived of the opportunity to purchase lower-priced biosimilar versions of etanercept.

183.    As a result, Plaintiff has sustained substantial losses and damage to its business and property in the form of overcharges. The overcharges resulting from Amgen's conduct are directly traceable through the pharmaceutical distribution chain to Plaintiff given that each Enbrel purchase is documented and closely tracked by pharmacies, pharmacy benefit managers, and third-party payors (such as insurers and health and welfare funds). The full amount, forms, and components of such damages will be calculated after discovery and upon proof at trial.

## CLAIMS FOR RELIEF

### COUNT I:
### Conspiracy to Restrain Trade/Restraint of Trade in Violation of California's Cartwright Act

184.    Plaintiff repeats and reincorporates the above paragraphs as though fully set forth therein.

185.    As stated more fully above, Amgen and Roche willfully entered into the 2004 Exclusive License Agreement and into a continuing illegal contract, combination, and restraint of trade. The purposes and effects of their agreement were to (i) ensure that neither Roche nor its

sublicensee would compete against Amgen using Roche's competing patent rights related to etanercept; (ii) allow Amgen to wrongfully acquire control over Roche's competing patent rights; (iii) allow Amgen to use that wrongfully acquired control to unlawfully delay competition from would-be etanercept biosimilar competitors; (iv) benefit Roche by receiving a lump-sum payment of $45,375,000 from Amgen; (v) extend Amgen's monopoly in the etanercept market; and (vi) raise and maintain the prices that Plaintiff and others would pay or reimburse for their members' prescriptions of Enbrel at supracompetitive levels.

186.    There is and was no cognizable, non-pretextual procompetitive justification for the 2004 Exclusive License Agreement that outweighs its harmful effects. Even if there were some conceivable such justification, the 2004 Exclusive License Agreement was and is broader and more anticompetitive than necessary to achieve such a purpose.

187.    By engaging in the foregoing conduct, individually and in concert, Amgen unlawfully agreed with Roche to combine and/or conspire to restrain trade and did restrain trade in violation of California's Cartwright Act (Cal. Bus. & Prof. Code §§ 16700, *et seq.*).

188.    Amgen's conduct in violation of California's Cartwright Act was done knowingly, willingly, and flagrantly.

189.    Amgen's anticompetitive conduct, performed with Roche's agreement and assistance, substantially reduced and harmed competition in the relevant market and was an unreasonable restraint on trade.

190.    Amgen's unlawful acts with Roche had, and continue to have, a substantial and foreseeable effect on California commerce by artificially raising and fixing prices for Enbrel. Amgen's unlawful conduct, including its unlawful acts with Roche, occurred in and emanated from California. The 2004 Exclusive License Agreement was executed in Thousand Oaks, California by Richard Nanula, Amgen's Executive Vice President and Chief Financial Officer. In addition, Amgen's payment to Roche, Amgen's use of the wrongfully acquired control over Roche's patent rights to block would-be etanercept biosimilar competitors, and Amgen's repeated price increases of Enbrel all occurred in or emanated from Amgen's California headquarters.

191.    Amgen's unlawful activities with Roche, as described in this Complaint, also

affected both intrastate commerce and interstate commerce flowing in to or out from California and had direct, substantial, and reasonably foreseeable effects upon trade and commerce in California by artificially raising and fixing prices for Enbrel, as they were paid in, and/or out from, California and otherwise injuring corporations and persons located in California.

192.    During the relevant period, through Amgen or the regional and national distributors and retailers that they have engaged for the sale of Enbrel, many millions of dollars' worth of Enbrel have been, and continue to be, sold each year in California. Moreover, Amgen sells Enbrel from its headquarters in California.

193.    There was and is a gross and unconscionable disparity between the price that Plaintiff paid for Enbrel and the value received. Had Amgen competed on the merits, instead of engaging in unlawful activities with Roche, one or more etanercept biosimilars would have been available at least by August 13, 2019 (the date the Psoriasis Patents expired), but potentially as early as August 16, 2016. Plaintiff would have substituted the lower-priced etanercept biosimilars for the higher-priced brand Enbrel (or paid less for Enbrel) for some or all their etanercept requirements. As a result, Plaintiff would have paid substantially lower prices for etanercept.

194.    As a direct and proximate result of Amgen's violation of the Cartwright Act, Plaintiff has been harmed by paying artificially inflated, supracompetitive prices for Enbrel dispensed to its members and suffered damages in an amount to be proven at trial. Plaintiff's injury is of the type that the Cartwright Act was designed to prevent, and flows from that which makes Amgen's conduct with Roche unlawful.

## COUNT II:
## Monopolization and Monopolistic Scheme in Violation of California's Cartwright Act

195.    Plaintiff repeats and reincorporates the above paragraphs as though fully set forth therein.

196.    At all relevant times, Amgen has possessed substantial market (*i.e.*, monopoly) power in the relevant market. Amgen has the market shares alleged in detail above and possesses the power to control prices in, prevent prices from falling in, and exclude competitors from the market.

CROWELL & MORING LLP
ATTORNEYS AT LAW

COMPLAINT

197.     That market power is coupled with, and supported by, strong regulatory and contractual barriers to entry.

198.     As stated more fully above, Amgen, in concerted action with Roche, knowingly and willfully engaged in anticompetitive conduct in the form of a scheme designed to unlawfully extend and maintain its monopoly power through restrictive and exclusionary conduct.

199.     By (i) entering the 2004 Exclusive License Agreement with Roche, and (ii) the unlawful control it gained over Roche's competing patent rights to exclude competition from would-be etanercept biosimilar competitors, thereby further buttressing and entrenching its monopoly, Amgen, with Roche's assistance, willfully and unlawfully maintained, enhanced, and extended its monopoly power in the U.S. market for etanercept through restrictive and exclusionary conduct.

200.     The goal, purpose, and effect of the anticompetitive scheme was to (i) ensure that neither Roche nor its sublicensee would compete against Amgen using Roche's competing patent rights related to etanercept; (ii) allow Amgen to wrongfully acquire control over Roche's competing patent rights; (iii) allow Amgen to use that wrongfully acquired control to unlawfully delay competition from would-be etanercept biosimilar competitors; (iv) benefit Roche by receiving a lump-sum payment of $45,375,000 from Amgen; (v) extend Amgen's monopoly in the etanercept market; and (vi) raise and maintain the prices that Plaintiff and others would pay or reimburse for their members' prescriptions of Enbrel at supracompetitive levels.

201.     By extending its monopoly, Amgen, with Roche's assistance, was able to prevent and/or delay competition for at least 10 years and continue charging supracompetitive prices for Enbrel without any significant loss of sales. If etanercept biosimilar competitors had entered the market, they would have fairly competed with Amgen, and Plaintiff would have paid dramatically lower prices for some or all Enbrel products (and products containing etanercept) as of August 13, 2019 (the date the Psoriasis Patents expired), but potentially as early as August 16, 2016. Plaintiff would have substituted the lower-priced etanercept biosimilars for the higher-priced brand Enbrel (or paid less for Enbrel) for some or all their etanercept requirements.

202.     By engaging in the foregoing conduct, individually and in concert with Roche,

CROWELL
& MORING LLP
ATTORNEYS AT LAW

Amgen unlawfully engaged in a monopolistic scheme in violation of California's Cartwright Act (Cal. Bus. & Prof. Code §§ 16700, *et seq.*).

203.     Amgen knowingly, willfully, and flagrantly violated California's Cartwright Act, which provides that every "combination of capital, skill or acts by two or more persons" with the purpose of "creat[ing] or carry[ing] out restrictions in trade or commerce" is "unlawful, against public policy, and void." Cal. Bus. & Prof Code, §§ 16720, 16726.

204.     Amgen's unlawful acts with Roche had, and continue to have, a substantial and foreseeable effect on California commerce by artificially raising and fixing prices for Enbrel. Amgen's unlawful conduct, including its unlawful acts with Roche, occurred in and emanated from California. The 2004 Exclusive License Agreement was executed in Thousand Oaks, California by Richard Nanula, Amgen's Executive Vice President and Chief Financial Officer. In addition, Amgen's payment to Roche, Amgen's use of the wrongfully acquired control over Roche's patent rights to block would-be etanercept biosimilar competitors, and Amgen's repeated price increases of Enbrel all occurred in or emanated from Amgen's California headquarters.

205.     Amgen's unlawful activities with Roche, as described in this Complaint, also affected both intrastate commerce and interstate commerce flowing into or out from California and had direct, substantial, and reasonably foreseeable effects upon trade and commerce in California by artificially raising and fixing prices for Enbrel, as they were paid in, and/or out from, California and otherwise injuring corporations and persons located in California.

206.     During the relevant period, through Amgen or the regional and national distributors and retailers that they have engaged for the sale of Enbrel, many millions of dollars' worth of Enbrel have been, and continue to be, sold each year in California. Moreover, Amgen sells Enbrel from its headquarters in California.

207.     There was and is a gross and unconscionable disparity between the price that Plaintiff paid for Enbrel and the value received, given that more inexpensive etanercept products should have been available, and would have been available, absent Amgen's illegal conduct.

208.     As a direct and proximate result of Amgen's violation of the Cartwright Act, carried out with Roche's assistance, Plaintiff has been harmed by paying artificially inflated,

CROWELL
& MORING LLP
ATTORNEYS AT LAW

55

supracompetitive prices for Enbrel dispensed to its members and suffered damages in an amount to be proven at trial. Plaintiff's injury is of the type that the Cartwright Act was designed to prevent, and flows from that which makes Amgen's conduct with Roche unlawful.

### COUNT III:
### Monopolization and Monopolistic Scheme Under Various State Laws

209.    Plaintiff repeats and incorporates the above paragraphs as though fully set forth herein.

210.    Count Three is pleaded on behalf of Plaintiff under the antitrust laws of each jurisdiction identified below. It is pleaded in the alternative to Count Two, in the event it is determined that all of Plaintiff's claims for relief related to its reimbursements and payments of Enbrel are not governed by California law.

211.    Count Three arises from Amgen's exclusionary, anticompetitive conduct that was designed to create and maintain Amgen's improper monopoly over etanercept and exclude or substantially exclude its biosimilars from the market.

212.    The essential elements of each antitrust claim in Count Three are the same as those in Count Two. The above-alleged conduct will, if proven, establish a claim under each of the laws cited below.

213.    At all relevant times, Amgen possessed and continues to possess substantial market power (*i.e.*, monopoly power) in the market for etanercept. Amgen possessed and continues to possess the power to control prices in, prevent prices from falling in, and exclude competitors from the U.S. market for etanercept.

214.    That market power is coupled with, and supported by, strong regulatory and contractual barriers to entry.

215.    Through its anticompetitive acts, as alleged above, Amgen knowingly and willfully maintained its monopoly power in the market for etanercept in the United States after 2004, when it obtained exclusive control over Roche's patent rights and used restrictive or exclusionary conduct, rather than by means of a superior product, business acumen, or historic accident, and thereby injured Plaintiff. Amgen engaged in its anticompetitive conduct with the

1    specific intent to maintain its monopoly in the market for etanercept in the United States.

2        216.    By (i) entering the 2004 Exclusive License Agreement with Roche, under which

3    Amgen acquired exclusive control over Roche's competing patent rights to etanercept, and Roche

4    thus agreed not to compete against Amgen in the United States or to license those rights to

5    another competitor to Amgen, and (ii) using the control over Roche's patent rights to exclude

6    competition from would-be etanercept biosimilar competitors, thereby further buttressing and

7    entrenching its monopoly, Amgen, with Roche's assistance, accomplished its anticompetitive

8    scheme and willfully and unlawfully maintained, enhanced, and extended its monopoly power in

9    the U.S. market for etanercept through restrictive and exclusionary conduct.

10        217.    The goal, purpose, and effect of Amgen's anticompetitive scheme was to (i) ensure

11    that neither Roche nor its sublicensee would compete against Amgen using Roche's competing

12    patent rights related to etanercept; (ii) allow Amgen to wrongfully acquire control over Roche's

13    competing patent rights; (iii) allow Amgen to use that wrongfully acquired control to unlawfully

14    delay competition from would-be etanercept biosimilar competitors; (iv) benefit Roche by

15    receiving a lump-sum payment of $45,375,000 from Amgen; (v) extend Amgen's monopoly in

16    the etanercept market; and (vi) raise and maintain the prices that Plaintiff and others would pay or

17    reimburse for their members' prescriptions of Enbrel at supracompetitive levels.

18        218.    Had Amgen competed on the merits, instead of unlawfully maintaining its

19    monopoly in the market for etanercept, one or more etanercept biosimilars would have been

20    available at least by August 13, 2019 (the date the Psoriasis Patents expired), but potentially as

21    early as August 16, 2016. Plaintiff would have substituted the lower-priced etanercept biosimilars

22    for the higher-priced brand Enbrel (or paid less for Enbrel) for some or all their etanercept

23    requirements. As a result, they would have paid substantially lower prices for etanercept.

24        219.    During the relevant period, Enbrel, manufactured and sold by Amgen, was shipped

25    into each state and was dispensed to Plaintiff's members.

26        220.    During the relevant period, in connection with the purchase and sale of Enbrel,

27    money changed hands and business communications and transactions occurred in each state.

28        221.    Amgen's conduct as set forth above and below had substantial effects on intrastate

CROWELL
& MORING LLP
ATTORNEYS AT LAW

57

commerce in that, *inter alia*, Plaintiff was foreclosed from offering biosimilars of Enbrel to its members located in various states. This impairment of competition directly impacts and disrupts commerce within each state.

222.    Amgen's anticompetitive activities have directly, foreseeably, and proximately caused injury to Plaintiff throughout the United States. Plaintiff's injuries consist of: (i) being denied the opportunity to purchase lower-priced Enbrel from Amgen; (ii) paying higher prices for etanercept prescriptions dispensed to members than it would have paid in the absence of Amgen's unfair, illegal, and deceptive conduct; and (iii) being denied the opportunity to pay for or reimburse biosimilar etanercept at prices substantially lower than what it was forced to pay or reimburse for Enbrel. These injuries are of the type that the laws of the jurisdictions below were designed to prevent, and they flow from that which makes Amgen's conduct unlawful.

223.    Plaintiff is a proper entity to bring a case concerning Amgen's unlawful anticompetitive conduct.

224.    Amgen's anticompetitive conduct directly impacts and disrupts commerce within each jurisdiction below.

225.    By engaging in the foregoing conduct, Amgen intentionally and flagrantly maintained its monopoly power over etanercept in the United States in violation of the following state laws:

a)    Ala. Code §§ 6-5-60, et seq.; §§ 8-10-1, et seq. with respect to Plaintiff's payments and/or reimbursements for prescriptions dispensed to members in Alabama.

b)    Ariz. Rev. Stat. §§ 44-1401 et seq., with respect to Plaintiff's payments and/or reimbursements for prescriptions dispensed to members in Arizona.

c)    Cal. Bus. & Prof. Code §§ 16700 et seq., with respect to Plaintiff's payments and/or reimbursements for prescriptions dispensed to members in California.

d)    Col. Rev. Stat. Ann. §§ 6-4-105 et seq., with respect to Plaintiff's payments and/or reimbursements for prescriptions dispensed to members in Colorado.

e)    Kan. Stat. Ann. §§ 50-101 et seq., with respect to Plaintiff's payments and/or reimbursements for prescriptions dispensed to members in Kansas.

f)    Mich. Comp. Laws Ann. §§ 445.771 et seq., with respect to Plaintiff's payments and/or reimbursements for prescriptions dispensed to members in

1      Michigan.

2      g)    Miss. Code Ann. §§ 75-21-1 et seq., with respect to Plaintiff's payments
             and/or reimbursements for prescriptions dispensed to members in
3            Mississippi, in that the actions and transactions alleged herein substantially
             affected Mississippi trade or commerce.
4

5      h)    Nev. Rev. Stat. Ann. §§ 598A.010 et seq., with respect to Plaintiff's
             payments and/or reimbursements for prescriptions dispensed to members in
6            Nevada, in that the actions and transactions alleged herein substantially
             affected Nevada trade or commerce.

7      i)    N.H. Rev Stat. Ann. §§ 356:1, et seq., with respect to Plaintiff's payments
             and/or reimbursements for prescriptions dispensed to members in New
8            Hampshire.

9      j)    N.J. Stat. Ann. §§ 56:9-3, et seq., with respect to Plaintiff's payments
             and/or reimbursements for prescriptions dispensed to members in New
10           Jersey.

11     k)    N.Y. Gen. Bus. Law §§ 340 et seq., with respect to Plaintiff's payments
             and/or reimbursements for prescriptions dispensed to members in New
12           York.

13     l)    N.C. Gen. Stat. Ann. §§ 75-1 et seq., with respect to Plaintiff's payments
             and/or reimbursements for prescriptions dispensed to members in North
14           Carolina.

15     m)    Tenn. Code Ann §§ 47-25-101 et seq., with respect to Plaintiff's payments
             and/or reimbursements for prescriptions dispensed to members in
16           Tennessee, in that the actions and transactions alleged herein substantially
             affected Tennessee trade or commerce.
17

18     226.   Plaintiff has or will shortly notify certain state Attorneys General regarding the

19     filing of this Complaint.

20     227.   As a result of the unlawful and anticompetitive conduct described above, Plaintiff

21     paid artificially inflated prices for Enbrel for prescriptions dispensed to members in each of these

22     listed jurisdictions.

23     228.   In light of the foregoing, and other facts to be learned through discovery, and/or

24     proven at trial, Plaintiff seeks damages, trebled or multiplied to the full extent permitted under the

25     laws of each of these states and territories for all overcharges incurred and paid by Plaintiff as a

26     result of Amgen and Roche's conduct, as well as restitution, attorneys' fees and costs, and all

27     other forms of relief available.

28

CROWELL
& MORING LLP
ATTORNEYS AT LAW

COMPLAINT

**COUNT IV:**
**Conspiracy to Restrain Trade/Restraint of Trade in Violation of Various State Laws**

229.    Plaintiff repeats and reincorporates the above paragraphs as though fully set forth therein.

230.    This claim for relief is pleaded in the alternative to Count One, in the event it is determined that all of Plaintiff's claims for relief related to its reimbursements and payments for Enbrel are not governed by California law.

231.    As stated more fully above, Amgen and Roche willfully entered into the 2004 Exclusive License Agreement and into a continuing illegal contract, combination, and restraint of trade under which Amgen secured agreement from Roche to assist in unlawfully securing and extending Amgen's dominance in the etanercept market, in exchange for a lump-sum payment and other benefits to Roche. The purposes and effects of the agreement not to compete and the 2004 Exclusive License Agreement were to (i) ensure that neither Roche nor its sublicensee would compete against Amgen using Roche's competing patent rights related to etanercept; (ii) allow Amgen to wrongfully acquire control over Roche's competing patent rights; (iii) allow Amgen to use that wrongfully acquired control to unlawfully delay competition from would-be etanercept biosimilar competitors; (iv) benefit Roche by receiving a lump-sum payment of $45,375,000 from Amgen; (v) extend Amgen's monopoly in the etanercept market; and (vi) raise and maintain the prices that Plaintiff and others would pay or reimburse for their members' prescriptions of Enbrel at supracompetitive levels.

232.    To the extent that Amgen is permitted to assert one, there is and was no cognizable, non-pretextual procompetitive justification for the 2004 Exclusive License Agreement that outweighs its harmful effects. Even if there were some conceivable such justification that Amgen was permitted to assert, the restraint is and was broader and more anticompetitive than necessary to achieve such a purpose.

233.    Amgen's anticompetitive conduct substantially reduced and harmed competition in the relevant market and was an unreasonable restraint on trade.

234.    Amgen's conduct was done knowingly, willingly, and flagrantly violation of the

1    laws in each of the below states and territories.

2         235.    By engaging in the foregoing conduct, Amgen, acting individually and in concert

3    with Roche, intentionally and wrongfully conspired to restrain trade and did restrain trade

4    violated antitrust and competition statutes of all states and territories that may provide any relief

5    for indirect purchasers, including each of the following such laws:

6         a)    Ala. Code §§ 6-5-60, et seq.; §§ 8-10-1, et seq. with respect to Plaintiff's
7              payments and/or reimbursements for prescriptions dispensed to members in
              Alabama.

8         b)    Ariz. Rev. Stat. §§ 44-1401 et seq., with respect to Plaintiff's payments
9              and/or reimbursements for prescriptions dispensed to members in Arizona.

         c)    Cal. Bus. & Prof. Code §§ 16700 et seq., with respect to Plaintiff's
10             payments and/or reimbursements for prescriptions dispensed to members in
              California.
11
         d)    Col. Rev. Stat. Ann. §§ 6-4-105 et seq., with respect to Plaintiff's payments
12             and/or reimbursements for prescriptions dispensed to members in
              Colorado.
13
         e)    Kan. Stat. Ann. §§ 50-101 et seq., with respect to Plaintiff's payments
14             and/or reimbursements for prescriptions dispensed to members in Kansas.

15        f)    Mich. Comp. Laws Ann. §§ 445.771 et seq., with respect to Plaintiff's
              payments and/or reimbursements for prescriptions dispensed to members in
16             Michigan.

17        g)    Miss. Code Ann. §§ 75-21-1 et seq., with respect to Plaintiff's payments
              and/or reimbursements for prescriptions dispensed to members in
18             Mississippi, in that the actions and transactions alleged herein substantially
              affected Mississippi trade or commerce.
19
         h)    Nev. Rev. Stat. Ann. §§ 598A.010 et seq., with respect to Plaintiff's
20             payments and/or reimbursements for prescriptions dispensed to members in
              Nevada, in that the actions and transactions alleged herein substantially
21             affected Nevada trade or commerce.

22        i)    N.H. Rev Stat. Ann. §§ 356:1, et seq., with respect to Plaintiff's payments
              and/or reimbursements for prescriptions dispensed to members in New
23             Hampshire.

24        j)    N.J. Stat. Ann. §§ 56:9-3, et seq., with respect to Plaintiff's payments
              and/or reimbursements for prescriptions dispensed to members in New
25             Jersey.

26        k)    N.Y. Gen. Bus. Law §§ 340 et seq., with respect to Plaintiff's payments
              and/or reimbursements for prescriptions dispensed to members in New
27             York.

28        l)    N.C. Gen. Stat. Ann. §§ 75-1 et seq., with respect to Plaintiff's payments
              and/or reimbursements for prescriptions dispensed to members in North

Carolina.

m)   Tenn. Code Ann §§ 47-25-101 et seq., with respect to Plaintiff's payments and/or reimbursements for prescriptions dispensed to members in Tennessee, in that the actions and transactions alleged herein substantially affected Tennessee trade or commerce.

236.   Plaintiff has or will shortly notify certain state Attorneys General regarding the filing of this Complaint.

237.   Amgen's unlawful acts, done with Roche's assistance, had, and continue to have, a substantial and foreseeable effect on the commerce of each of the states and territories listed above by artificially raising and fixing prices for Enbrel.

238.   Amgen's unlawful activities, as described in this Complaint, also affected both intrastate commerce and interstate commerce flowing in to or out from each of the above states and territories and had direct, substantial, and reasonably foreseeable effects upon trade and commerce in each of these states and territories by artificially raising and fixing prices for Enbrel.

239.   During the relevant period, through Amgen or the regional and national distributors and retailers that they have engaged for the sale of Enbrel, many millions of dollars' worth of Enbrel have been, and continue to be, sold each year in each of the above states and territories.

240.   There was and is a gross and unconscionable disparity between the price that Plaintiff paid or reimbursed for its members' prescriptions for Enbrel and the value received. Had Amgen competed on the merits, instead of engaging in unlawful activities with Roche, one or more etanercept biosimilars would have been available at least by August 13, 2019 (the date the Psoriasis Patents expired), but potentially as early as August 16, 2016. Plaintiff would have substituted the lower-priced etanercept biosimilars for the higher-priced brand Enbrel (or paid less for Enbrel) for some or all their etanercept requirements. As a result, Plaintiff would have paid substantially lower prices for its members' prescriptions of etanercept.

241.   As a direct and proximate result of Amgen's violation of the laws of each of these states and territories, Plaintiff has been harmed by paying or reimbursing artificially inflated, supracompetitive prices for Enbrel dispensed to its members and suffered damages in an amount

to be proven at trial. Plaintiff's injury is of the type that these laws were designed to prevent, and flows from that which makes Amgen's conduct with Roche unlawful.

242.    In light of the foregoing, and other facts to be learned through discovery, and/or proven at trial, Plaintiff seeks damages, trebled or multiplied to the full extent permitted under the laws of each of these states and territories for all overcharges incurred and paid by Plaintiff as a result of Amgen and Roche's conduct, as well as restitution, attorneys' fees and costs, and all other forms of relief available.

## COUNT V:
## Violations of State Consumer Protection Laws

243.    Plaintiff repeats and incorporates the above paragraphs as though fully set forth herein.

244.    As described above, Amgen has engaged and continues to engage in unfair competition or unfair, unconscionable, deceptive, and/or fraudulent conduct, acts, or practices in violation of the state consumer protection statutes set forth below. As a direct and proximate result of Amgen's anticompetitive, deceptive, unfair, unconscionable, and/or fraudulent conduct, Plaintiff has been and continues to be deprived of the opportunity to pay or reimburse for its members' prescriptions of lower-priced biosimilar versions of etanercept.

245.    Amgen established, maintained, and/or used a monopoly, or attempted to establish a monopoly, and to restrain trade or commerce in the U.S. market for etanercept. A substantial part of this conduct occurred within each jurisdiction identified below. Amgen intended to injure competitors and exclude or substantially lessen competition. Amgen intended to injure consumers by unlawfully reaping supracompetitive profits.

246.    By unlawfully delaying the entry of etanercept biosimilars, Amgen, as a supplier, engaged in a fraudulent or deceptive act or practice in connection with a consumer transaction.

247.    Amgen's conduct constitutes consumer-oriented deceptive acts or practices that resulted in consumer injury and broad adverse impact on the public at large. Amgen's conduct thereby harmed consumers' interest in an honest marketplace where economic activity is conducted in a competitive manner.

CROWELL
& MORING LLP
ATTORNEYS AT LAW

COMPLAINT

248.    Amgen withheld material facts and information from Plaintiff, including that Amgen was unlawfully excluding manufacturers of biosimilar etanercept from the market and monopolizing the market for etanercept (and thereby profiting from the resulting supracompetitive prices that Plaintiff paid and/or reimbursed for prescriptions of Enbrel dispensed to members).

249.    Amgen's conduct was willful and knowing. Amgen intended to deceive Plaintiff regarding the nature of its actions within the stream of commerce in each jurisdiction below.

250.    Amgen's acts, omissions, misrepresentations, practices, and/or non-disclosures constituted a common, continuous, and continuing course of conduct of deceptive and unfair competition by means of unfair, unlawful, and/or fraudulent business acts or practices.

251.    Plaintiff made payments and/or reimbursements for prescriptions dispensed to its members of etanercept primarily for personal, family, or household purposes. The payments made by Plaintiff are for members' prescriptions of Enbrel for the members' own use.

252.    Plaintiff, who does not profit from reimbursing its members for prescriptions of etanercept, is a "consumer" under the consumer protection laws of the jurisdictions below.

253.    There was and is a gross disparity between the price that Plaintiff paid and/or reimbursed for etanercept and the value Plaintiff received given that less expensive biosimilar versions of etanercept should have been available and would have been but for Amgen's unlawful conduct.

254.    As a direct and proximate result of Amgen's unlawful conduct, Plaintiff has been injured and is threatened with continued injury.

255.    As a direct and proximate result of Amgen's unfair, unconscionable, deceptive, and fraudulent conduct in violation of the state consumer protection statutes listed below, Plaintiff was denied the opportunity to pay or reimburse for prescriptions of lower-priced etanercept biosimilars and paid higher prices for Enbrel than Plaintiff would otherwise have paid.

256.    The gravity of harm from Amgen's unlawful conduct significantly outweighs any conceivable utility from that conduct. Plaintiff could not reasonably have avoided injury from Amgen's conduct.

CROWELL
& MORING LLP
ATTORNEYS AT LAW

64

257.    Amgen's unlawful conduct substantially affected the trade and commerce of each jurisdiction in which etanercept was sold.

258.    As a result of the unfair and deceptive conduct described above, Plaintiff paid artificially inflated prices for Enbrel, for prescriptions dispensed to members in each of these listed jurisdictions.

259.    Amgen's unfair and deceptive acts described above were knowing, willful, and unconscionable and have violated the unfair and deceptive trade practices and consumer protection statutes of numerous states and territories, including but not limited to the following:

a) Ariz. Rev. Stat. §§ 44-1521, et seq. with respect to Plaintiff's payments and/or reimbursements for prescriptions dispensed to members in Arizona.

b) Cal. Bus. & Prof. Code §§ 17200, et seq. with respect to Plaintiff's payments and/or reimbursements for prescriptions dispensed to members in California.

c) Colo. Rev. Stat §§ 6-1-101, et seq. with respect to Plaintiff's payments and/or reimbursements for prescriptions dispensed to members in Colorado.

d) 6 Del. Code §§ 2511, et seq. with respect to Plaintiff's payments and/or reimbursements for prescriptions dispensed to members in Delaware.

e) Fla. Stat. §§ 501.201, et seq. with respect to Plaintiff's payments and/or reimbursements for prescriptions dispensed to members in Florida.

f) Ind. Code. §§ 24-5-0.5-1, et seq. with respect to Plaintiff's payments and/or reimbursements for prescriptions dispensed to members in Indiana.

g) Mass. Gen. Laws. ch. 93A, §§ 1, et seq. with respect to Plaintiff's payments and/or reimbursements for prescriptions dispensed to members in Massachusetts.

h) Mich. Comp. Laws. Ann. §§ 445.901, et seq. with respect to Plaintiff's payments and/or reimbursements for prescriptions dispensed to members in Michigan.

i) Miss. Code. Ann. §§ 75-24-1, et seq. with respect to Plaintiff's payments and/or reimbursements for prescriptions dispensed to members in Mississippi.

j) Mo. Rev. Stat. §§ 407.010, et seq. with respect to Plaintiff's payments and/or reimbursements for prescriptions dispensed to members in Missouri.

k) Nev. Rev. Stat. §§ 598.0903, et seq. with respect to Plaintiff's payments and/or reimbursements for prescriptions dispensed to members in Nevada.

l) N.H. Rev. Stat. §§ 358-A:1, et seq. with respect to Plaintiff's payments and/or reimbursements for prescriptions dispensed to members in New

Hampshire.

m)   N.J. Stat. § 56:8-1, et seq. with respect to Plaintiff's payments and/or reimbursements for prescriptions dispensed to members in New Jersey.

n)   N.Y. Gen. Bus. Law §§ 349, et seq. with respect to Plaintiff's payments and/or reimbursements for prescriptions dispensed to members in New York.

o)   N.C. Gen. Stat. §§ 75-1.1, et seq. with respect to Plaintiff's payments and/or reimbursements for prescriptions dispensed to members in North Carolina.

p)   73 Pa. Cons. Stat. §§ 201-1, et seq. with respect to Plaintiff's payments and/or reimbursements for prescriptions dispensed to members in Pennsylvania.

q)   S.C. Stat. §§ 39-5-10, et seq. with respect to Plaintiff's payments and/or reimbursements for prescriptions dispensed to members in South Carolina.

260.   Plaintiff has or will shortly notify certain state Attorneys General regarding the filing of this Complaint.

261.   Amgen's unlawful acts had, and continue to have, a substantial and foreseeable effect on the commerce of each above state and territory by artificially raising and fixing prices for Enbrel dispensed in each state or territory.

262.   In light of the foregoing, and other facts to be learned through discovery, and/or proven at trial, Plaintiff seeks damages, trebled or multiplied to the full extent permitted under the laws of each of these states and territories for all overcharges incurred and paid by Plaintiff as a result of Amgen and Roche's conduct, as well as restitution, attorneys' fees and costs, and all other forms of relief available.

**COUNT VI:**
**Unjust Enrichment Under State Law**

263.   Plaintiff repeats and incorporates the above paragraphs as though fully set forth herein.

264.   To the extent required, this claim is pleaded in the alternative to the other claims in this Complaint.

265.   As a result of its unlawful conduct described above, Amgen has and will continue to be unjustly enriched by the receipt of unlawfully inflated prices and unlawful profits from sales

CROWELL
& MORING LLP
ATTORNEYS AT LAW

COMPLAINT

of Enbrel.

266.    Amgen has received a benefit from Plaintiff in the form of revenue resulting from unlawful overcharges, which revenue resulted from anticompetitive prices that inured to the benefit of Amgen and to the economic detriment of Plaintiff. Amgen has benefited from its unlawful acts, and it would be inequitable for Amgen to retain any of the ill-gotten gains resulting from Plaintiff's overpayments for Enbrel prescriptions dispensed to its members during the relevant period.

267.    Amgen's financial benefits are traceable to Plaintiff's overpayments for Enbrel.

268.    It would be futile for Plaintiff to seek to exhaust any remedy against the immediate intermediary in the chain of distribution from which they indirectly purchased Enbrel, as those intermediaries are not liable for, and would not compensate Plaintiff for, Amgen's unlawful conduct.

269.    It would be futile for Plaintiff to seek a remedy from any party with whom it has privity of contract for its indirect purchases of Enbrel.

270.    The economic benefit Amgen derived from Plaintiff's payments and/or reimbursements for Enbrel prescriptions dispensed to its members is a direct and proximate result of Amgen's unlawful and anticompetitive practices.

271.    The financial benefits Amgen derived are ill-gotten gains that rightfully belong to Plaintiff who paid and continues to pay artificially inflated prices that inured to Amgen's benefit.

272.    Amgen is aware of and appreciates the benefits that Plaintiff has bestowed upon it.

273.    Amgen should be ordered to disgorge all unlawful or inequitable proceeds it received to a common fund for the benefit of Plaintiff who collectively has no adequate remedy at law.

274.    A constructive trust should be imposed upon all unlawful or inequitable sums Amgen received that are traceable to Plaintiff.

275.    By engaging in the unlawful or inequitable conduct described above, which deprived Plaintiff of the opportunity to purchase lower-priced biosimilar versions of etanercept and forced them to pay higher prices for Enbrel, Amgen has been unjustly enriched in violation of

COMPLAINT

CROWELL & MORING LLP
ATTORNEYS AT LAW

unjust enrichment principles of all states and territories in the United States, except Ohio and Indiana. It would be inequitable under these principles for Amgen to be permitted to retain any of the overcharges derived from Amgen's unlawful, unfair and unconscionable methods, acts, and trade practices alleged in this Complaint.

**<u>DEMAND FOR RELIEF</u>**

**WHEREFORE**, Plaintiff respectfully demands that this Court:

A.      Conduct expedited discovery proceedings leading to a prompt trial on the merits before a jury on all claims and defenses;

B.      Enter judgment against Amgen and in favor of Plaintiff;

C.      Declare that the conduct alleged herein is in violation of California's Cartwright Act and various state laws;

D.      Award Plaintiff actual, consequential, and compensatory damages, trebled, and/or other damages, in an amount to be determined at trial, plus pre- and post-judgment interest in accordance with law;

E.      Award Plaintiff equitable relief in the nature of disgorgement, restitution, and/or the creation of a constructive trust to remedy Amgen's violations of various state unfair and deceptive trade practices, consumer protection laws, and unjust enrichment principles;

F.      Award Plaintiff its cost of suit, including reasonable attorneys' fees as provided by law; and

G.      Award such further and additional relief as is necessary to correct for the anticompetitive market effects Amgen's unlawful conduct caused and as the Court may deem just and proper under the circumstances.

/ / /

/ / /

/ / /

/ / /

/ / /

/ / /

CROWELL
& MORING LLP
ATTORNEYS AT LAW

COMPLAINT

1                             **JURY DEMAND**

2        Plaintiff demands a trial by jury on all issues so triable.

3   Dated: July 29, 2025               Respectfully submitted,

4                               CROWELL & MORING LLP

5

6                               Tiffanie L. McDowell (State Bar No. 288946)
CROWELL & MORING LLP

7                               3 Park Plaza, 20th Floor
Irvine, California 92614

8                               Telephone: 949.263.8400
Facsimile: 949.263.8414

9                               TMcDowell@crowell.com

10                            Kent A. Gardiner (*pro hac vice* forthcoming)
Luke P. van Houwelingen (*pro hac vice*

11                            forthcoming) CROWELL & MORING LLP
1001 Pennsylvania Avenue NW

12                            Washington, D.C. 20004
Telephone: 202.624.2500

13                            Facsimile: 202.628.5116
KGardiner@crowell.com

14                            LvanHouwelingen@crowell.com

15                            Luke T. Taeschler (*pro hac vice* forthcoming)
CROWELL & MORING LLP

16                            Two Manhattan West
375 Ninth Avenue

17                            New York, NY 10001
Telephone: 212.803.4000

18                            Facsimile: 212.223.4134
LTaeschler@crowell.com

19

20                            *Attorneys for Plaintiff Blue Cross and Blue Shield of Kansas City*

21

22

23

24

25

26

27

28

# APPENDIX A

# EXHIBIT 1



# LICENSE AGREEMENT FOR

# ETANERCEPT

# AMONG

# IMMUNEX CORPORATION,

# HOFFMANN-LA ROCHE INC., AND

# F.HOFFMANN-LA ROCHE LTD

JOINT EXHIBIT

**JTX-13**

CONFIDENTIAL

AMG−ENBNJ−00132941

# LICENSE AGREEMENT

This license agreement ("Agreement") is entered into effective as of November 6, 1998 (the "Effective Date") by Immunex Corporation ("Immunex"), a Washington corporation with its principal office at 51 University Street, Seattle, Washington 98101 with Hoffmann-La Roche Inc. ("Roche Nutley"), a New Jersey corporation with its principal office at 340 Kingsland Street, Nutley, New Jersey 07110 and F.Hoffmann-La Roche Ltd ("Roche Basel"), a Swiss corporation with its principal office at Grenzacherstrasse 124, CH-4070 Basel, Switzerland (Roche Nutley and Roche Basel are collectively referred to as "Roche").

WHEREAS, Immunex has commercialized Etanercept (defined below), a p75TNFR:Fc Fusion Protein (defined below), for therapeutic use, which it is currently selling under the trademark *ENBREL*®;

WHEREAS, Roche owns certain patent rights relating to p75TNFR:Fc Fusion Proteins;

WHEREAS, Immunex wishes to obtain a license from Roche under such patent rights to make, have made, use, sell, offer for sale, and import Etanercept for therapeutic and prophylactic uses;

WHEREAS, Genentech Inc. ("Genentech"), a Delaware Corporation having its principal office at 1 DNA Way, South San Francisco, California 94080, owns certain patent rights under the Genentech Immunoadhesin Patents (defined below) and together with Roche owns certain patent rights under the Genentech Process Patents (defined below);

WHEREAS, Immunex and Genentech have entered into an agreement executed on May 28, 1999 ("Immunex-Genentech Agreement") in which Genentech granted to Immunex, among other things, certain rights under the mentioned Genentech Immunoadhesin Patents as defined in the Immunex-Genentech Agreement, and certain rights under the mentioned Genentech Process Patents as defined in the Immunex-Genentech Agreement;

WHEREAS, Immunex is the exclusive licensee of certain patent rights relating to p55TNFR:Fc Fusion Proteins (defined below);

WHEREAS, Roche wishes to obtain an option for a nonexclusive license from Immunex under such patent rights to make, have made, use, sell, offer for sale, and import p55TNFR:Fc Fusion Proteins; and

WHEREAS, the parties wish to grant such license and option to each other under the terms and conditions set forth in this Agreement and for the consideration set forth herein;

Page 2

CONFIDENTIAL

AMG-ENBNJ-00132942

NOW, THEREFORE, in consideration of the mutual promises contained herein, the Parties agree as follows:

1.0    Definitions

1.1    "Affiliate", with respect to any Party, shall mean any entity, which controls, is controlled by, or under common control with such Party, excluding Genentech, a Delaware corporation.  For these purposes, "control" shall refer to: (i) the possession, directly or indirectly, of the power to direct the management or policies of an entity, whether through ownership of voting securities, by contract or otherwise, or (ii) the ownership, directly or indirectly, of at least fifty percent (50%) of the voting securities or other ownership interest of an entity.  For the purposes of this Agreement, American Home Products Corporation, and all entities presently or in the future controlling, controlled by, or under common control with American Home Products Corporation, shall be considered Immunex Affiliates regardless of any future change in ownership or control of Immunex.  For the purposes of this Agreement, Roche and all entities presently or in the future controlling, controlled by, or under common control with Roche, except for Genentech and all entities presently or in the future controlled by Genentech, shall be considered Roche Affiliates regardless of any future change in ownership or control of Roche.

1.2    "Brockhaus Patent Rights" shall mean all of the legal rights throughout the world conferred upon Roche and its Affiliates by all Brockhaus patents and patent applications that issue from or that claim priority of Swiss Patent Application Nos. 3319/89, 746/90, and/or 1347/90, including, but not limited to, European Application No. 90116707.2 and U.S. Patent Application No. 07/580,013.  A complete list of all patents and patent applications in existence as of the date of execution of this Agreement shall be provided to Immunex by Roche within thirty (30) days of the date of execution of this Agreement and such list shall be updated on the first business day of each Calendar Quarter thereafter during the Term of this Agreement.

1.3    "Calendar Quarter" shall mean each three-month period commencing January 1, April 1, July 1 and October 1 of each year during the Term of this Agreement.

1.4    "Etanercept" shall mean the recombinant molecule schematically depicted in Exhibit A attached hereto, which is a homodimer of two polypeptide chains, each chain consisting of the extracellular ligand-binding domain of p75TNFR fused at its carboxy terminus to the amino terminus of the hinge, CH2 and CH3 domains (including the first cysteine residue of the CH1 domain) of human immunoglobulin G1 and having the amino acid sequence set forth in Exhibit B, including N-terminal and C-terminal heterogeneity accompanying expression of the nucleic acid sequence encoding the amino acid sequence of Exhibit B (arising from, for example, post translational modifications or other cellular processing events), which recombinant molecule was commercially sold by Immunex or its Affiliates on the Effective Date.

Page 3

CONFIDENTIAL

AMG-ENBNJ-00132943

1.5 "Field" shall mean the field of administering to humans or animals a pharmaceutically active compound for the treatment or prevention of any disease or condition, including the administration by *in vitro* or gene therapy of materials, such as DNA or RNA, which produce the pharmaceutically active compound in the humans or animals, and including, without limitation, *ex vivo* exposure of cells to a pharmaceutically active compound within a course of treatment or prevention of any human or animal disease or condition.

1.6 "First Commercial Sale" shall mean, in each country in the Territory, the first sale by Immunex, its Affiliates or sublicensees of a Licensed Product to an independent Third Party after the required formal approval to sell such Licensed Product in that country has been granted by the relevant regulatory authority. A Licensed Product sale shall be deemed to occur on the earlier of (a) the date the Licensed Product is shipped, or (b) the date of the invoice to the purchaser of the Licensed Product.

1.7 "Lauffer Patent Rights" shall mean all of the legal rights throughout the world conferred by all Lauffer patents and patent applications that claim priority of German Patent Application No. 4 020 607 (for example, EP 464 533 B1) that are exclusively licensed to Immunex and its Affiliates.

1.8 "Lauffer U.S. Patents" shall mean all U.S. patents and patent applications within the scope of Lauffer Patent Rights.

1.9 "Licensed Product" shall mean Etanercept, including any different glycoforms, and any materials for use in the manufacture of Etanercept in humans and animals upon administration, including DNA or RNA, for use in the Field. "Licensed Product" shall also mean any formulation of Etanercept sold or distributed in any dosage size or type of packaging or vial sizes, including lyophilized, liquid, or sustained release formulations of Etanercept.

1.10 "Net Sales" shall mean, as to each Calendar Quarter, the gross invoiced sales prices charged for all Licensed Product sold by or for Immunex, its Affiliates and sublicensees in arm's length transactions to independent Third Parties during such Calendar Quarter, after deduction (if not already deducted in the amount invoiced) of the following items paid by Immunex, its Affiliates and sublicensees during such Calendar Quarter with respect to sales of Licensed Product, regardless of the Calendar Quarter in which such sales were made, provided and to the extent that such items are incurred or allowed (with the exception of Section 1.10(d) below) and do not exceed reasonable and customary amounts in the market in which such sales occurred:

(a) trade, cash, and/or quantity discounts or rebates actually taken and allowed, including discounts or rebates to governmental or managed care organizations;

Page 4

CONFIDENTIAL

AMG-ENBNJ-00132944

        (b)     credits or allowances given or recorded for rejection or return of previously sold Licensed Product (including, without limitation, chargebacks);

        (c)     any tax, tariff, duty or government charge (including any tax such as a value added or similar tax or government charge other than an income tax) levied on the sale, transportation or delivery of a Licensed Product and borne by the seller thereof without reimbursement from any Third Party;

        (d)     one and one-half percent (1.5%) of the amount invoiced to cover bad debt, freight or other transportation costs, insurance charges, additional special packaging, and other governmental charges; and

        (e)     the standard inventory cost (Immunex' actual acquisition cost) of devices used for dispensing or administering the Licensed Product that accompany the Licensed Product as it is sold; provided that, no deduction shall be taken for the cost of any packaging (for example, vials or cartons) into which Licensed Product or devices are placed in conjunction with their sale.

All of the foregoing deductions from the gross invoiced sales prices of Licensed Product shall be determined in accordance with GAAP. In the event that Immunex, its Affiliates or sublicensees make any adjustments to such deductions after the associated Net Sales have been reported pursuant to this Agreement, the adjustments shall be reported and reconciled with the next report and payment of any royalties due. It is the intent of the Parties that Net Sales shall be based on arm's length sales transactions to independent wholesalers, hospitals and pharmacies. Net Sales shall not be based on sales between Immunex and its Affiliates or its sublicensees. In the event that Immunex, its Affiliates or its sublicensees sells to an independent Third Party who resells to wholesalers, hospitals or pharmacies, Net Sales shall be based on the Net Sales of such Third Party. Licensed Product provided by Immunex, its Affiliates or its sublicensees, but not sold, for administration to patients enrolled in clinical trials, or distributed through a not-for-profit foundation at no charge to patients unable to purchase Licensed Product, shall not be included in Net Sales.

    1.11   "Party" shall mean Roche or Immunex and, when used in the plural, shall mean both of them.

    1.12   "p55TNFR:Fc Fusion Protein" shall mean any polypeptide comprising at least a functional portion of the human 55 kilodalton (p55) tumor necrosis factor receptor (which receptor has the amino acid sequence set forth in Figure 1 of Gray et al., Proc. Natl. Acad. Sci. USA 87:7380-7384 (1990) in Exhibit C attached hereto) covalently joined to at least a portion of an immunoglobulin protein, and any homologs, muteins, variants and modifications thereof. This term "p55TNFR:Fc Fusion Protein" shall not include within its meaning a "p75TNFR:Fc Fusion Protein" as defined below in Section 1.14.

CONFIDENTIAL

1.13 "p75TNFR" shall mean the extracellular ligand-binding domain of the human 75 kilodalton ("p75") tumor necrosis factor receptor having the amino acid sequence set forth as amino acids 23 through 257 of Figure 3B of Smith et al., <u>Science</u> 248:1019-1023 (1990) in Exhibit D attached hereto. For clarification, "p75TNFR" shall not include any polypeptide that differs from the Exhibit D amino acid sequence, for example by virtue of amino acid substitutions, additions or deletions in such sequence.

1.14 "p75TNFR:Fc Fusion Protein" shall mean any polypeptide comprising at least a functional portion of the human p75 tumor necrosis factor receptor (which receptor has the amino acid sequence set forth in Figure 3B of Smith et al., <u>Science</u> 248:1019-1023 (1990) in Exhibit D attached hereto) covalently joined to at least a portion of an immunoglobulin protein, and any homologs, muteins, variants and modifications thereof. This term "p75TNFR:Fc Fusion Protein" shall not include within its meaning a "p55TNFR:Fc Fusion Protein" as defined above in Section 1.12.

1.15 "Term" shall mean the term as defined in Section 9 below.

1.16 "Territory" shall mean worldwide.

1.17 "Third Party" shall mean any natural person or business or governmental entity that is not a Party or an Affiliate of a Party.

1.18 "Valid Claim" shall mean a claim of a pending patent application or an issued and unexpired patent, which has not been revoked, declared unpatentable or unenforceable, or held invalid by a decision of a court or other body of competent jurisdiction that is unappealable or unappealed within the time period allowed for appeal.

2.0 <u>License Grant</u>

2.1 <u>License to Immunex</u>

(a) Subject to the terms and conditions of this Agreement, Roche hereby grants to Immunex a license, under the Brockhaus Patent Rights, to make, have made, use, sell, offer for sale, and import Licensed Product in the Territory (all of these licensed rights are collectively referred to as "commercialize" or "commercializing"). Such license shall be deemed effective as of the Effective Date and is co-exclusive with Roche. For the purposes of this Agreement, "co-exclusive" shall mean that, in each country in the Territory, Immunex and Roche shall each have the right under the Brockhaus Patent Rights to commercialize Licensed Product in the Territory. Roche shall have the right to grant co-exclusive rights in each country to one (1) licensee in lieu of or in collaboration with Roche, and for any given country, to a single Third Party to distribute Licensed Product within that country in lieu of Roche and its licensee. Additionally, Roche and its licensees shall have the right, without the prior written consent of Immunex, to sublicense one or more contract manufacturers to manufacture Licensed Product for use, sale, importation, and/or distribution by Roche and Roche's

CONFIDENTIAL

AMG-ENBNJ-00132946

licensees; provided that Roche and its licensees shall be limited to one such contract manufacturer in any country in the Territory.

(b)     Roche agrees to only license to one (1) licensee in any country its rights under the Brockhaus Patent Rights to make, use, sell, offer for sale and import any p75TNFR:Fc Fusion Protein in the Field in the Territory.  Roche shall have the right to grant its co-exclusive rights in each country to one (1) licensee in lieu of or in collaboration with Roche, and for any given country, to a single Third Party to distribute Licensed Product within that country in lieu of Roche and its licensee.  Additionally, Roche and its licensees shall have the right, without the prior written consent of Immunex, to sublicense one or more contract manufacturers to manufacture Licensed Product for use, sale, importation, and/or distribution by Roche and Roche's licensees; provided that Roche and its licensees shall be limited to one such contract manufacturer in any country in the Territory.

(c)     Except as expressly granted herein, there are no licenses granted to Immunex under the Brockhaus Patent Rights or any other intellectual property rights owned or controlled by Roche.

(d)     The rights under this Section 2.1 may be terminated by Roche upon written notice, to the extent permitted by applicable law or regulation, in the event that Immunex, its Affiliates or sublicensees of the Brockhaus Patent Rights, challenges the validity of the Brockhaus Patent Rights, other than in an interference in the United States between Lauffer Patent Rights and Brockhaus Patent Rights.

2.2     <u>Option to Roche</u>

(a)     Immunex grants to Roche and its Affiliates an option to obtain a worldwide, non-exclusive, sublicense under the Lauffer Patent Rights to make, have made, use, sell, offer for sale, or import any single p55TNFR:Fc Fusion Protein product, as determined on a country-by-country basis, in the Field in the Territory.  The grant of the sublicense under the option is contingent upon: (i) the exercise of the option by Roche in accordance with the terms of this Agreement; (ii) Immunex possessing the right to grant the sublicense at the time the option is exercised; and (iii) the execution by both parties of a written sublicense agreement incorporating royalty and payment provisions, field of use limitations, provisions and limitations on the right to sublicense, and all the other usual and customary provisions appropriate for such an agreement, to the extent such provisions and limitations are consistent with Immunex's obligations relating to the Lauffer Patent Rights and are in accordance with the terms of this Agreement.  Upon exercise of the option, Immunex and Roche agree to negotiate in good faith the terms of the written sublicense agreement.  Any royalties due under the sublicense shall be passed on by Immunex to one or both of those parties that have granted Immunex an exclusive license to the Lauffer Patent Rights.  In Immunex's sole discretion, the sublicense may be converted into a direct license between one or both of those parties that have granted Immunex an exclusive license to the Lauffer Patent Rights as licensor(s) and Roche as licensee.  Additionally, the sublicense to Roche

CONFIDENTIAL

AMG-ENBNJ-00132947



shall permit Roche to further sublicense its rights in the Lauffer Patent Rights with respect to such single p55TNFR:Fc Fusion Protein exclusively to a single sublicensee in lieu of Roche and its Affiliates on a country-by-country basis. Such further sublicensee shall be required to assume all obligations of Roche placed on and assumed by Roche by the sublicense from Immunex to Roche, and Roche shall guarantee the performance of such obligations by such further sublicensee. If Roche exercises its option to said sublicense and Immunex pays to a Third Party, as a result of Roche exercising said sublicense, a royalty due to the making, having made, using, selling, offering for sale, or importing of a p55TNFR:Fc Fusion Protein product in the Territory for or by Roche, its Affiliates or its sublicensees (limited to one per country in lieu of Roche), then Roche shall be responsible for the payment of one hundred percent (100%) of such Third Party royalty. If Immunex pays such Third Party any milestone payments or other license fees due to the making, having made, using, selling, offering for sale, or importing of a p55TNFR:Fc Fusion Protein product in the Territory for or by Roche, its Affiliates or its sublicensees, then Roche shall pay a *pro rata* portion of these payments or fees that would be applicable to Roche's rights under Section 2.2(a) of this Agreement. This *pro rata* portion shall be just and equitable as determined by the Parties in good faith negotiations. Except for the above requirements, the license from Immunex to Roche, its Affiliates and its sublicensees, shall be free of financial obligations on the part of Roche to Immunex, i.e., no royalties, no milestones, and no other payments are due or payable by Roche to Immunex relating to sales of a p55TNFR:Fc Fusion protein product with respect to the license to the Lauffer Patent Rights.

     (b)    Roche may exercise the option granted in Section 2.2(a) at any time during the life of the Lauffer Patent Rights on a country-by-country basis by providing Immunex with written notice at which point the parties shall commence negotiations of the written sublicense agreement in good faith.

     (c)    Except as expressly granted herein, there are no licenses granted to Roche under the Lauffer Patent Rights or any other intellectual property rights owned or controlled by Immunex.

     (d)    The rights under this Section 2.2 may be terminated by Immunex upon written notice, to the extent permitted by applicable law or regulation, in the event that Roche, its Affiliates or its sublicensees, or Genentech and its Affiliates, challenges the validity of the Lauffer Patent Rights, other than in an interference between Lauffer Patent Rights and Brockhaus Patent Rights in the United States.

     (e)    Immunex shall not assign or otherwise transfer any of the Lauffer Patent Rights to a Third Party without ensuring Roche's option to a sublicense under the Lauffer Patent Rights under the terms set forth in this Section 2.2. This Section 2.2(e) shall not affect Immunex's right to abandon any of the patent rights included in the Lauffer Patent Rights or to terminate any license or other agreement that relates to or gives rise to Immunex's rights in the Lauffer Patent Rights.

Page 8

CONFIDENTIAL

AMG-ENBNJ-00132948

### 2.3 Sublicense Rights

Immunex shall have the right, without the prior written consent of Roche, to sublicense the rights granted to it by Roche under Section 2.1 above to one Immunex Affiliate in each country in the Territory, and for any given country, to a single Third Party to distribute Licensed Product within that country in lieu of Immunex and its Affiliate. Any sublicensee shall be bound by all of the obligations of Immunex hereunder, and Immunex shall guarantee the performance by its sublicensees hereunder, including but not limited to payment of royalties. Additionally, Immunex shall have the right, without the prior written consent of Roche, to sublicense one or more contract manufacturers to manufacture Licensed Product for use, sale, importation, and/or distribution by Immunex, Immunex Affiliates, and/or Immunex sublicensees under the rights granted to it by Roche under this Section 2.3 and Section 2.1 above; provided that, Immunex shall be limited to one such contract manufacturer in any country in the Territory.

### 2.4 Release

(a)     For good and valuable consideration as set forth throughout this agreement, Roche hereby releases Immunex and its Affiliates from any and all claims, demands, and rights of action that Roche may have on account of any infringement or alleged infringement of any of the Brockhaus Patent Rights by the manufacture, use, sale, offer for sale, other disposition, or importation of Licensed Product which, prior to the Effective Date of this Agreement, was manufactured, used, sold, offered for sale, otherwise disposed of, or imported by or on behalf of Immunex or its Affiliates.

(b)     Immunex hereby releases Roche and its Affiliates from any and all claims, demands, and rights of action that Immunex may have on account of any infringement or alleged infringement of any Lauffer Patent Rights by the manufacture, use, sale, other disposition, or importation of any p55 TNFR:Fc Fusion Protein product which, prior to the Effective Date of this Agreement, was manufactured, used, sold, otherwise disposed of, or imported by or on behalf of Roche, its Affiliates or its sublicensees.

## 3.0 Intellectual Property Rights

### 3.1 Ownership

Roche shall retain ownership or control of the Brockhaus Patent Rights. Nothing in this Agreement shall transfer any ownership or control of the Lauffer Patent Rights to Roche or any Third Party. Except as expressly provided herein, each Party shall own and shall have the exclusive right to exploit all intellectual property rights owned or acquired by such Party.

CONFIDENTIAL

AMG-ENBNJ-00132949

### 3.2    p55TNFR:Fc Fusion Protein Patent Position and Immunity

With respect to any p55TNFR:Fc Fusion Protein product, Immunex represents and warrants that the Lauffer Patent Rights are the only patent rights owned or controlled by Immunex and/or its Affiliates (as to those entities that were Immunex Affiliates on the Effective Date) as of the Effective Date of this Agreement that could be infringed by the using, selling, offering for sale or importing of any p55TNFR:Fc Fusion Protein product in the Territory by Roche, its Affiliates or its sublicensees, or by the making or use of DNA encoding such p55TNFR:Fc Fusion Protein, vectors comprising such DNA, and/or cells comprising such DNA product in the Territory by Roche, its Affiliates or its sublicensees, apart from United States Patent Number 5,447,851. If Immunex breaches this warranty, then Immunex shall grant to Roche, its Affiliates and its sublicensees immunity from suit on such patent rights giving rise to such breach in each country in the Territory with respect to sales of any p55TNFR:Fc Fusion Protein product in the Territory by Roche, its Affiliates or its sublicensees. Immunex hereby grants to Roche, its Affiliates and sublicensees immunity from suit from United States Patent Number 5,447,851 with respect to the manufacture, use, importation, or sales of any p55TNFR:Fc Fusion Protein product by Roche, its Affiliates or sublicensees.

### 3.3    Infringement Determination

If Immunex determines in good faith that a Licensed Product does not infringe any claims within the Brockhaus Patent Rights, then Immunex shall so notify Roche and provide to Roche the evidence and reasoning for such determination. If Roche agrees, then Immunex shall be entitled to terminate its license with respect to such particular patent or patent application, without prejudice to its license under any remaining patents and patent applications within the Brockhaus Patent Rights. If Roche disagrees with the determination of non-infringement by Immunex, then the Parties shall submit such infringement issue to resolution by binding arbitration pursuant to Section 10.14 hereof. Notwithstanding the foregoing, any issue that arises under this Agreement related to the validity of a patent or any claim of a patent within the Brockhaus Patent Rights shall be determined solely and exclusively by litigation in Federal court, and shall not be submitted to, or resolved by, arbitration.

### 3.4    Patent Prosecution

Roche shall be responsible, at its sole discretion, for the prosecution and maintenance of the Brockhaus Patent Rights in the Territory, at Roche's expense. Roche shall not be responsible for any expenses relating to the prosecution and maintenance of the Lauffer Patent Rights.

### 3.5    Patent Infringement

(a)    If Immunex learns that a Third Party is infringing the Brockhaus Patent Rights by virtue of such Third Party's manufacture, use, sale, offer for sale or

CONFIDENTIAL

AMG-ENBNJ-00132950

importation of a p75TNFR:Fc Fusion Protein product in the Territory, then it shall promptly notify Roche in writing. The Parties shall use reasonable efforts in cooperation with each other to stop such patent infringement without litigation. "Infringing" or "infringement" as used in this Section shall not include licensed activities by a Third Party duly licensed pursuant to the provisions of Section 2.1 above.

(b)     Roche shall have the sole right, but not the obligation, to take the appropriate steps to remove such infringement of Brockhaus Patent Rights, including, without limitation, initiating suit. Immunex agrees to provide reasonable assistance to Roche in taking such steps. Any legal action taken by Roche under this Section 3.5 will be under its control and at its expense. Immunex may choose to be represented in any such action by counsel of its own choice at its own expense. Roche shall retain all awards of damages and costs recovered as a result of any action Roche takes to enforce the Brockhaus Patent Rights, or to remove the infringement thereof; provided, however, that in the event Immunex is damaged by such infringement, Immunex shall have the right to join any litigation initiated by Roche at its own cost and Immunex shall be entitled to obtain any damages, including lost profits, awarded to it, subject to reimbursement by Immunex to Roche for (i) royalties due to Roche on such lost profits and (ii) a *pro rata* share of Roche's costs of litigation to be agreed upon by the Parties in good faith negotiations. Notwithstanding the foregoing, Roche shall have the right, in its sole discretion, to settle the litigation with the accused infringer, or otherwise dismiss or terminate the litigation at any time; provided, however, that Roche shall not have the right to settle any litigation initiated by Immunex that is consolidated with any litigation initiated by Roche pursuant to this Section 3.5 without Immunex' prior written consent.

(c)     On or before the date six (6) months after Roche's receipt of written notice of such infringement from Immunex, Roche shall either (i) cause such infringement to terminate; or (ii) initiate suit against the alleged infringer. In the event that (i) Roche has not filed suit against the accused infringer or otherwise abated such infringement within such six (6) month period, (ii) Immunex demonstrates to Roche that its Net Sales of Licensed Product in the country wherein the infringement is occurring has decreased by at least ten percent (10%) for such six (6) month period as compared to the Net Sales for the six (6) month period prior to the notice of such infringement and that such decrease is directly caused by such infringing product (as demonstrated by market sales and share data) and not as a result of other causes (e.g., non-competing products or a declining product life cycle) or the activities of Roche, its Affiliates or its sublicensees consistent with the co-exclusive license granted in Section 2.1 above, and (iii) Immunex and its Affiliates have filed suit asserting any relevant patents owned by Immunex against the alleged infringer and/or exhausted all of their available legal and equitable remedies with respect to such infringement, then Immunex shall be relieved of its obligation to pay royalties on fifty percent (50%) of the Net Sales of Licensed Product made in the country wherein the infringement is occurring from the end of such six (6) month period until the earlier of such time as the infringement is abated or Roche initiates suit.

CONFIDENTIAL

AMG-ENBNJ-00132951



   (d) Immunex shall have no obligation to defend the Lauffer Patent Rights if the validity of any of the Lauffer Patent Rights is challenged by a Third Party, nor shall Immunex have an obligation to defend the Lauffer Patent Rights from infringement.

4.0 <u>Confidentiality</u>

   In the course of performance of this Agreement, one Party may disclose to the other or receive information from the other relating to the subject matter of this Agreement, which information shall be considered to be the disclosing Party's confidential information, if in the case of a written disclosure, it is designated as confidential at the time of disclosure, or if in the case of oral disclosure, the specific nature of the oral disclosure and its confidentiality is confirmed in writing to the other Party within thirty (30) days of the oral disclosure (the "Confidential Information"). Each Party shall protect and keep confidential and shall not use, publish or otherwise disclose to any Third Party, except as permitted by this Agreement or with the other Party's written consent, the other Party's Confidential Information for a period of five (5) years from the date of disclosure of such Confidential Information. The foregoing notwithstanding, Confidential Information may be disclosed as may be reasonably required to comply with applicable governmental laws or regulations. For the purposes of this Agreement, Confidential Information shall not include such information that:

   (a) was known to the receiving Party at the time of disclosure;

   (b) was generally available to the public or was otherwise part of the public domain at the time of disclosure or became generally available to the public or otherwise part of the public domain after disclosure other than through any act or omission of the receiving Party in breach of this Agreement;

   (c) became known to the receiving Party after disclosure from a source that had a lawful right to disclose such information to others; or

   (d) was independently developed by the receiving Party without the use of Confidential Information of the other Party, as evidenced by written records.

5.0 <u>License Fee and Royalties</u>

   In consideration for the licenses granted to Immunex by Roche pursuant to Section 2.1 above, Immunex shall make the following payments to Roche.

  5.1 <u>License Fee and Genentech Process Patent Royalties</u>

    (a) Immunex and Roche hereby acknowledge and agree that the License Fee (as defined in the Immunex–Genentech Agreement) paid to Genentech pursuant to Section 5.1(a) of the Immunex–Genentech Agreement forms a portion of the consideration for the present Agreement and, except for the running royalties that

Page 12

CONFIDENTIAL

AMG-ENBNJ-00132952

shall be due under this Agreement, shall constitute the sole license, milestone, and other fees due under this Agreement. Such license fee is not creditable against any royalties payable to Roche hereunder.

(b)    Immunex and Roche hereby acknowledge and agree that if any royalties were paid to Genentech on behalf of Roche pursuant to Section 5.2(c) of the Immunex–Genentech Agreement, and such royalties were conditioned on the absence of royalties being payable with respect to the Brockhaus Patent Rights, and royalties did in fact accrue during the period of time in which Immunex made such royalty payments to Genentech on Roche's behalf, then such royalties shall be creditable against any royalties payable by Immunex to Roche hereunder.

5.2    Royalties

(a)    Immunex shall pay to Roche Basel the following royalties for Net Sales of Licensed Product by Immunex, its Affiliates and its sublicensees:

(i)    For Net Sales in countries within the Territory, excluding the United States, in which the commercializing of Licensed Product, but for the licenses granted hereinabove, would infringe a Valid Claim within the Brockhaus Patent Rights, Immunex shall pay to Roche Basel royalties of four percent (4%) of Net Sales of all Licensed Product commencing with First Commercial Sale on a country-by-country basis. Such royalties shall be reduced to two percent (2%) on a country-by-country basis, if a patent application, within the Brockhaus Patent Rights, in a given country fails to issue as a patent containing said infringed Valid Claim by May 1, 2000. If the patent application within the Brockhaus Patent Rights containing said infringed Valid Claim within the given country subsequently issues, then the royalties in that country shall increase to four percent (4%) of Net Sales as of the date the patent issues.

(ii)    For Net Sales in countries within the Territory, excluding the United States, in which the commercializing of Licensed Product would not infringe a Valid Claim within the Brockhaus Patent Rights, but the Licensed Product was manufactured in a country, including the United States, in which the manufacture of Licensed Product would have infringed a Valid Claim in such country of manufacture within the Brockhaus Patent Rights, but for the grant of the license in Section 2.1 above, then Immunex shall pay to Roche fifty percent (50%) of the royalties that would have been due had the sales occurred in the country of manufacture but in no event shall such royalties be greater than two percent (2%) of Net Sales. If the country of manufacture is other than the United States, then Immunex shall pay the royalties under this Section 5.2(a)(ii) to Roche Basel. If the country of manufacture is the United States, then Immunex shall pay the royalties under this Section 5.2(a)(ii) to Roche Nutley, but such royalties shall be due only in the event that royalties are due on Net Sales in the United States pursuant to Section 5.2(b) below.

CONFIDENTIAL                    AMG-ENBNJ-00132953



(b)     Immunex shall pay to Roche Nutley the following royalties for Net Sales of Licensed Product by Immunex, its Affiliates and its sublicensees:

(i)     For Net Sales in the United States, in which the commercializing of Licensed Product, but for the licenses granted hereinabove, would infringe a Valid Claim of an issued United States patent within the Brockhaus Patent Rights, Immunex shall pay to Roche Nutley royalties at a rate of four percent (4%) of Net Sales of all Licensed Product commencing with First Commercial Sale in the United States.  Such royalty rate shall be increased by one-half percent (1/2%) for Net Sales in the United States if Immunex is no longer paying royalties based on the Lauffer Patent Rights and is no longer obligated under the Immunex-Genentech Agreement to pay royalties to Genentech based on the Immunoadhesin Patents (defined in the Immunex-Genentech Agreement).  Such royalty rate shall further be increased by one-half percent (1/2%) for Net Sales in the United States if Immunex is no longer paying royalties based on the Lauffer Patent Rights and is no longer obligated under the Immunex-Genentech Agreement to pay royalties to Genentech based on the Genentech Process Patents (defined in the Immunex-Genentech Agreement).  Thus, it is envisioned that the royalty rate will increase from four percent (4%) to four and one-half percent (4 ½%) to five percent (5%) for Net Sales in the United States, provided that a United States patent issues within the Brockhaus Patent Rights, which contains an infringed Valid Claim.  Such royalty rate, however, shall not exceed two percent (2%) should such issued Brockhaus United States patent be subject to a reasonable attempt by Immunex to provoke an interference between such issued Brockhaus Patent and the Lauffer U.S. Patents.  If the infringed Valid Claims contained within the issued United States patent within the Brockhaus Patent Rights are involved in an interference with the Lauffer U.S. Patents, and the decision of the Board of Patent Appeals and Interferences does not award priority to the patent contained within the Brockhaus Patent Rights or otherwise determines that the formerly infringed Valid Claim is not valid or patentable, resulting in the issued United States patent within the Brockhaus Patent Rights containing no Valid Claim covering the commercializing of Licensed Product, then such two percent (2%) royalties shall accrue, but not be payable, for sales of Licensed Product occurring after the time of the Board's decision.  If no appeal is taken and/or a decision upholding the Board's decision is rendered by a court from which no appeal is or can be taken, then the royalties that have accrued from the time of the Board's decision shall be forgiven and future royalties for Net Sales in the United States shall no longer be due or payable except as may be payable under the provisions of Section 5.2(b)(iii) below or unless the United States Patent and Trademark Office subsequently issues a patent within the Brockhaus Patent Rights that contains a claim that would be infringed by the commercializing of Licensed Product, but for the licenses granted hereinabove.  On the other hand, if the Board's decision is overturned, resulting in a patent within the Brockhaus Patent Rights containing a Valid Claim covering the commercializing of Licensed Product, then such two percent (2%) royalties shall become due and payable for the period of time

Page 14

CONFIDENTIAL

AMG-ENBNJ-00132954

beginning at the Board's decision and royalties thereafter shall be collected at four percent (4%), four and one-half percent (4 ½%), or five percent (5%) as described above, until no Valid Claim covers the commercializing of the Licensed Product.

(ii)     For Net Sales in the United States, in which the commercializing of Licensed Product, but for the licenses granted hereinabove, would only infringe a Valid Claim of a pending United States patent application within the Brockhaus Patent Rights, Immunex shall pay to Roche Nutley royalties at a rate of two percent (2%) of Net Sales of all Licensed Product commencing with First Commercial Sale in the United States irrespective of the country where the Licensed Product is manufactured.  If the infringed Valid Claim contained within the United States patent applications within the Brockhaus Patent Rights are involved in an interference with the Lauffer U.S. Patents, and the decision of the Board of Patent Appeals and Interferences does not award priority to the application contained within the Brockhaus Patent Rights or otherwise determines that the formerly infringed Valid Claim is not valid or patentable, resulting in the United States patent applications within the Brockhaus Patent Rights containing no Valid Claim covering the commercializing of Licensed Product, then such two percent (2%) royalties shall accrue, but not be payable, for sales of Licensed Product occurring after the time of the Board's decision.  If no appeal is taken and/or a decision upholding the Board's decision is rendered by a court from which no appeal is or can be taken, then the royalties that have accrued from the time of the Board's decision shall be forgiven and future royalties for Net Sales in the United States shall no longer be due or payable except as may be payable under the provisions of Section 5.2(b)(iii) below or unless the United States Patent and Trademark Office subsequently issues a patent within the Brockhaus Patent Rights that contains a claim that would be infringed by the commercializing of Licensed Product, but for the licenses granted hereinabove.  On the other hand, if the Board's decision is overturned, resulting in a patent application within the Brockhaus Patent Rights containing a Valid Claim covering the commercializing of Licensed Product, then such two percent (2%) royalties shall become due and payable for the period of time beginning at the Board's decision and continuing thereafter until either no Valid Claim covers the commercializing of the Licensed Product or until the provisions of Section 5.2(b)(i) apply.

(iii)     For Net Sales in the United States, in which the commercializing of Licensed Product would not infringe a Valid Claim in the United States within the Brockhaus Patent Rights, but the Licensed Product was manufactured in a country outside the United States in which the manufacture of Licensed Product would have infringed a Valid Claim in such country outside the United States within the Brockhaus Patent Rights, but for the grant of the license in Section 2.1 above, then Immunex shall pay to Roche Basel fifty percent (50%) of the royalties that would have been due had the sales occurred in the country

Page 15

CONFIDENTIAL

AMG–ENBNJ–00132955

of manufacture but in no event shall such royalties be greater than two percent (2%) of Net Sales.

(c)     The obligation to pay royalties to Roche under this Section 5.2 shall be imposed only once with respect to the same unit of Licensed Product, at the highest royalty rate applicable under this Section 5.2, regardless of the number of patents and patent applications within the Brockhaus Patent Rights pertaining thereto.

5.3     Third Party Royalties

If Roche or Immunex is required to pay to a Third Party and/or Genentech any royalty due to the making, having made, using, selling, offering for sale, or importing of a p55TNFR:Fc Fusion Protein product in the Territory for or by Roche, its Affiliates or its sublicensees, then Roche shall be responsible for the payment of one hundred percent (100%) of such Third Party royalty, without deduction from the royalties payable to Immunex hereinabove.

5.4     Royalty Payments

(a)     All royalties payable under Section 5.2 above with respect to the Brockhaus Patent Rights shall be payable on Net Sales commencing from the date of First Commercial Sale until expiration of the Term. Such royalties payable to Roche for Net Sales from the date of First Commercial Sale through the end of the Calendar Quarter immediately preceding the date of the execution of this Agreement shall be due and paid to Roche within thirty (30) days after the execution date of this Agreement.

(b)     Except as provided in Section 5.4(a) above, royalty payments under Section 5.2 above shall be made to Roche quarterly within sixty (60) days following the end of each Calendar Quarter for which royalties are due. Each royalty payment made under Section 5.4(a) above shall be accompanied by a report, as described in Section 5.8(b) below, summarizing the total Net Sales during the relevant Calendar Quarter(s) and the calculation of royalties, if any, due thereon under Section 5.2. All royalty payments not made when due shall bear interest, calculated from the date such payment was due, at the rate of two percent (2%) over the prime rate of interest as reported by the Bank of America in San Francisco, California from time to time.

5.5     Taxes

The royalty payments shall be free and clear of any taxes, duties, levies, fees or charges, except for withholding taxes (to the extent applicable). Immunex shall make any withholding payments due on behalf of Roche and shall promptly provide Roche with copies of any tax certificate or other documentation evidencing such withholding as sufficient to satisfy the requirements of the United States Internal Revenue Service related to any application by Roche for a foreign tax credit for such payment.

CONFIDENTIAL

AMG-ENBNJ-00132956



### 5.6 Mode of Payment

All payments due under this Agreement shall be made in United States dollars via wire transfer of immediately available funds, or by such other commercially reasonable means as may be designated by Roche. All payments due under this Agreement for royalties accrued in the United States shall be paid to Roche Nutley and all payments due under this Agreement for royalties accrued outside the United States shall be paid to Roche Basel. All payments shall be made in the manner as directed by Roche, which may change from time to time. Royalty payments due on Net Sales in countries or jurisdictions in the Territory outside the United States shall be made in United States dollars, after being converted by Immunex into United States dollars at the rate of exchange for such country's or jurisdiction's currency, or for the Euro, if applicable, as listed in the Wall Street Journal on the last business day of the Calendar Quarter in which such sales were made. If by law, regulations or fiscal policies, remittance of royalties in United States dollars is prohibited or restricted, Immunex will notify Roche and payment of the royalty obligation shall be made by deposit thereof in local currency to the credit of Roche in a recognized banking institution designated by Roche. If in any country or jurisdiction, the law, regulations or fiscal policies prohibit both the transmittal and deposit of royalties on sales in such country, royalty payments shall be suspended for as long as such prohibition is in effect, and as soon as such prohibition ceases, all royalties that Immunex would have otherwise been under an obligation to transmit or deposit but for the prohibition shall forthwith be deposited or transmitted to the extent allowable.

### 5.7 Termination

If the license granted to Immunex herein is terminated by the Parties, Immunex shall have no obligation to make any royalty payments to Roche that has not accrued prior to the effective date of such termination, but shall remain liable for all such payments accruing prior to termination.

### 5.8 Records and Reporting

(a)     Records.  Immunex, its Affiliates and sublicensees shall keep full, true and accurate books of account containing all particulars that may be necessary for the purpose of showing Net Sales. Such books of account shall be kept at the principal place of business of Immunex, its Affiliates or sublicensees, as the case may be. Subject to the provisions of Section 5.8(c) below, such books and the supporting data shall be open at all reasonable times, for three (3) calendar years following the end of the calendar year to which they pertain, to the inspection of an independent public accountant retained by Roche and reasonably acceptable to Immunex (or its Affiliate or its sublicensee) for the purpose of verifying Net Sales under this Agreement.

(b)     Reports.  Within thirty (30) days after the execution of this Agreement, Immunex shall deliver to Roche a true and accurate report, covering that period of time beginning with the Calendar Quarter of the First Commercial Sale of

Page 17

CONFIDENTIAL

AMG-ENBNJ-00132957

Licensed Product in the Field by Immunex, its Affiliate or sublicensees until the end of the Calendar Quarter immediately preceding the date of execution of this Agreement, which sets forth such particulars of the business conducted by Immunex, its Affiliates and sublicensees during such preceding Calendar Quarters as are pertinent to an accounting for Net Sales and deductible expenses under this Agreement. Thereafter, Immunex shall deliver such a report setting forth such particulars within sixty (60) days after the end of each Calendar Quarter, beginning with the Calendar Quarter in which this Agreement was executed. Such reports shall include for each country in which sales of Licensed Product occurred: the gross sales and Net Sales in each country's currency or in the Euro, if applicable; the applicable royalty rate; the royalties payable in each country's currency or the Euro, if applicable, including an accounting of all deductions taken in the calculation of Net Sales and the formulas used in the calculation of royalties owed thereon; the applicable exchange rate to convert from each country's currency or the Euro, if applicable, to United States Dollars; and the royalties payable in United States Dollars. All such reports shall be deemed to be Immunex Confidential Information.

      (c)    Auditing. At Roche's request and expense, Immunex shall permit an independent certified public accountant selected by Roche and acceptable to Immunex to examine, not more than once in any four consecutive Calendar Quarters during the term of this Agreement, but including one (1) post-termination audit, Immunex' books of account and records of all sales of Licensed Product by Immunex for the sole purpose of determining the correctness of the reports provided by Immunex under the above Section 5.8(b). Roche shall provide Immunex at least twenty (20) days' prior notice before any such audit, and all such audits shall be conducted during normal business hours. If such accountant reasonably determines that the royalties owed by Immunex to Roche under the above Section 5.2 have been, for any calendar year in total, understated by Immunex, Immunex shall immediately pay all understated royalties, together with interest on such royalties from the date accrued at a rate of two percent (2%) over the prime rate of interest as reported by Bank of America in San Francisco, California from time to time, and shall pay the reasonable costs of the examination if Immunex has understated such royalties by the greater of (i) $250,000 or (ii) five percent (5%) of the amount due under this Agreement so long as there has been actual notice to Immunex, prior to such audit, of the existence of patents or patent applications within the Brockhaus Patent Rights that cause such additional royalties to be payable to Roche. Roche agrees that any such independent certified public accountant shall be subject to an obligation to maintain any information reviewed (including, but not limited to, reports submitted under Section 5.8(b) above) in confidence.

6.0    Representations and Warranties

    6.1    Disclaimer

    Except as expressly provided herein, THE PARTIES DISCLAIM ALL OTHER REPRESENTATIONS AND WARRANTIES, EXPRESS OR IMPLIED, INCLUDING

Page 18

CONFIDENTIAL

WITHOUT LIMITATION, WARRANTIES OF COMMERCIAL UTILITY, MERCHANTABILITY, FITNESS FOR A PARTICULAR PURPOSE, VALIDITY OR SCOPE OF BROCKHAUS PATENT RIGHTS OR LAUFFER PATENT RIGHTS OR NON-INFRINGEMENT OF THIRD PARTY INTELLECTUAL PROPERTY RIGHTS.

### 6.2 Representations and Warranties

(a) Each Party represents and warrants to the other that: (a) it is free to enter into this Agreement; (b) in so doing it will not violate any other agreement to which it is a party; (c) it is currently capable of making the grant of rights described in Section 2.0 above; and (d) it will not enter into any agreement in the future which conflicts with or violates any term or provision of this Agreement. Roche further represents and warrants that: (i) it is the owner or licensee of the Brockhaus Patent Rights and that it has the right to grant the licenses granted to Immunex hereunder and (ii) as of the execution date of this Agreement and to the best of its knowledge, it does not own any patent rights nor is it seeking any additional patent rights, based on patent applications filed on inventions conceived and reduced to practice before the date of execution of this Agreement by Roche, that claim the Licensed Product or its use, other than those disclosed to Immunex prior to such date. Roche makes no representation or warranty that all intellectual property rights necessary for Immunex, its Affiliates or its sublicensees to make, have made, use, sell, offer for sale and import Licensed Product in the Field in the Territory have been granted to Immunex under Section 2.0 of this Agreement. Immunex further represents and warrants that: (i) the royalty reports delivered to Roche under this Agreement shall be true and accurate to the best of its knowledge, and (iii) it is the exclusive licensee of the Lauffer Patent Rights and that it has the right to grant the option granted to Roche hereunder.

### 7.0 Indemnification

7.1 Immunex shall indemnify, defend and hold harmless Roche and its Affiliates from and against all costs, claims, suits, expenses (including reasonable attorneys' fees) and damages arising out of or resulting from: (a) any willful or negligent act or omission by Immunex relating to the subject matter of this Agreement or (b) the use by or administration to any person of a Licensed Product that is sold, distributed or otherwise provided to a Third Party by Immunex, its Affiliates and sublicensees; except where such costs, claims, suits, expenses or damages arose or resulted from any negligent act or omission by Roche, provided that Roche gives reasonable notice to Immunex of any such claim or action, tenders the defense of such claim or action to Immunex and assists Immunex at Immunex' expense in defending such claim or action and does not compromise or settle such claim or action without Immunex' prior written consent.

7.2 Roche shall indemnify, defend and hold harmless Immunex and its Affiliates from and against all costs, claims, suits, expenses (including reasonable attorneys' fees) and damages arising out of or resulting from: (a) any willful or negligent act or omission by Roche relating to the subject matter of this Agreement, or (b) the use

Page 19

CONFIDENTIAL

AMG-ENBNJ-00132959

by or administration to any person of a p55TNFR:Fc Fusion Protein that is sold, distributed or otherwise provided to a Third Party by Roche, its Affiliates, its licensees and its sublicensees; except where such costs, claims, suits, expenses or damages arose or resulted from any negligent act or omission by Immunex, provided that Immunex gives reasonable notice to Roche of any such claim or action, tenders the defense of such claim or action to Roche and assists Roche at Roche's expense in defending such claim or action and does not compromise or settle such claim or action without Roche's prior written consent.

8.0    Insurance

8.1    At all times during the term of this Agreement, Immunex shall provide the following insurance at its sole cost and expense:

(a)    Commercial General Liability, including coverage for products and completed operations (maintained for a period of at least two (2) years after the termination of this Agreement) and contractual liability (including coverage for advertising and personal injury). The policy shall have a limit of no less than $10 million.

(b)    Foreign Local Coverages. Where required by law, Immunex will purchase foreign local coverages in an amount that, at a minimum, satisfies the legal requirements of that jurisdiction.

(c)    Workers' Compensation and Employer's Liability. Workers' Compensation insurance or the foreign equivalent, to comply with the statutory requirements of the applicable jurisdictions. Immunex will also purchase Employer's Liability insurance for an amount not less than $1 million each occurrence.

(d)    Policy Conditions: All policies shall:

(i)    Be written by insurance companies with an A.M. Best's rating of A:VIII or higher (or if Immunex' policies are not subject to the Best rating, then by carriers who are acceptable to Roche).

(ii)    Provide that coverage shall not be suspended, voided, canceled, non-renewed, reduced in scope or limits below $10 million, except after a thirty (30) day written notice by certified mail has been given to Roche.

(iii)    Add Roche as an additional insured.

(iv)    Be primary to any other insurance owned, secured or in place by Roche, which insurance shall not be called upon to contribute in any way.

Page 20

CONFIDENTIAL

Immunex shall provide Roche a certificate of insurance which shall reflect the above coverages and provision, with annual renewals as long as the contract continues.

## 9.0 Term and Termination

9.1 <u>Term</u>. This Agreement shall commence on the Effective Date and shall continue in full force and effect, unless earlier terminated pursuant to Sections 9.2, 9.3, or 9.4 below, on a product-by-product and country-by-country basis, until the revocation or expiration of the last to expire, or be revoked, patent or patent application within the Brockhaus Patent Rights that covers such Licensed Product in such country. Following expiration of this Agreement pursuant to this Section 9.1, all rights licensed hereunder with respect to such Licensed Product on a country-by-country basis, as appropriate, shall become nonexclusive, fully-paid up and irrevocable upon payment of any amounts due that have accrued hereunder prior to such expiration.

9.2 <u>Termination for Default</u>. If either Party shall default in a material manner with respect to any material provision of this Agreement and the other Party shall have given the defaulting Party written notice of such default, the defaulting Party shall have thirty (30) days from receipt of such written notice to cure such default. If such default is not cured within such thirty (30) day period, the nondefaulting Party shall have the right, upon notice to the defaulting Party and without prejudice to any other rights the non-defaulting Party may have, to terminate this Agreement, unless the defaulting Party is in the process of attempting in good faith to remedy such default, in which case, the thirty (30) day cure period shall be extended by an additional thirty (30) days. Upon such termination, any sublicenses granted under this Agreement shall not automatically terminate, but instead, the non-defaulting Party shall have the option to either terminate or continue this Agreement with each sublicensee.

9.3 <u>Bankruptcy</u>. Either Party may, in addition to any other remedies available to it by law or in equity, terminate this Agreement, in whole or in part as the terminating Party may determine, by written notice to the other Party in the event the other Party shall have become bankrupt, or shall have made an assignment for the benefit of its creditors or there shall have been appointed a trustee or receiver of the other Party or for all or a substantial part of its property or any case or proceeding shall have been commenced or other action taken by or against the other Party in bankruptcy or seeking reorganization, liquidation, dissolution, winding-up, arrangement, composition or readjustment of its debts or any other relief under any bankruptcy, insolvency, reorganization or other similar act or law of any jurisdiction now or hereafter in effect and any such event shall have continued for sixty (60) days undismissed, unbonded and undischarged. All rights and licenses granted under this Agreement by one Party to the other Party are, and shall otherwise be deemed to be, for purposes of Section 365 (n) of the Bankruptcy Code, licenses of rights to "intellectual property" as defined under Section 101 (56) of the Bankruptcy Code. The Parties agree that the each Party under this Agreement shall retain and may fully exercise all of its rights and elections under the Bankruptcy Code in the event of a bankruptcy by the other Party. The

CONFIDENTIAL

AMG-ENBNJ-00132961

Parties further agree that in the event of the commencement of a bankruptcy proceeding by or against one Party under the Bankruptcy Code, the other Party shall be entitled to complete access to any such intellectual property pertaining to the rights granted in the licenses hereunder of the Party by or against whom a bankruptcy proceeding has been commenced and all embodiments of such intellectual property.

9.4 <u>Unilateral Termination</u>. In addition to any other right of termination provided herein, Immunex shall have the right to terminate this Agreement for any reason, with or without cause, upon at least six (6) months' prior written notice to Roche. If Immunex terminates this Agreement pursuant to this Section 9.4, the licenses granted hereunder shall terminate, but the obligation of Immunex under Section 2.2 above shall survive such termination.

9.5 <u>Survival of Certain Provisions</u>. Termination of this Agreement for any reason shall not release either Party from any obligation arising prior to the date of termination. The provisions of Sections 2.4, 3.1, 4.0, 5.8(a) and (c) with respect to pre-termination manufacture or sales of Licensed Product, 6.0, 7.0, 9.5 and 10.7 shall survive any termination or expiration of this Agreement. The provisions of Section 2.2 shall survive any termination of this Agreement by Immunex pursuant to Sections 9.2 or 9.4 hereof or the expiration of this Agreement.

10.0 <u>General Provisions</u>

10.1 <u>Notices</u>

All notices which may be required pursuant to this Agreement: (a) shall be in writing, (b) shall be addressed, in the case of Roche (except as otherwise specified herein), to the Corporate Secretary at the address set forth at the beginning of this Agreement, and in the case of Immunex, to the General Counsel at the address set forth at the beginning of this Agreement, (or to such other person or address as either Party may so designate from time to time), (c) shall be delivered personally or shall be mailed, postage-prepaid, by registered mail or certified mail, return receipt requested, or transmitted by courier for hand delivery or transmitted by facsimile and (d) shall be deemed to have been given on the date of receipt if sent by mail or on the date of delivery if transmitted personally or by courier or facsimile. Notices by facsimile may be sent to the following numbers: for Immunex, to 206-233-0644; for Roche, to (973) 235-3500 (or to such other numbers as either Party may so designate from time to time).

10.2 <u>Governing Law</u>

This Agreement shall be governed by and construed in accordance with the laws of the State of New Jersey (other than its choice of law principles).

Page 22

CONFIDENTIAL

AMG-ENBNJ-00132962

### 10.3 Entire Agreement

This Agreement is the entire agreement between the Parties with respect to the specific subject matter hereof, and there are no prior written or oral promises or representations related thereto which are not incorporated herein. No amendment or modification of the terms of this Agreement shall be binding on either Party unless reduced to writing and signed by an authorized officer of the Party to be bound.

### 10.4 Binding Effect and Assignment

This Agreement shall be binding upon and inure to the benefit of the Parties hereto and their respective permitted successors and assigns. This Agreement shall not be assignable by either Party without the other's prior written consent, which consent shall not be unreasonably withheld or delayed; provided however, that either Party may assign this Agreement, without the other Party's written consent but after providing at least thirty (30) days' prior written notice to the other Party, to any successor pursuant to a consolidation or merger of the Party with or into any other corporation or corporations.

### 10.5 Waiver

The waiver by a Party hereto of any breach of or default under any of the provisions of this Agreement or the failure of a Party to enforce any of the provisions of this Agreement or to exercise any right thereunder shall not be construed as a waiver of any other breach or default or as a waiver of any such rights or provisions hereunder.

### 10.6 Severability

If any part of this Agreement shall be invalid or unenforceable under applicable law, such part shall be ineffective only to the extent of such invalidity or unenforceability, without in any way affecting the remaining parts of this Agreement. In addition, the part that is ineffective shall be reformed in a mutually agreeable manner so as to as nearly approximate the intent of the Parties as possible.

### 10.7 Publicity

Immunex and Roche agree that, except as may otherwise be required by applicable laws, regulations, rules, or orders, including the disclosure requirements of the Securities and Exchange Commission ("SEC"), no information concerning this Agreement and the transactions contemplated herein (except information which is already in the public domain) shall be made public by either Party without the prior written consent of the other Party. Notwithstanding the foregoing, with respect to complying with the disclosure requirements of the SEC, in connection with any required SEC filing of this Agreement by Immunex, Immunex shall seek confidential treatment of portions of this Agreement from the SEC and Roche shall have the right to review and

CONFIDENTIAL

AMG-ENBNJ-00132963

comment on such an application for confidential treatment prior to its being filed with the SEC. Roche shall provide its comments, if any, on such application as soon as practicable and in no event later than five (5) days after such application is provided to Roche. Notwithstanding the foregoing, each Party shall have the right to disclose information concerning this Agreement and the transactions contemplated herein to sublicensees and prospective sublicensees hereunder to the extent reasonably necessary and under obligations of confidentiality no less stringent than those provided for in Section 4 above.

### 10.8 Counterparts

This Agreement may be executed in two (2) or more counterparts, each of which shall be deemed an original for all purposes, but all of which together shall constitute one and the same instrument.

### 10.9 Force Majeure

(a) If either Party shall be delayed, interrupted or prevented with respect to the performance of any obligation under this Agreement by reason of any act of God, flood, fire, explosion, strike, lockout, labor dispute, casualty or accident, war, revolution, civil commotion, act of public enemies, blockage or embargo, injunction, law, order, proclamation, regulation, ordinance, demand or requirement of any government or subdivision, authority or representative of any such government, or any other cause beyond the reasonable control of such Party, such Party shall not be liable to the other therefor; and the time for performance of such obligation shall be extended for a period equal to the duration of the contingency that occasioned the delay, interruption or prevention.

(b) Within fifteen (15) days after the beginning of the *force majeure*, the party invoking its *force majeure* rights must notify the other party of this fact in accordance with Section 10.9(a) above. The other party must also be notified of the termination of the *force majeure* within fifteen (15) days after such termination. If the *force majeure* renders either of the required notifications impossible, notification must be given as soon as possible.

(c) If the delay resulting from the *force majeure* exceeds six (6) months, then the injured party may elect to treat such delay as a default and may terminate this Agreement pursuant to the provisions of Section 9.2 above. If no notice of such election is given prior to termination of *force majeure*, the Agreement will continue in effect without modification.

### 10.10 Headings

Headings are for the convenience of reference only and shall not control the construction or interpretation of any of the provisions of this Agreement.

CONFIDENTIAL

AMG-ENBNJ-00132964

### 10.11 No Partnership

Nothing in this Agreement is intended or shall be deemed to constitute a partnership, agency, employer-employee, or joint venture relationship between the Parties.

### 10.12 Further Assurances

At the request of either Party, the other Party shall execute and deliver from time-to-time such further instruments and shall provide reasonable cooperation in such proceedings or actions as shall be necessary or reasonably appropriate to effectuate the purposes of this Agreement.

### 10.13 Disclaimer of Express or Implied License

Notwithstanding all other provisions of this Agreement and the negotiations that led to this Agreement, the Parties agree that nothing in this Agreement grants to Roche, any Roche Affiliate, or any Roche licensee or sublicensee any right under any Immunex patent, patent application, or other intellectual property to make, have made, use, sell, offer for sale or import any product that includes all or a portion of any form, homolog, mutein, or variant of the human p75 tumor necrosis factor receptor.

### 10.14 Arbitration

The Parties agree that an infringement determination under Section 3.3 of this Agreement shall be resolved through binding arbitration as set forth below:

(a)     Initiation of Arbitration.  Any such dispute shall be finally resolved by arbitration in Washington, D.C. under the International Arbitration Rules of the American Arbitration Association ("AAA") as amended from time to time.

(b)     Selection of Arbitrators.  The arbitral tribunal shall consist of three (3) arbitrators. Roche shall appoint one arbitrator and Immunex shall appoint one arbitrator.  The Party commencing the arbitration proceeding shall designate its proposed arbitrator in its initial statement of its case, and the other Party shall designate its arbitrator within thirty (30) days thereafter.  The third arbitrator shall be appointed by mutual agreement of said two arbitrators and shall have experience in intellectual property law and specifically with patents held in the biotechnology industry.  In the event of failure of the two arbitrators to agree on the third arbitrator within thirty (30) days after their appointment, the third arbitrator shall be appointed in accordance with the then existing rules of the AAA.  All arbitrators shall be impartial and independent.

(c)     Confidential Proceedings.  The arbitration proceedings shall be confidential and the arbitral tribunal shall issue appropriate protective orders to safeguard each Party's Confidential Information.  Except as required by law, no Party shall make (or instruct the arbitral tribunal to make) any public announcement with

CONFIDENTIAL

AMG-ENBNJ-00132965

respect to the proceedings or decision of the arbitral tribunal without the prior written consent of each other Party. The Parties shall keep the existence of any dispute submitted to arbitration, and the award of the arbitral tribunal, in confidence and the arbitral tribunal, except as required in connection with the enforcement of such award or as otherwise required by applicable law.

(d)  Costs.  The costs and fees of the arbitration shall be paid by Immunex in the event that the arbitration tribunal determines that the Licensed Product or new manufacturing process infringes any claim of a Roche Patent; provided however, that such costs and fees shall exclude Roche's costs (including, its attorney's fees) and expenses incurred in connection with such arbitration. Otherwise, the Parties shall each pay one-half of the costs and fees of the arbitration and each Party shall pay its own costs (including, its attorneys' fees) and expenses incurred in connection with such arbitration.

(e)  Choice of Law.  The arbitration tribunal shall apply the law of the Court of Appeals for the Federal Circuit in making any determination of claim interpretation and infringement.

(f)  Records of Proceedings.  A court reporter will record any hearing of the arbitration tribunal and that reporter's record will be the official transcript of the proceedings. The arbitration tribunal shall prepare a detailed statement specifying with particularity the details of any determination and the reasoning behind the determination.

10.15  Resolution of U.S. Inteferences

Any interferences involving Lauffer Patent Rights and Brockhaus Patent Rights shall be resolved according to the terms as set forth in Exhibit E attached hereto.

Page 26

CONFIDENTIAL

AMG-ENBNJ-00132966

IN WITNESS WHEREOF, the Parties have caused this Agreement to be duly executed by its duly authorized representatives as of the date set forth below.

**HOFFMANN-LA ROCHE INC.**

By: _George W. Johnston_

Name: _GEORGE W. JOHNSTON_

Title: _VICE PRESIDENT_

Date: _9/14/99_

**F.HOFFMANN-LA ROCHE LTD**

By: _W. Klug     A. St_

Name: _WERNER HENRICH,     STEFAN ARNOLD_

Title: _SR. VICE PRESIDENT,     VICE PRESIDENT_

Date: _9/14/99_

**IMMUNEX CORPORATION**

By: _Scott G. Hallquist_

Name: _SCOTT G. HALLQUIST_

Title: _SENIOR VICE PRESIDENT_

Date: _9.15.99_

CONFIDENTIAL

AMG-ENBNJ-00132967

**Exhibit A**

CONFIDENTIAL

AMG-ENBNJ-00132968

EXHIBIT A



Primary
Translation
Product

rhu TNFR:Fc

CONFIDENTIAL

AMG-ENBNJ-00132969

**Exhibit B**

CONFIDENTIAL

AMG-ENBNJ-00132970

AMG-ENBNJ-00132971

EXHIBIT B



```
LPAQVAFTPYAPEPGSTCRLREYYDQTAQMCCSKCSPGQHAKVFCTKTSDTVCDSCEDSTYTQLWNWVPECLSCG
----|----|----|----|----|----|----|----|----|----|----|----|----|----|
        10        20        30        40        50        60        70

SRCSSDQVETQACTREQNRICTCRPGWYCALSKQEGCRLCAPLRKCRPGFGVARPGTETSDVVCKPCAPGTFSNT
----|----|----|----|----|----|----|----|----|----|----|----|----|----|
        80        90       100       110       120       130       140       150

TSSTDICRPHQICNVVAIPGNASMDAVCTSTSPTRSMAPGAVHLPQPVSTRSQHTQPTPEPSTAPSTSFLLPMGP
----|----|----|----|----|----|----|----|----|----|----|----|----|----|
       160       170       180       190       200       210       220

SPPAEGSTGDEPKSCDKTHTCPPCPAPELLGGPSVFLFPPKPKDTLMISRTPEVTCVVVDVSHEDPEVKFNWYVD
----|----|----|----|----|----|----|----|----|----|----|----|----|----|
       230       240       250       260       270       280       290       300

GVEVHNAKTKPREEQYNSTYRVVSVLTVLHQDWLNGKEYKCKVSNKALPAPIEKTISKAKGQPREPQVYTLPPSR
----|----|----|----|----|----|----|----|----|----|----|----|----|----|
       310       320       330       340       350       360       370

EEMTKNQVSLTCLVKGFYPSDIAVEWESNGQPENNYKTTPPVLDSDGSFFLYSKLTVDKSRWQQGNVFSCSVMHE
----|----|----|----|----|----|----|----|----|----|----|----|----|----|
       380       390       400       410       420       430       440       450

ALHNHYTQKSLSLSPGK
----|----|----|--
       460
```

CONFIDENTIAL

**Exhibit C**

CONFIDENTIAL

AMG-ENBNJ-00132972

EXHIBIT C

*Proc. Natl. Acad. Sci. USA*
Vol. 87, pp. 7380–7384, October 1990
Immunology

# Cloning of human tumor necrosis factor (TNF) receptor cDNA and expression of recombinant soluble TNF-binding protein

(cytokine/soluble receptor/receptor family/lymphotoxin)

PATRICK W. GRAY, KATHY BARRETT, DAVID CHANTRY, MARTIN TURNER, AND MARC FELDMANN

Charing Cross Sunley Research Centre, Lurgan Avenue, Hammersmith, London, W6 8LW, England

Communicated by James Gowans, July 6, 1990

**ABSTRACT** The cDNA for one of the receptors for human tumor necrosis factor (TNF) has been isolated. This cDNA encodes a protein of 455 amino acids that is divided into an extracellular domain of 171 residues and a cytoplasmic domain of 221 residues. The extracellular domain has been engineered for expression in mammalian cells, and this recombinant derivative binds TNF$\alpha$ with high affinity and inhibits its cytotoxic activity *in vitro*. The TNF receptor exhibits similarity with a family of cell surface proteins that includes the nerve growth factor receptor, the human B-cell surface antigen CD40, and the rat T-cell surface antigen OX40. The TNF receptor contains four cysteine-rich subdomains in the extracellular portion. Mammalian cells transfected with the entire TNF receptor cDNA bind radiolabeled TNF$\alpha$ with an affinity of $2.5 \times 10^{-9}$ M. This binding can be competitively inhibited with unlabeled TNF$\alpha$ or lymphotoxin (TNF$\beta$).

Tumor necrosis factor $\alpha$ (TNF$\alpha$) is a potent cytokine that elicits a broad spectrum of biological responses. TNF$\alpha$ causes the cytolysis or cytostasis of many tumor cell lines *in vitro*, induces the hemorrhagic necrosis of transplanted tumors in mice, enhances the phagocytosis and cytotoxicity of polymorphonuclear neutrophils, and modulates the expression of many proteins, including lipoprotein lipase, class I antigens of the major histocompatibility complex, and cytokines such as interleukin 1 and interleukin 6 (1–4). TNF$\alpha$ appears to be necessary for a normal immune response (5, 6), but large quantities produce dramatic pathogenic effects (7–9). TNF$\alpha$ has been termed "cachectin" since it is the predominant factor responsible for the wasting syndrome (cachexia) associated with neoplastic disease and parasitemia (1, 3). TNF is also a major contributor to toxicity in Gram-negative sepsis, since antibodies against TNF can protect infected animals (7, 10).

The many activities of TNF$\alpha$ are mediated by binding to a cell surface receptor. Radioligand binding studies have confirmed the presence of TNF receptors on a wide variety of cell types (11–14). Although these receptors are expressed in limited numbers (100–10,000 per cell), they bind TNF$\alpha$ with high affinity ($K_a = 10^9$ M$^{-1}$ at 4°C). The TNF receptor has been characterized as a 55- to 80-kDa glycoprotein that binds both TNF$\alpha$ and the structurally related lymphotoxin (TNF$\beta$). Lymphotoxin has biological activities that are similar, if not identical, to those of TNF$\alpha$, presumably because both are recognized by the same receptor (4). Recently, several laboratories have detected heterogeneity in TNF receptor preparations (15, 16) and have proposed that at least two distinct cell surface molecules bind TNF$\alpha$. In addition, both of these receptors appear to be released from cells in soluble form, as TNF-binding proteins of 30 kDa have been isolated from urine and serum (16–18). This soluble extracellular domain

retains the capacity to bind ligand with high affinity and therefore may be important in regulating concentrations of TNF$\alpha$ *in vivo*.

To further elaborate the structure of the TNF receptor, we have identified a cDNA for one of the receptor forms.* COS cells transfected with this cDNA bind TNF$\alpha$ with high affinity and this binding can be inhibited by unlabeled TNF$\alpha$ or lymphotoxin. A derivative of the TNF receptor, the extracellular domain, has also been expressed in COS cells. This results in the secretion of a soluble recombinant receptor domain with characteristics similar to those of the TNF-binding protein.

## MATERIALS AND METHODS

**Reagents.** Recombinant human TNF$\alpha$ and TNF$\beta$ were generously supplied by Genentech as highly purified proteins derived from *Escherichia coli*. The specific activities of these preparations were approximately $10^7$ units/mg, as measured in the murine L929 cell cytotoxicity assay. The synthetic oligonucleotides were prepared by Oswel DNA Service (University of Edinburgh).

**Isolation of TNF Receptor cDNA Clones.** Purification and partial amino acid sequence analysis of the TNF-binding protein have been described (16, 17). The sequence of a peptide fragment (Glu-Met-Gly-Gln-Val-Glu-Glu-Ile-Ser-Ser-Thr-Val-Asp-Arg-Asp-Thr-Val-Cys-Gly) was used to design a synthetic oligodeoxynucleotide probe (5′-AAG-GAG-ATG-GGC-CAG-GTT-GAG-ATC-TCT-TCT-ACT-GTT-GAC-AAT-GAC-ACT-GTG-TGT-GGC-3′). The 57-mer DNA probe was labeled with $^{32}$P by T4 polynucleotide kinase (New England Biolabs) and used to screen a placental cDNA library in $\lambda$gt10 (19, 20). Approximately 800,000 phage were transferred to nitrocellulose filters and screened at reduced stringency (21). Filters were incubated for 2 hr at 42°C in 0.05 M sodium phosphate, pH 6.5/20% formamide/0.75 M sodium chloride/0.075 M sodium citrate/1% polyvinylpyrrolidone (Sigma)/1% Ficoll/1% bovine serum albumin (Sigma), and sonicated salmon sperm DNA (Sigma) at 50 ng/ml. The radiolabeled probe was then added to the filters ($10^6$ cpm/ml), which were hybridized for 16 hr. Filters were washed extensively in 0.06 M sodium chloride/0.006 M sodium citrate/1% SDS at 37°C and positive clones were identified by autoradiography. Ten hybridizing clones were plaque-purified (19) and cDNA insert size was determined by polyacrylamide gel electrophoresis of *Eco*RI-digested phage DNA. The inserts of two cDNA clones were sequenced by the dideoxy chain-termination technique (22).

**Southern and Northern Blot Analysis.** DNA was isolated from human lymphocytes by the method of Blin and Stafford (23) and used for Southern blot analysis (24). DNA was

The publication costs of this article were defrayed in part by page charge payment. This article must therefore be hereby marked "*advertisement*" in accordance with 18 U.S.C. §1734 solely to indicate this fact.

---

Abbreviations: TNF, tumor necrosis factor; PCR, polymerase chain reaction.
*The sequence reported in this paper has been deposited in the GenBank data base (accession no. M37764).

7380

CONFIDENTIAL

AMG–ENBNJ–00132973

Immunology: Gray *et al.*                          *Proc. Natl. Acad. Sci. USA* 87 (1990)    7381

digested with restriction endonucleases (New England Biolabs), fractionated in a 1% agarose gel, and transferred to nitrocellulose. Hybridization and washing were conducted under stringent conditions (20) using a $^{32}$P-labeled preparation of a 600-base-pair (bp) fragment of the TNF receptor cDNA. Northern blot analysis was performed (25) on oligo(dT)-selected RNA isolated from human placenta, spleen (generously provided by the Cooperative Human Tissue Network, Birmingham, AL), and fibroblast cell line 293. Following electrophoresis in a formaldehyde/1.2% agarose gel, the RNA was transferred to nitrocellulose and hybridized with the TNF receptor DNA probe under stringent conditions.

**Mammalian Cell Expression of the Human TNF Receptor and Derivatives.** The coding region of the majority of the human TNF receptor was isolated as an *Eco*RI fragment and cloned into a mammalian cell expression vector (26), resulted in plasmid prTNFR. The *Eco*RI fragment encodes 374 amino acids of the TNF receptor; 81 carboxyl-terminal residues of the cytoplasmic domain are therefore missing from this plasmid construction and 23 unrelated residues are added. A derivative of the TNF receptor was produced by engineering a termination codon just prior to the transmembrane domain (following Ile-159). The polymerase chain reaction (PCR) technique (27) was used to generate a 300-bp restriction fragment containing Bgl II site at the 5' end and a *L .. .*III site preceded by a TAG stop codon at the 3' end. The PCR primers were 5'-GCTGCTCCAAATGCCGAAAG-3' and 5'-AGTTCAAGCTTTTACAGTGCCCTTAACAT-TCTAA-3'. The PCR product was purified by gel electrophoresis and cloned into the TNF receptor expression plasmid (described above) digested with *Bgl* II and *Hind*III. DNA sequencing confirmed that the resulting plasmid (pTNFRecd) contained the designed DNA sequence.

The TNF receptor expression plasmids were transfected into monkey COS-7 cells by using Lipofectin (GIBCO/BRL) according to the manufacturer's instructions. Cells were cultured in Dulbecco's modified Eagle's medium containing 10% fetal bovine serum.

**Analysis of Recombinant TNF Receptor Derivatives.** TNFα was radioiodinated with the Iodo-Gen method (Pierce) according to the manufacturer's directions. The specific activity of the $^{125}$I-labeled TNFα was 10–30 μCi/μg (1 μCi = 37 kBq). COS cells transfected with the TNF receptor cDNA (prTNFR, 1300-bp *Eco*RI fragment) were incubated for 24 hr and then seeded into six-well tissue culture plates (Nunc) at 2.5 × 10⁵ cells per well. The cells were incubated for a further 48 hr and then receptor expression was quantitated by radioligand binding for 2 hr at 4°C. Nonspecific binding of $^{125}$I-TNFα was determined in the presence of a 1000-fold molar excess of unlabeled TNFα. Binding data were analyzed by the method of Scatchard (28).

The TNF receptor derivative was analyzed for inhibition of $^{125}$I-TNFα binding to the natural receptor on human U-937 monocytic cells. Culture supernatant was harvested 72 hr after COS cells were transfected with pTNFRecd. U-937 cells (2.5 × 10⁶ cells in 200 μl) were incubated with 1 nM $^{125}$I-TNFα and dilutions of COS cell medium for 2 hr at 4°C. Cells were then centrifuged through 20% sucrose to remove unbound TNFα. Nonspecific binding was determined in the presence of 2 μM unlabeled TNFα.

The TNF receptor derivative was also analyzed for inhibition of TNFα cytotoxic effects *in vitro*. The cytotoxicity assay was performed as described on the TNF-sensitive cell line WEHI 164 clone 13 (29). Serial dilutions of culture supernatant from COS cells transfected with pTNFRecd or mock-transfected controls were incubated with a constant amount of TNFα (1 ng/ml) for 1 hr at 37°C before adding to the assay.

# RESULTS

**Isolation and Characterization of the TNF Receptor cDNA.** Partial amino acid sequence of the TNF-binding protein (16, 17) was used to design a synthetic oligonucleotide probe. The radiolabeled probe was used to screen a human placental cDNA library in λgt10, and 10 hybridizing phage were isolated. The nucleotide and deduced amino acid sequences of the longest cDNA clone are depicted in Fig. 1. The third potential ATG initiation codon occurs at position 156 of the nucleotide sequence; the first two ATG codons are closely followed by termination codons, and the third ATG is preceded by the best translation initiation consensus nucleotides (30). The cDNA encodes an open reading frame of 1365 bases that codes for a polypeptide of 455 residues. The peptide sequence determined by amino acid sequencing was identified in the encoded cDNA (18 of 19 matching residues). The amino-terminal end identified for the TNF-binding protein corresponds to the cDNA-encoded sequence (17 of 19 matching residues) beginning at residue 41. The first 35 amino acids are generally quite hydrophobic and probably represent a signal sequence. Residues 36–40 (−5 to −1 in Fig. 1) are highly charged (Asp-Arg-Glu-Lys-Arg) and such a sequence is not typically found in secretory signal sequences (31); perhaps the natural receptor is processed by proteolysis after residues 39 and 40, which comprise a dibasic cleavage site (Lys-Arg). Hydropathy analysis of the protein sequence predicts a signal transmembrane domain of 23 amino acids. This hydrophobic sequence divides the protein into an extracellular domain of 171 residues and a cytoplasmic domain of 221 residues. The amino acid composition determined for the TNF-binding protein (17) corresponds well with the predicted composition of the extracellular domain encoded by the cDNA (results not shown). The discrepancy between the predicted receptor size (49 kDa) and the size determined by SDS/polyacrylamide gel electrophoresis (55–60 kDa, refs. 12–14) is probably due to glycosylation; there are four potential N-linked glycosylation sites in the sequence, three of which are in the extracellular domain. The sequence contains a large number (i.e., 30) of cysteine residues, 24 of which are in the extracellular domain. The arrangement of these cysteines is similar to that of several other cell surface proteins (see *Discussion*), suggesting that the TNF receptor is structurally related to a family of receptors.

A Northern blot analysis is presented in Fig. 2A. The $^{32}$P-labeled 600-bp cDNA fragment hybridized to a single predominant band of oligo(dT)-selected RNA from human placenta or spleen. A minor larger transcript was also observed in RNA from a fibroblast cell line. The size of the hybridizing species is 2400 bases, in good agreement with the size of isolated cDNA. Fig. 2B shows a Southern blot of human genomic DNA hybridized with the same 600-bp probe from the cDNA. In each of the three different restriction digests, only a single hybridization signal was observed. Thus the TNF receptor that we have isolated appears to be encoded by a single gene.

**Expression of Recombinant TNF Receptor Sequences in Mammalian Cells.** To confirm that the cDNA shown in Fig. 1 indeed encodes the TNF receptor, the cDNA was engineered for expression in mammalian cells. The cDNA contains an *Eco*RI site at position 1270 of Fig. 1. The receptor coding sequence was isolated as a 1300-bp *Eco*RI fragment (containing all but the last 81 codons of the cytoplasmic domain) and inserted into the mammalian cell expression vector containing a cytomegalovirus promoter and simian virus 40 transcription termination sequences (26). The resulting plasmid was transfected into COS cells, which were analyzed for TNF receptor expression after 3 days. As shown in Fig. 3A, the transfected cells specifically bound radioiodinated TNFα in a saturable and dose-dependent fashion. The

CONFIDENTIAL

AMG-ENBNJ-00132974

```
   1 ACCA GTGATCTCTA TGCCCGAGTC TCAACCCTCA ACTGTCACCC CAAGGCACTT GGGACGTGCT GGACAGACCG
  75 AGTGCGGGGA AGCCGCAGCA CTGCGGCTGC CACACTGCCC TGACCCCAAA TGGGGGAGTG AGAGGGCATA CCTGTCTGCC

 -40 M  G  L  S  T  V  P  D  L  L  L  P  L  V  L  L  E  L  L  V  P
 156 ATG GGC CTC TCC ACC GTG CCT GAC CTG CTG CTG CCG CTG GTC CTC CTG GAG CTG TTG GTG GGA ATA TAC CCC

 -16 S  G  V  I  G  L  V  P  H  L  G  D  R  E  K  R  D  S  V  C  P  Q  G  K
 228 TCA GGG GTT ATT GGA CTA GTC CCT CAC CTA GGG GAC AGG GAC AAG AGA GAT AGT GTG TGT CCA CAA GGA AAA

   9 Y  I  H  P  Q  N  N  S  I  C  C  T  K  C  H  K  G  T  Y  L  Y  N  D  C
 300 TAT ATC CAC CCT CAA AAT AAT TCG ATT TGC TGT ACC AAG TGC CAC AAA GGA ACC TAC TTG TAC AAT GAC TGT

  33 P  G  P  G  Q  D  T  D  C  R  E  C  E  S  G  S  F  T  A  S  E  N  H  L
 372 CCA GGC CCG GGA CAG GAT ACG GAC TGC AGG GAG TGT GAG AGC GGC TCC TTC ACC GCT TCA GAA AAC CAC CTC

  57 R  H  C  L  S  C  S  K  C  R  K  E  M  G  Q  V  E  I  S  S  C  T  V
 444 AGA CAC TGC CTC AGC TGC TCC AAA TGC CGA AAG GAA ATG GGT CAG GTG GAG ATC TCT TCT TGC ACA GTG GAC

  81 R  D  T  V  C  G  C  R  K  N  Q  Y  R  H  Y  W  S  E  N  L  F  Q  C
 516 CGG GAC ACC GTG TGT GGC TGC AGG AAG AAC CAG TAC CGG CAT TAT TGG AGT GAA AAC CTT TTC CAG TGC TTC

 105 N  C  S  L  C  L  N  G  T  V  H  L  S  C  Q  E  K  Q  N  T  V  C  T
 588 AAT TGC AGC CTC TGC CTC AAT GGG ACC GTG CAC CTC TCC CAG GAG AAA CAG AAC ACC GTG TGC ACC TGC

 129 H  A  G  F  F  L  R  E  N  E  C  V  S  C  S  N  C  K  K  S  L  E  C  T
 650 CAT GCA GGT TTC TTT CTA AGA GAA AAC GAG TGT GTC TCC TGT AGT AAC TGT AAG AAA AGC CTG GAG TGC ACG

 153 K  L  C  L  P  Q  I  E  N  V  K  G  T  E  D  S  G  T  T | V  L  L  P |
 732 AAG TTG TGC CTA CCC CAG ATT GAG AAT GTT AAG GGC ACT GAG GAC TCA GGC ACC ACA GTG CTG TTG CCC CTG

 177 V  I  F  F  G  L  C  L  L  S  L  L  F  I  G  L  M  Y  R  Y  Q  R  W  K
 804 GTC ATT TTC TTT GGT CTT TGC CTT TTA TCC CTC CTC TTC ATT GGT TTA ATG TAT CGC TAC CAA CGG TGG AAG

 201 S  K  L  Y  S  I  V  C  G  K  S  T  P  E  K  E  G  E  L  E  G  T  T  T
 876 TCC AAA CTC TAC TCC ATT GTT TGT GGG AAA TCG ACA CCT GAA AAA GAG GGG GAG CTT GAA GGA ACT ACT ACT

 225 K  P  L  A  P  N  P  S  F  S  P  T  P  G  F  T  P  T  L  G  F  S  P  V
 948 AAG CCC CTG GCC CCA AAC CCA AGC TTC AGT CCC ACT CCA GGC TTC ACC CCC ACC CTG GGC TTC AGT CCC GTG

 249 P  S  S  T  F  T  S  S  S  T  Y  T  P  G  D  C  P  N  F  A  A  P  R
1020 CCC AGT TCC ACC TTC ACC TCC AGC TCC ACC TAT ACC CCC GGT GAC TGT CCC AAC TTT GCG GCT CCC CGC AGA

 273 E  V  A  P  P  Y  Q  G  A  D  P  I  L  A  T  A  L  A  S  D  P  I  P  N
1092 GAG GTG GCA CCA CCC TAT CAG GGG GCT GAC CCC ATC CTT GGG ACA GCC CTC GCC TCC GAC CCC ATC CCC AAC

 297 P  L  Q  K  W  E  D  S  A  H  K  P  Q  S  L  D  T  D  D  P  A  T  L  Y
1164 CCC CTT CAG AAG TGG GAG GAC AGT GCC CAC AAG CCA CAG AGC CTA GAC ACT GAT GAC CCC GCG ACG CTG TAC

 321 A  V  V  E  N  V  P  P  L  R  T  L  E  F  V  R  R  L  G  L  S  D  H  E
1236 GCC GTG GTG GAG AAC GTG CCC GTG GGC TGG AAG ATC TTG TGT GGG CGC CTA GGG CTG AGC GAC CAC GAG

3451 D  R  L  E  L  Q  N  G  R  C  L  R  E  A  Q  Y  S  M  L  A  T  W  R
1308 ATC GAT CGG CTA GAG CTG CAG AAC GGG CGC TGC CTG CGC GAG GCG CAA TAC AGC ATG CTG GCG ACC TGG AGG

 369 R  R  T  P  R  R  E  A  T  L  E  L  L  G  R  V  L  R  N  M  D  L  L  G
1380 CGG CGC ACG CCG CGG CGC GAG GCG ACG CTG GAG CTG CTG GGA CGC GTG CTC CGC AAC ATG GAC CTG CTG GGC

 393 C  L  E  D  I  E  E  A  L  C  G  P  A  A  L  P  P  A  P  S  L  L  R
1452 TGC CTG GAG GAC ATC GAG GAG GGG CTT TGC GGC CCC GCC GCC CTC CCG CCC GCG CCC AGT CTT CTC AGA TGA
1521 GGCTGGGCCC TGGGGGGAGC TCTAAGGACC GTCCTGGCAG ATGGCCTTCC AACCCCACTT TTTCTGGAA AGGAGGGGTC
1601 CTGCAGGGGC AAGCAGGAGC TAGCAGGGGC CTAGTTGGTG CTAACCCCTC GATGTACATA GCTTTTCTCA GCTGCCTGGG
1681 GCGCGGCGAC AGTCAGCGCT GTGGGGGGGG AGAAGGTGC GGGGTAGGGT CAAGAGCCTG AGTGGGTGGT TTGGGAGGAT
1761 GAGGGAGCGT ATGGCTCATG CCCGTTTGG GTGTCCTCAC CAGCAAGGCT GCTCGGGGGC CGCTGGTTGG TGCGTGAGCC
1841 TTTTTTCACAG TGCATAAGCA GTTTTTTTG TTTTTGTTTT GTTTTGTTTT GTTTTTAAA TCAATCATGT TACACTAATA
1921 GAAACTTGGC ACTCCTGTGC CCTGTGCCTG GACAAGCAC ATAGCAAGCT GAATGTCCT AAGGCAGGGG CGAGCACCGGA
2001 ACAATGGGGC CTTCAGCTGG AGCTGTGGAC TTTTGTACAT ACACTAAAAT TCTGAAGTTA AG
```

FIG. 1. Nucleotide sequence of the human TNF receptor cDNA and encoded amino acid sequence. The predicted signal sequence is numbered −40 to −1. The first residue of the TNF-binding protein (16, 17) is preceded by an arrowhead, the transmembrane domain is boxed, and potential N-linked glycosylation sites in the extracellular domain are overlined. The sequence homologous with the designed oligonucleotide probe is found at nucleotide positions 477–533.

population of COS cells expressed ≈1 × 10⁵ receptors per cell. The measured binding affinity of recombinant receptors was 2.5 × 10⁹ M⁻¹ at 4°C, which is in close agreement with the value for the natural receptor on human cells (13, 14). The binding of ¹²⁵I-TNFα (1 nM) to these cells could be inhibited by the addition of unlabeled TNFα or lymphotoxin (Fig. 3B). COS cells transfected with just the expression vector did not significantly bind ¹²⁵I-TNFα (<2% of the binding seen with the cDNA transfection).

The extracellular domain of the TNF receptor is naturally shed from cells (16–18). To produce a similar recombinant derivative, a stop codon preceding the transmembrane domain was engineered into the cDNA by PCR mutagenesis. The modified DNA was inserted into the expression plasmid and subsequently transfected into COS cells. After 3 days, the COS cell medium was tested for inhibition of TNFα binding to human U-937 cells. As shown in Fig. 4A, the transfected-cell medium inhibited ≈70% of the binding of TNFα. The recombinant TNF receptor derivative was next tested for inhibition of TNFα biological activity. A sensitive bioassay for TNFα is measurement of cytolysis of mouse WEHI 164 (clone 13) cells. The transfected-cell medium inhibited 60% of TNFα cytotoxicity on this cell line (Fig. 4B).

Medium from mock-transfected COS cells did not inhibit TNFα cytotoxicity or binding. These experiments demonstrate that the recombinant extracellular domain of the TNF receptor is capable of binding TNF and inhibiting its biological activity.

## DISCUSSION

This paper describes the cDNA cloning of a human TNF receptor. The cDNA was isolated with a synthetic oligonucleotide probe based on partial amino acid sequence. The two peptide sequences determined for the purified TNF-binding protein correspond to sequences encoded in the cDNA. Confirmation that this cDNA encodes the TNF receptor was established by mammalian cell expression studies: this cDNA directs the expression of a cell surface protein that specifically binds TNFα with high affinity.

Southern hybridization suggests that the cDNA is encoded by a single gene. Several other laboratories have provided strong evidence for at least two structurally distinct human TNF receptors (15, 16). Consequently, other forms of the TNF receptor must differ significantly from that isolated here, since only single hybridization signals are observed in

CONFIDENTIAL

AMG-ENBNJ-00132975

Immunology: Gray *et al.*

*Proc. Natl. Acad. Sci. USA 87 (1990)*    7383



FIG. 3. Binding characteristics of recombinant human TNF receptor expressed in COS-7 cells. (*A*) Direct binding of recombinant [125]I-TNFα to COS-5 cells transfected with prTNFR. (*Inset*) Scatchard analysis derived from these data. (*B*) Competition analysis. Monolayers of COS-7 cells transfected with the TNF receptor cDNA were incubated with 1 nM [125]I-TNF in the presence of various concentrations of unlabeled TNFα (●) or TNFβ (lymphotoxin, LT) (○).

th : outhern analysis (Fig. 2*B*). Similarly, the ligands for this receptor, TNFα and lymphotoxin, share 35% amino acid similarity but their coding sequences do not cross-hybridize (32).

The TNF receptor exhibits significant amino acid sequence homology to three other cell surface proteins: the low-affinity nerve growth factor receptor (28% similarity; ref. 33), human CD40 (a B-cell surface marker; 25% similarity, ref. 34), and rat OX40 (found on activated T cells that are CD4-positive; 24% identity; ref. 35). The similarity among these proteins is confined to the extracellular domain. As shown in Fig. 5, each of these contain four (three in OX40) cysteine-rich subdomains that probably evolved from a common motif. Consequently, these proteins are members of a family of cell surface molecules that are structurally related. The distinct functions of each of these molecules may be a result of their dissimilar cytoplasmic domains. The ligands for OX40 and CD40 have not been identified, but antibodies against them

can augment T-cell and B-cell responses, respectively (34, 35). TNFα and nerve growth factor do not share sequence similarity, but both ligands affect the growth and differentiation of target cells. Perhaps this family of cell surface molecules has evolved to recognize structurally distinct ligands but retained a common scaffold that is generally useful for recognition of polypeptide ligands. While th  dissimilar cytoplasmic domains suggest independent mod  of signal transduction, each receptor appears to function in the growth or differentiation of the cell.

The natural production of a soluble receptor domain has been observed for other cytokine receptors, including those for interleukins 2, 4, and 6 and interferon γ (36). The formation of a soluble extracellular domain can arise by several mechanisms—for example, by degradation of the receptor (as is the case for the interleukin 2 receptor) or by synthesis of an independent transcript that does not encode a transmembrane domain [as seen for the interleukin 4 receptor (37) and the soluble or cell-bound forms of immu-



FIG. 2.  :) Northern blot of oligo(dT)-selected RNA (10 μg per  from human 293 cells (fibroblast cell line) (lane 1), placenta  2), and spleen (lane 3) hybridized with the TNF receptor cDNA  I-EcoRI fragment). kb, Kilobases. (*B*) Southern blot of human  mic DNA (5 μg per lane) digested with *Pst* I (lane 4), *Hind*III   5) or *EcoRI* (lane 6) and hybridized with the same probe as used   Northern blot.



FIG. 4.  Effects of soluble TNF receptor on TNF binding  biological activity. (*A*) Effect of culture supernatants from COS-7  cells transfected with a cDNA encoding a soluble form of the TNF  receptor (pTNFRecd; ●) or mock-transfected (○) on [125]I-TNF binding to U-937 cells. (*B*) Effect of these supernatants on TNF-mediated killing of WEHI 164 (clone 13) line.

CONFIDENTIAL

AMG–ENBNJ–00132976

Immunology: Gray *et al.*

*Proc. Natl. Acad. Sci. USA 87 (1990)*



FIG. 5. Alignment of the cysteine-rich subdomains of the extracellular portions of the human TNF receptor (TNFR), rat nerve growth fac receptor (NGFR; ref. 33), human CD40 (34), and rat OX40 (35). Common residues are boxed. OX40 contains only three subdomains and lac the third. Residue numbers refer to the precursor form and begin with the initiating methionine.

noglobulin]. We observed a single predominant signal in a Northern blot of human spleen and placenta mRNA, suggesting that one size of transcript produces this form of the TNF receptor. Consequently, the formation of the TNF-binding protein is most likely a result of proteolytic cleavage from the membrane-bound receptor. Presumably the extracellular domain is cleaved by proteolysis near the transmembrane junction, resulting in the release of a soluble receptor fragment.

By introducing a termination codon prior to the transmembrane domain, we have expressed a soluble form of the extracellular domain. This recombinant product mimics the natural TNF-binding protein in its sequence, amino acid composition, and ability to inhibit TNF biological activity (16, 17). The natural TNF-binding protein may play an important role in the regulation of TNF-mediated responses by binding and sequestering the cytokine. The recombinant extracellular domain may similarly provide therapeutic benefit in disorders such as cachexia, sepsis, and autoimmune diseases where TNF has been shown to play a significant causative role, such as rheumatoid arthritis (38). Attempts to demonstrate the therapeutic potential of the recombinant soluble TNF receptor can now be instigated.

Note. After submission of this manuscript for review, two papers appeared (39, 40) describing the sequence of the human TNF receptor cDNA, which is identical to that reported here.

We thank Anne Hales, Peter Katsikis, and Maija Kissonerghis for their expert technical assistance and Brian Foxwell for helpful discussions. This work was supported by the Medical Research Council (England), the Arthritis and Rheumatism Council, the U.S. Navy Medical Research and Development Command, Xenova Ltd., and the Sunley Trust.

1. Beutler, B. & Cerami, A. (1989) *Annu. Rev. Immunol.* 7, 625–655.
2. Old, L. J. (1988) *Sci. Am.* 258, 41–49.
3. Beutler, B. & Cerami, A. (1988) *Annu. Rev. Biochem.* 57, 505–518.
4. Goeddel, D. V., Aggarwal, B. B., Gray, P. W., Nedwin, G. E., Palladino, M. A., Patton, J. S., Pennica, D., Shepard, H. M., Sugarman, B. J. & Wong, G. H. W. (1986) *Cold Spring Harbor Symp. Quant. Biol.* 51, 597–609.
5. Kindler, V., Sappino, A.-P., Grau, G. E., Piguet, P.-F. & Vassali, P. (1989) *Cell* 56, 731–740.
6. Shalaby, M. R., Espevik, T., Rice, G. C., Ammann, A. J., Figari, I. S., Ranges, G. E. & Palladino, M. A., Jr. (1988) *J. Immunol.* 141, 499–503.
7. Tracey, K. J., Beutler, B., Lowry, S. F., Merryweather, J., Wolpe, S., Milsark, I. W., Hariri, R. J., Fahey, T. J., III, Zentella, A., Albert, J. D., Shires, T. & Cerami, A. (1986) *Science* 234, 470–473.
8. Grau, G. E., Fajardo, L. F., Piquet, P.-F., Lambert, P.-H. & Vassali, P. (1987) *Science* 237, 1210–1213.
9. Piquet, P. F., Collart, M. A., Grau, G. E., Kapanci, Y. & Vassali, (1989) *J. Exp. Med.* 170, 655–663.
10. Tracey, K. J., Fong, Y., Hesse, D. G., Manogue, K. R., Lee, A. Kuo, G., Lowry, S. F. & Cerami, A. (1987) *Nature (London)* 33 662–664.
11. Aggarwal, B. B., Essalu, T. E. & Hass, P. E. (1985) *Nature (London* 318, 665–667.
12. Creasy, A. A., Yamamoto, R. & Vitt, C. R. (1987) *Proc. Natl. Acad. Sc USA* 84, 3293–3297.
13. Stauber, G. B., Aiyer, R. A. & Aggarwal, B. B. (1988) *J. Biol. Chen* 263, 19098–19104.
14. Scheurich, P., Ucer, U., Kronke, M. & Pfitzenmaier, K. (1986) *Int. Cancer* 38, 127–133.
15. Hohmann, H., Remy, R., Brockhaus, M. & van Loon, P. G. M. (198 *J. Biol. Chem.* 264, 14927–14934.
16. Englemann, H., Novick, D. & Wallach, D. (1990) *J. Biol. Chem.* 26 1531–1536.
17. Olsson, I., Lantz, M., Nilsson, E., Peetre, C., Thysell, H., Grubb, A. Adolf, G. (1989) *Eur. J. Haematol.* 42, 270–275.
18. Seckinger, P., Isaaz, S. & Dayer, J.-M. (1989) *J. Biol. Chem.* 264 11966–11973.
19. Maniatis, T., Hardison, R. C., Lacy, E., Lauer, J., O'Connell, C., Quon D., Sim, G. K. & Efstratiadis, A. (1978) *Cell* 15, 687–701.
20. Lawn, R. M., Fritsch, E. F., Parker, R. C., Blake, G. & Maniatis, T. (1978) *Cell* 15, 1157–1174.
21. Gray, P. W., Leong, S. R., Fennie, E., Farrar, M. A., Pingel, J. T. & Schreiber, R. D. (1989) *Proc. Natl. Acad. Sci. USA* 86, 8497–8501.
22. Smith, A. J. H. (1980) *Methods Enzymol.* 65, 560–580.
23. Blin, N. & Stafford, D. W. (1976) *Nucleic Acids Res.* 3, 2303–2308.
24. Southern, E. M. (1975) *J. Mol. Biol.* 98, 503–517.
25. Dobner, P. R., Kawasaki, E. S., Yu, L. Y. & Bancroft, F. C. (1981) *Proc. Natl. Acad. Sci. USA* 78, 2230–2234.
26. Eaton, D. L., Wood, W. I., Eaton, D., Hass, P. E., Hollingshead, P., Wion, K., Mather, J., Lawn, R. M., Vehar, G. A. & Gorman, C. (1986) *Biochemistry* 25, 8343–8347.
27. Scharf, S. J., Horn, G. T. & Erlich, H. A. (1986) *Science* 233, 1076–1079.
28. Scatchard, G. (1949) *Ann. N.Y. Acad. Sci.* 51, 660–672 .
29. Espevik, T. & Nissen-Meyer, J. (1986) *J. Immunol. Methods* 95, 99–105.
30. Kozak, M. (1989) *J. Cell Biol.* 108, 229–241.
31. von Heijne, G. (1986) *Nucleic Acids Res.* 14, 4683–4690.
32. Nedwin, G. E., Naylor, S. L., Sakaguchi, A. Y., Smith, D., Jarrett-Nedwin, J., Pennica, D., Goeddel, D. V. & Gray, P. W. (1985) *Nucleic Acids Res.* 13, 6361–6373.
33. Radeke, M. J., Misko, T. P., Hsu, C., Herzenberg. L. A. & Shooter, E. M. (1987) *Nature (London)* 325, 593–597.
34. Stamenkovic, I., Clark, E. A. & Seed, B. (1989) *EMBO J.* 8, 1403–1410.
35. Mallett, S., Fossum, S. & Barclay, A. N. (1990) *EMBO J.* 9, 1063–1068.
36. Novick, D., Englemann, H., Wallach, D. & Rubinstein, M. (1989) *J. Exp. Med.* 170, 1409–1414.
37. Mosley, B., Beckmann, M. P., March, C. J., Idzerda, R. L., Gimpel, S. D., Van den Bos, T., Friend, D., Alpert, A., Anderson, D., Jackson, J., Wignall, J. M., Smith, C., Gallis, B., Sims, J. E., Urdal, D., Widmer, M. B., Cosman, D. & Park, L. S. (1989) *Cell* 59, 335–348.
38. Brennan, F. M., Chantry, D., Jackson, A., Maini, R. N. & Feldmann, M. (1989) *Lancet* ii, 244–247.
39. Loetscher, H., Wan, Y.-C. E., Lahm, H.-W., Gentz, R., Brockhaus, M., Tabuchi, H. & Lesslauer, W. (1990) *Cell* 61, 351–359.
40. Schall, T. J., Lewis, M., Koller, K. J., Lee, A., Rice, G. C., Wong, G. H. W., Gatanaga, T., Granger, G. A., Lentz, R., Raab, H., Kohr, W. J. & Goeddel, D. V. (1990) *Cell* 61, 361–370.

AMG–ENBNJ–00132977

CONFIDENTIAL

**Exhibit D**

CONFIDENTIAL

AMG-ENBNJ-00132978



immunodominant region of the autoantigen MBP. This may provide insight into the molecular mechanisms of MS and help in the design of new specific therapeutic approaches.

**REFERENCES AND NOTES**

1. D. E. McFarlin and H. F. McFarland, *N. Engl. J. Med.* 307, 1183 (1982); D. A. Hafler and H. L. Weiner, *Immunol. Today* 10, 104 (1989).
2. E. C. Alvord, Jr., M. W. Kies, A. J. Suckling, Eds. *Experimental Allergic Encephalomyelitis: A Useful Model for Multiple Sclerosis* (Liss, New York, 1984).
3. M. Allegretta, J. A. Nicklas, S. Sriram, R. J. Albertini, *Science* 247, 718 (1990).
4. K. Ota, M. Matsui, H. L. Weiner, D. A. Hafler, *FASEB J.* 4, A1857 (abstr.) (1990); R. Martin *et al.*, p. A1857 (abstr.); M. Pette *et al.*, *Neurology* 40, 391 (abstr. 1005) (1990).
5. Sequences of MBP peptides: MBP(84–102): DENPVVHFFKNIVTPRTP MBP(143–168): FKGVDAQGTLSKIFKLGGRD. Single-letter abbreviations for the amino acid residues are: A, Ala; C, Cys; D, Asp; E, Glu; F, Phe; G, Gly; H, His; I, Ile; K, Lys; L, Leu; M, Met; N, Asn; P, Pro; Q, Gln; R, Arg; S, Ser; T, Thr; V, Val; W, Trp; and Y, Tyr.
6. F. Mokhtarian, D. E. McFarlin, C. S. Raine, *Nature* 309, 356 (1984); A. Ben-Nun and I. Cohen, *J. Immunol.* 129, 303 (1982).
7. S. S. Zamvil *et al.*, *Nature* 324, 258 (1986).
8. J. L. Urban *et al.*, *Cell* 54, 577 (1988); H. Acha-Orbea *et al.*, *ibid.*, p. 263.
9. E. R. Burns *et al.*, *J. Exp. Med.* 169, 27 (1989).
10. A. A. Vandenbark, G. H. Hashim, H. Offner, *Nature* 341, 541 (1989); M. D. Howell *et al.*, *Science* 246, 668 (1989).
11. Myelin basic protein–specific T cell lines were grown from peripheral blood mononuclear cells at 300,000 cells per well in the presence of human MBP (10 μg/ml). Under these conditions 1 to 20% of the wells were positive for MBP; therefore, most lines are likely to have been generated from a single MBP-reactive T cell. Cells were stimulated two times with MBP and tested for their peptide specificity by use of a panel of 13 overlapping synthetic MBP peptides. All cell lines analyzed reacted specifically with one of the 13 synthetic MBP peptides (4). After a third stimulation with the specific MBP peptide, RNA was extracted from cell culture pellets (20,000 to 50,000 cells) by extraction with guanidinium isothiocyanate/phenol chloroform and isopropanol precipitation in the presence of carrier tRNA. Single-stranded cDNAs were synthesized with oligo-dT and avian myeloblastosis virus reverse transcriptase. PCR amplification was done with a panel of 19 oligonucleotides corresponding to the CDR2 region of the TCR β chain and a T cell receptor Cβ primer specific for the leader segment, which contained an internal Pst I restriction site. Amplifications were done for 30 cycles (94°C, 1 min; 55°C, 2 min; and 72°C, 3 min) with 1 μg of each primer in 50-μl reactions. Amplified products were separated in 1% agarose gels, transferred to nitrocellulose, and hybridized with an internal oligonucleotide probe. Probes were end-labeled with [³²P]ATP (adenosine triphosphate) and T4 polynucleotide kinase to a specific activity of 10⁸ cpm/μg and hybridized. Blots were washed at a final stringency of 6× SSC (saline sodium citrate) at 70°C and autoradiographed for 2 to 18 hours. T cell lines that were positive for more than two Vβ segments were considered not to be derived from a single MBP-reactive T cell and were therefore excluded from analysis. For sequencing, amplification was performed with a Vβ17 primer specific for the leader segment, which contained an internal Pst I restriction site. Amplified DNA was treated with proteinase K, extracted with phenol chloroform, precipitated with ethanol, and digested with restriction endonucleases Bgl II and Pst I. Gel-purified DNA was ligated into M13mp19, and single-stranded DNA was sequenced by the dideoxy method. Negative controls were included during the procedure to test for possible contamination of RNA samples or reagents used for cDNA synthesis and amplification.
12. J. F. Tillinghast, M. A. Behlke, D. Y. Loh, *Science*

233, 879 (1986); N. Kimura, B. Toyonaga, Y. Yoshikai, M. D. Minden, T. W. Mak, *J. Exp. Med.* 164, 739 (1986); B. Toyonaga, Y. Yoshikai, V. Vadasz, B. Chin, T. W. Mak, *Proc. Natl. Acad. Sci. U.S.A.* 82, 8624 (1985); P. Concannon, L. Pickering, P. Kung, L. Hood, *ibid.* 83, 6598 (1986).
13. N. Kimura, B. Toyonaga, Y. Yoshikai, R. P. Du, T. W. Mak, *Eur. J. Immunol.* 17, 37 (1987).
14. Primers used for PCR: Vβ1, 5' AAGAGAGAG-CAAAAGGAAACATTCTTGAAC 3'; Vβ2, 5' GC-TGCAAGGCCACATAGGAGCAAGGGGTGG 3'; Vβ3, 5' AAAATGGAAAGAAAAAGGAGATATTTC-CTGAG 3'; Vβ4, 5' CTGAGGGCCACATATGAG-AGTGGATTTGTCA 3'; Vβ5, 5' CAGAGAAAC-AAAGGAAACTTCCCTGGTGGA 3'; Vβ6, 5' G-GGTGCGGCAGATGACTCAGGGCTGGCC-AA 3'; Vβ7, 5' ATAAATGAAAGTGTGCCAAG-TGGCTTCTCA 3'; Vβ8, 5' AACGTTCCGATAG-ATGATTCAGGGATGCCC 3'; Vβ9, 5' CATTAT-AAATGAAACAGTTCCAAATGGCTT 3'; Vβ10, 5' CTTATTCAGAAAGCAGAAATAATCAATG-AG 3'; Vβ11, 5' TCCACAGAGAAGGGAGATC-TTTCCTCTGAG 3'; Vβ12, 5' GATACTGACAA-AGGAGAAGTCTCAGATGGCG⁵; Vβ14, 5' GT-GACTGATAAGGGAGATGTTCCTGAAGG 3'; Vβ15, 5' GATATAAACAAAGGAGAGATCTC-TGATGGA 3'; Vβ16, 5' CATGATAATCTTTAT-CGAGTGTTATGGGA 3'; Vβ17, 5' TTTCAG-AAAGGAGATATAGCTGAAGGGTAC 3'; Vβ18, 5' GATGAGTCAGGAATGGCAAAGGAACGAT-TT 3'; Vβ19, 5' CAAGAAAGGGAGATGCACAA-

15. A. Wacofa, G. Panzalos, L. J. Morezza, J. Carottini, M. C. Mingari, *J. Exp. Med.* 157, 743 (1983). D. A. Hafler *et al.*, *ibid.* 167, 1313 (1988).
16. E. Lai *et al.*, *Nature* 331, 543 (1988).
17. A. Winoto *et al.*, *ibid.* 324, 679 (1986).
18. E. Seboun *et al.*, *Cell* 57, 1095 (1989); A. Swejgaard, P. Platz, P. Ryder, *Immunol. Rev.* 70, 193 (1983); O. Olerup *et al.*, *Proc. Natl. Acad. Sci. U.S.A.* 86, 7113 (1989).
19. We thank M. Pette and H. Wekerle for helpful discussions and C. Koddy and L. Rhein for their expert technical assistance. Supported by grants from the National Institutes of Health (R01 NS-24247 and NS 00981), the National Multiple Sclerosis Society, the Howard Hughes Medical Institute, and by Autoimmune, Inc., Boston, MA. K.W.W. is a Susan Conroy Furbacher fellow for MS research. A.R. is a recipient of a physician scientist award by the NIH (1 K11 HL 02228-01) and D.A.H. is a Harry Weaver Scholar of the National Multiple Sclerosis Society.

28 February 1990; accepted 20 April 1990

# A Receptor for Tumor Necrosis Factor Defines an Unusual Family of Cellular and Viral Proteins

Craig A. Smith,* Terri Davis, Dirk Anderson, Lisabeth Solam, M. Patricia Beckmann, Rita Jerzy, Steven K. Dower, David Cosman, Raymond G. Goodwin

Tumor necrosis factor α and β (TNF-α and TNF-β) bind surface receptors on a variety of cell types to mediate a wide range of immunological responses, inflammatory reactions, and anti-tumor effects. A cDNA clone encoding an integral membrane protein of 461 amino acids was isolated from a human lung fibroblast library by direct expression screening with radiolabeled TNF-α. The encoded receptor was also able to bind TNF-β. The predicted cysteine-rich extracellular domain has extensive sequence similarity with five proteins, including nerve growth factor receptor and a transcriptionally active open reading frame from Shope fibroma virus, and thus defines a family of receptors.

TUMOR NECROSIS FACTOR α (TNF-α, cachectin) and β (TNF-β, lymphotoxin) are structurally and functionally homologous proteins secreted by activated macrophages and lymphocytes, respectively (1). These cytokines have pleiotropic activities in vitro and in vivo, including cytotoxic effects against tumors and virus-infected cells, stimulation of interleukin-1 secretion, stimulation of prostaglandin E2 and collagen production, inhibition of lipogenic gene expression in adipocytes, and stimulation of various immune responses (2). Clinical interest has focused on TNF because it appears to be a common

mediator of inflammation, endotoxin-induced shock (1), and the wasting syndrome commonly observed in chronic infections and neoplastic disease (3). TNF receptors appear on virtually all somatic cells (1), and generally the ligands cross-compete for binding (4), suggesting they share a common receptor. As an aid to studying the TNF system in molecular detail, we isolated a cDNA clone of the receptor.

The SV40-transformed human lung fibroblast cell line WI26-VA4 was used as a source of mRNA for construction of a cDNA library. This cell line binds both TNF-α and -β and displays multiple affinity classes; approximately 23,000 binding sites per cell (N) were detected with ¹²⁵I-TNF-α that could be fit to two affinity classes, low ($K_{a1} = 0.16 \pm 0.10$ nM$^{-1}$, $N_1 = 19,700 \pm$

Immunex Corporation, Seattle, WA 98101.

*To whom correspondence should be addressed.

CONFIDENTIAL

AMG-ENBNJ-00132979

Joint Exhibit JTX-13   p. 39 of 46

Appx25903

4,800) and high ($K_{d1} = 6.2 \pm 3.9$ nM$^{-1}$, $N_2 = 3,000 \pm 1,400$) (Fig. 1A). TNF-$\beta$ binds with lower affinity than TNF-$\alpha$ and the ligands cross-compete for binding (Fig. 1B). Double-stranded cDNA was synthesized by standard procedures, inserted into the mammalian expression vector pDC302 (5) and a TNF receptor clone isolated by a direct expression approach. Plasmid DNA from about 1000 *Escherichia coli* (DH5$\alpha$) transformants were pooled, transfected into COS cells, and screened by contact autoradiography (6), which detects positive pools by the ability of those COS cells expressing TNF receptor inserts to bind $^{125}$I-labeled TNF-$\alpha$. After screening 175,000 clones, one positive pool (#737) was obtained, subdivided, and converged to a single clone in two cycles of this procedure. By autoradiographic plate binding (6), the pure clone when transfected into COS cells expressed a receptor that bound both $^{125}$I–TNF-$\alpha$ and -$\beta$; binding of either ligand was completely inhibited by a 200-fold excess of the same or homologous unlabeled cytokine (7). Quantitative in situ binding studies of the COS-expressed receptor with $^{125}$I–TNF-$\alpha$ agreed with these results and showed the binding to be complex (Fig. 1C). As with the native

WI26-VA4 receptor, the recombinant COS receptor displayed both low ($K_{d1} = 0.18 \pm 0.06$ nM$^{-1}$) and high ($K_{d2} = 10.1 \pm 1.0$ nM$^{-1}$) affinity classes for $^{125}$I–TNF-$\alpha$. TNF-$\beta$ bound with lower affinity and competitively inhibited $^{125}$I–TNF-$\alpha$ binding (Fig. 1D). Thus, ligand binding properties of both the native and recombinant receptor appear similar. The origin of the multiple affinity classes for TNF-$\alpha$ is unclear. Indeed, most workers (1, 4, 8, 9), but not all (10), have reported monophasic Scatchard plots for TNF-$\alpha$. However, TNF-$\alpha$ is predominantly a homotrimer (11) and therefore intrinsically capable of multivalent binding. In one report (12), differential biological effects could be related to biphasic binding of TNF-$\alpha$. While not necessarily sharing a common origin, multiple affinity classes are a common feature of many receptor systems (13).

The isolated TNF receptor cDNA was used as a probe to analyze the mRNA expressed in a variety of cell lines and tissues (Fig. 2). A single size class of transcripts of ~4.5 kb was detected in WI26-VA4, Raji cells (a B lymphoblastoid line), LPS-stimulated peripheral blood monocytes (PBM), induced peripheral blood T cells (PBL), and




Fig. 2. RNA blot analysis of TNF receptor mRNA. Polyadenylated RNA (3.5 $\mu$g) was used from each source, except placental tissue (5 $\mu$g total RNA). PBL were cultured for 6 days in IL-2 and OKT3 monoclonal antibody, then restimulated for 8 hours with concanavalin A (Con A) and PMA (6). RNA was fractionated on a 1.1% agarose-formaldehyde gel, blotted onto Hybond N (Amersham), and hybridized with a [32]antisense RNA probe prepared from the 630 Not I–Bgl II fragment of the TNF receptor cDNA that had been subcloned into a Bluescript plasmid (Stratagene). Filter hybridization and washing conditions were as described (5). Variable exposure times were used in preparing the figure.

placental tissue. A transcript of slightly larger size (~5.0 kb) was detected in thymus tissue, and splenic tissue contained transcripts of both size classes. The origin of these differences is not clear, but the presence of TNF receptor transcripts in the different cells is consistent with the nearly ubiquitous distribution of the receptor.

The 3.7-kb insert of clone 737 was subcloned and sequenced (5) (Fig. 3). The cDNA contains a string of adenines at the 3' end and an upstream consensus poly(A)ation signal. The discrepancy between the size of the isolated cDNA and that of the transcripts estimated from Northern analysis may be due to a deficiency of 5' sequence in this clone. It is also possible that alternate polyadenylation signals are utilized. Upstream of the polyadenylation site is a 22-bp segment that has homology to the Alu family of repetitive sequences (14). The sequence contains a single large open reading frame encoding 461 amino acids with features typical of an integral membrane protein (15). The initiating methionine precedes 22 hydrophobic residues characteristic of a leader sequence; the most probable cleavage site (16) predicts Leu$^{22}$ as the mature NH$_2$-terminus. Another hydrophobic region of 30 amino acids is located between residues 258 and 287, bordered by charged residues at either end (Asp$^{257}$-Lys$^{288-290}$), consistent with a transmembrane segment that makes a single helical span. Immediately upstream of this element is a region of 57 amino acids rich in threonine, serine, and proline residues. Such a composition is indicative of O-linked glycosylation sites containing sialic acid and is found in similar extracellular regions of several receptors, including those for nerve growth factor (NGF) (17) and low density lipoprotein (LDL) (18). The NH$_2$-terminal 162 amino acids (positions 39 to 200) are rich



Fig. 1. TNF binding characteristics of native and recombinant TNF receptors (31). (A) Direct binding of $^{125}$I–TNF-$\alpha$ to WI26-VA4 cells (Scatchard coordinate system). (B) Inhibition of $^{125}$I–TNF-$\alpha$ binding to WI26-VA4 cells by unlabeled TNF-$\alpha$ (●) and TNF-$\beta$ (O). TNF-$\alpha$ inhibition: $K_{i1}$ (low affinity) = 1.6 ± 0.2 nM; $K_{i2}$ (high affinity) = 0.8 ± 0.1 pM. TNF-$\beta$ inhibition: $K_{i1}$ (low affinity) = 0.29 ± 0.06 nM; $K_{i2}$ (high affinity) = 1.3 ± 0.6 pM. (C) Direct binding of $^{125}$I–TNF-$\alpha$ to recombinant (COS) TNF receptor. (D) High affinity site inhibition of $^{125}$I–TNF-$\alpha$ binding to recombinant (COS) TNF receptor by unlabeled TNF-$\alpha$ (●) or -$\beta$ (O). $K_i$ ($\alpha$) = 6.7 ± 2.9 nM; $K_i$ ($\beta$) = 3.3 ± 0.8 nM. $C$, free concentration of TNF (molar); $r$, molecules of TNF bound per cell. All parameter values are ± standard error. Data fit to one or two site models as described (32).

CONFIDENTIAL

AMG-ENBNJ-00132980

cysteines (22 residues) and also contain two potential N-linked glycosylation sites. The receptor terminates in a cytoplasmic domain 174 amino acids, rich in serines (18%), of which are contiguous. Five cysteines and one potential N-linked glycosylation site are also present in this domain.

A computer search of several sequence databases (19) queried with the entire 439-residue sequence of the mature TNF receptor revealed five proteins with striking similarity: human and rat NGF receptor, CD40, cDNA clone 4-1BB, and T2 (Fig. 4). Four of these are transmembrane proteins, two of which are known receptors (for human and rat NGF). CD40 is a B cell–localized surface antigen, found also on neoplastic cells of epithelial origin, that becomes phosphorylated in the cytoplasmic domain after binding the CD40-specific monoclonal antibody G28-5 (20). Clone 4-1BB was identified as a murine cDNA from induced helper and cytolytic T cell clones (21). Both molecules have been suggested to be cytokine recep-

tors for unidentified ligands. All identity between these four proteins is localized to the cysteine-rich regions of the extracellular domains; no homology was detected between the TNF receptor cytoplasmic domain and any proteins in the database. T2 is a transcriptionally active open reading frame from the Shope fibroma virus (SFV), a poxvirus that produces invasive malignancies in newborn rabbits (22). Although dominated by 22 conserved cysteines, the alignment is also reinforced by other conserved amino acids, particularly tyrosine, glycine, and proline. Thus, the extracellular domains of these molecules, presumably heavily disulfide bonded, probably share a common structural motif. Central to this motif would appear to be repeating homologous domains. Several groups have shown that the cysteine-rich regions of NGF receptor and CD40 can be resolved into either pseudo twofold repeats of about 80 amino acids or pseudo fourfold repeats of about 40 residues (17, 20). Similar repeats can be shown with the TNF receptor and T2, consistent with all these genes having arisen by duplication and divergence from a common gene. Since both NGF and TNF are oligomeric, repeating substructures in their receptors may aid in binding and predicts that the putative ligands for CD40 and 4-1BB may also be oligomers. The net charge associated with the cysteine-rich domains of these family members varies (−19 for NGF receptor; +1 for TNF receptor), which may be related to ligand specificity. Presumably, it is this NH₂-terminal region that contains the TNF binding site. Multiple lines of evidence have localized the (apoprotein B) ligand binding site of the LDL receptor to the NH₂-terminal (60-kD), cysteine-rich



Fig. 3. Sequence of the human TNF receptor cDNA clone. (A) Schematic representation and restriction map of the cDNA. The entire coding region is boxed. The leader is hatched, the cysteine-rich region is shown stippled, and the transmembrane segment is solid. B = Bgl II; P = Pvu II. (B) The deduced amino acid sequence of cDNA coding region. The leader region is singly underlined, the transmembrane domain is shown boxed, potential N-linked glycosylation sites are doubly underlined, and cysteines are identified by an asterisk. The entire nucleotide sequence is available upon request and has been deposited at GenBank, accession number M32315.

Fig. 4. Sequence similarities among the TNF receptor superfamily. Consensus alignment of residues from the cysteine-rich regions of human TNF receptor (huTNFR), T2 open reading frame of Shope fibroma virus (SFV-T2), human CD40 (huCD40), human and rat nerve growth factor receptor (huNGFR, rNGFR), and murine cDNA clone 4-1BB (mu4-1BB). Numbers at NH₂- and COOH-termini refer to residues as cited in publications describing cDNA cloning (17, 20, 21, 22); numbers at top right of each tick mark residues from NH₂-terminus at top left. Shaded residues reflect those common to huTNF receptor and at least one other protein. Cysteines are in bold, and boxed residues are invariant.

CONFIDENTIAL

AMG-ENBNJ-00132981

Joint Exhibit JTX-13   p. 41 of 46
Appx25905

domain (18).

Sequences containing cysteine-rich repeats are present in a number of proteins, including the CD18 adhesion molecules (23), epidermal growth factor (EGF) precursor, Drosophila notch protein, the neu oncogene, and the external domains of receptors for LDL, EGF, and insulin (18, 24). Although many of these proteins show homology to each other, we detect little similarity to the TNF receptor. Optimal alignments of family members using the National Biomedical Research Foundation (NBRF) ALIGN program (19) show the strongest similarity is between the TNF receptor and T2, with a score of 19 standard deviations (SD) above the mean score for an ensemble of randomly permuted molecules of the same lengths and amino acid composition. ALIGN scores greater than 3.0 are considered significant and indicate common ancestry. Almost 40% of the residues are identical, approaching the conservation level between many murine and human cytokines and their receptors (25). Slight variants of T2 may also exist in other poxvirus family members, and some of these viruses are strongly immunosuppressive (22). Although T2 possesses a signal peptide sequence, the molecule appears to lack a hydrophobic segment typical of transmembrane regions, suggesting that T2 may be a soluble entity secreted from virally infected cells. Thus, perhaps T2 may bind TNF, or another cytokine, serving to locally dampen the host immune response. The protective effects of such a "soluble receptor" would no doubt confer a selective advantage to the pathogen. CD40, however, is also similar to this TNF receptor (38.5% amino acid identity; 15.2 SD), yet does not bind CD40 when expressed in COS cells at high levels in an immunoreactive form (26). TNF receptor is more distantly related to 4-1BB and NGF receptor (9.0 and 12.3 SD, respectively).

The signal transduction mechanism of TNF is unclear. The receptor cytoplasmic domain, as with other family members, shows no similarity with known proteins, including the cytoplasmic domain of the human T cell interleukin-1 (IL-1) receptor (6), despite the fact that TNF and IL-1 mediate many common biological activities (1). The TNF receptor expressed in COS cells does not bind radiolabeled human IL-1α or -β, nor does the recombinant human IL-1 receptor bind TNF (7). No sequences present are typical of tyrosine kinases, protein kinase C, or phosphorylation sites corresponding to substrates for these kinases (27). The cytolytic activity of TNF, however, appears to depend on the presence of a 200-kD protein distinct from the receptor, and with which it comodulates (28).

Several groups have characterized TNF binding proteins from urine. Uromodulin is a renal glycoprotein that binds IL-1, IL-2, and TNF-α with high affinity, but does not inhibit ligand binding to their respective receptors and shows no sequence similarity to the TNF receptor reported here (29). Two groups have recently reported purification and sequencing of soluble TNF-α binding proteins from urine with molecular weights of 27 to 30 kD (30). However, the NH₂-terminal sequence of these proteins is not found in the predicted sequence of clone 737. TNF-α receptors on myeloid cells are probably different from those on cells of epithelial origin (8). An 80-kD form of the receptor contains O- and N-linked carbohydrate; a 60-kD form lacks O-linked carbohydrate, possesses a different form of N-linked carbohydrate, and displays different tryptic peptide maps. Monoclonal antibodies to these two receptors also do not cross-react. The receptor we have described may correspond to the 80-kD form. Affinity cross-linking of the recombinant receptor using either $^{125}$I–TNF-α or -β shows a single species of 80 kD (7). Because the calculated protein is 46 kD, carbohydrate appears to be attached, and both O- and N-linked glycosylation sites are present in the sequence.

The availability of a full-length cDNA clone for a human TNF receptor will now permit detailed studies into the molecular mechanisms by which ligand-receptor interactions produce the pleiotropic effects of this important cytokine. Soluble, recombinant forms of this receptor may also be produced to explore the clinical value of TNF inhibition in pathological settings.

## REFERENCES

1. B. Beutler and A. Cerami, Annu. Rev. Immunol. 7, 625, 1989.
2. E. A. Carswell et al., Proc. Natl. Acad. Sci. U.S.A. 72, 3666 (1975); G. H. W. Wong and D. V. Goeddel, Nature 323, 819 (1986); C. A. Dinarello et al., J. Exp. Med. 163, 1433 (1986); J.-M. Dayer, B. Beutler, A. Cerami, ibid. 162, 2163 (1985); R. Zechner, T. Newman, B. Sherry, A. Cerami, J. Breslow, Mol. Cell Biol. 8, 2394 (1988); J. Gamble, J. Harlan, S. Klebanoff, A. Lopez, M. Vadas, Proc. Natl. Acad. Sci. U.S.A. 82, 8667 (1985); J. Djeu, B. Blanchard, D. Halkias, H. Friedman, J. Immunol. 137, 2980 (1986); D. Silberstein and J. David, Proc. Natl. Acad. Sci. U.S.A. 83, 1055 (1986); H. Kashiwa, S. Wright, B. Bonavida, J. Immunol. 138, 1383 (1987).
3. A. Oliff, Cell 54, 141 (1988); K. Tracey et al., J. Exp. Med. 167, 1211 (1988); A. Oliff et al., Cell 50, 555 (1987).
4. B. Aggarwal, T. Eessalu, P. Hass, Nature 318, 665 (1985).
5. R. G. Goodwin et al., Cell 60, 941 (1990). Briefly, double-stranded cDNA was modified with Eco RI linker-adapters containing internal Not I sites (Invitrogen), and cloned into λgt10. Following packaging and amplification of the resulting phage, cDNA inserts larger than 2 kb were isolated after Not I digestion and ligated into pDC302.
6. J. Sims et al., Science 241, 585 (1988). J. Sims et al., Proc. Natl. Acad. Sci. U.S.A. 86, 8946 (1989). COS

cells express about 800 endogenous TNF receptors (7), or ∼0.1% of the level typical of cells expressing receptor inserts. COS cell surrogate backgrounds at the $^{125}$I–TNF-α concentration used in screening (0.1 nM) are undetectable.
7. C. Smith and R. Goodwin, unpublished.
8. H.-P. Hohmann, R. Remy, M. Brockhaus, Loan, J. Biol. Chem. 264, 14927 (1989).
9. P. Hass, A. Hotchkiss, M. Mohler, B. Aggarwal, ibid. 264, 3573 (1989); K. Imamura, Sherman, D. Spriggs, D. Kufe, ibid. 263, (1988); R. Munker, J. Disparzio, H. Koeffler 70, 1730 (1987).
10. J. Rudza et al., Int. J. Cancer 41, 573 (198 Imamura, D. Spriggs, D. Kufe, J. Immunol 2989 (1987).
11. E. Jones, D. Stuart, N. Walker, Nature 33 (1989); R. Smith and C. Baglioni, J. Biol. 262, 6951 (1987).
12. H. Ishikura, K. Hori, A. Block, Blood 73 (1989).
13. L. Park et al., J. Biol. Chem. 264, 5420 (198 Yamasaki et al., Science 241, 825 (1989); R. K al., J. Exp. Med. 154, 1455 (1984); D. Gear King, N. Gough, N. Nicola, EMBO J. 8 (1989); T. Bird and J. Saklatvala, Nature 32 (1986); A. Sutter, R. Riopelle, R. Harris-W E. Shooter, J. Biol. Chem. 254, 5972 (1979
14. C. Schmid and W. Jelinek, Science 216, (1982).
15. Single letter abbreviations for the amino re are: A, Ala; C, Cys; D, Asp; E, Glu; F, Phe; G, H, His; I, Ile; K, Lys; L, Leu; M, Met; N, A Pro; Q, Gln; R, Arg; S, Ser; T, Thr; V, V Trp; and Y, Tyr.
16. G. von Heijne, Nucleic Acids Res. 14, 4683 (1
17. D. Johnson et al., Cell 47, 545 (1986); M. R T. Misko, C. Hsu, L. Herzenberg, E. Sh Nature 325, 593 (1987).
18. J. Goldstein et al., Annu. Rev. Cell Biol. 1, 1 (1
19. Databases from GenBank (December 1989 ed European Molecular Biology Lab 1989 edition), and the National B search Foundation (December 1989 edition) analyzed with software from the University o cousin Genetics Computer Group [J. Devere Haeberli, O. Smithies, Nucleic Acids Res. 12 (1984)] and the NBRF ALIGN and Fast? grams.
20. I. Stamenkovic, E. Clark, B. Seed, EMBO J. 8, (1989).
21. B. Kwon and S. Weissman, Proc. Natl. Acad U.S.A. 86, 1963 (1989).
22. C. Upton, A. DeLange, G. McFadden, Vi 160, 20 (1987); G. McFadden, in Viral Dise Laboratory and Captive Animals, G. Darai, Ed. hoff, Boston, MA 1988), pp. 37–62.
23. T. Kishimoto, K. O'Connor, A. Lee, T. Rober Springer, Cell 48, 681 (1987).
24. R. Doolittle, D. Feng, M. Johnson, Nature 558 (1984); A. Ullrich et al., ibid. 313, 756 (1 K. Wharton, K. Johansen, T. Xu, S. Artav Tsakonas, Cell 43, 567 (1985); C. Bargmann Hung, R. Weinberg, Nature 319, 226 (1986 Ebina et al., Cell 40, 747 (1985).
25. N. Nicola, Annu. Rev. Biochem. 58, 45 (1989
26. The CD40 and human TNF receptor clones separately transfected into COS cells (CD40 d TNF₂-COS) and expression was monitored I diolabeled ligand binding using contact autora raphy (6). CD40-COS clearly and specifically b $^{125}$I–G28 antibody, but did not bind $^{125}$I–T (0.2 nM). $^{125}$I-G28 binding was not inhibited 500-fold molar excess of unlabeled TNF-α. Sim by TNF-COS specifically bound $^{125}$I–TNF-α -β but not $^{125}$I-G28 (0.2 nM).
27. Y. Yarden, and A. Ullrich, Annu. Rev. Biochem 443 (1988); U. Kikkawa, A. Kishimoto, Y. N zuka, ibid. 58, 31 (1989); A. Edelman, D. King et al., Science, ibid. 56, 567 (198
28. S. Yonehara, A. Ishii, M. Yonehara, J Cell 169, 1747 (1989).
29. A. Sherblom, J. Sathyamoorthy, J. Decker, A. Munchmore, S Chem. 263, 5418 (1988); C. Hession et al., S 237, 1479 (1987).

1022

CONFIDENTIAL

AMG-ENBNJ-00132982

Joint Exhibit JTX-13  p. 43 of 46

Appx25907

1. Olsson et al., Eur. J. Haematol. 42, 270 (1989); H. Engelman, D. Aderka, M. Rubinstein, D. Rosman, D. Wallach, J. Biol. Chem. 264, 11974 (1989). COS cells were transfected with the vector pDC302 containing the TNF receptor cDNA insert (clone 737) or control vector lacking insert as described (5, 6). For quantitative in situ binding studies, transfected COS cells were replated (24 hours after transfection) into six well trays (CoStar) and analyzed 48 hours later at near confluence (6 × 10⁵ cells per well). COS monolayers were washed once with phosphate-buffered saline (PBS), then incubated with ¹²⁵I–TNF–α at various concentrations in bind-

ing media [RPMI 1640, bovine serum albumen (10%), NaN₃ (0.1%), 20 mM Hepes, pH 7.4] at 4°C for 2 hours. Free ¹²⁵I–TNF–α was determined by counting gamma emissions in the supernatant. Monolayers were then washed once with ice-cold RPMI, detached with 0.1% trypsin in PBS, and counted to determine bound ligand. Nonspecific ligand binding was determined by inclusion of a 200-fold molar excess of unlabeled ligand. Inhibition assays used ¹²⁵I–TNF–α at 0.2 nM. Data were analyzed and theoretical curves plotted as described (6, 32). TNF–α and TNF–β (R&D Sciences) were radiolabeled using Iodogen (Pierce) to a specific

activity of 2 × 10¹⁵ cpm/mmol (4). Radiolabeled TNF–α gel filtered as a single peak with an apparent molecular weight of 55 kD (7), consistent with a trimeric status (11).

32. S. Dower, K. Ozato,, D. Segal, J. Immunol. 132, 751 (1984).

33. We thank J. Wignall, D. Friend, J. Jackson, U. Martin, J. Slack, and T. VandenBos for excellent technical assistance and E. Clark for the generous gift of a full-length CD40 cDNA clone in a CDM8 vector.

16 February 1990; accepted 26 April 1990



*"The good news is we have the human genome. The bad news is the computer alphabetized it."*

CONFIDENTIAL                                                    AMG-ENBNJ-00132983

**Exhibit E**

CONFIDENTIAL

AMG-ENBNJ-00132984

## Interference procedures

1. Hoffmann-La Roche ("Roche") has represented that it currently has one or more applications claiming TNFR:Fc fusion proteins or DNA currently before the Board of Patent Appeals and Interferences, which application's *ex parte* prosecution has been suspended pending the declaration of an interference. If and when a patent or a pending application owned or exclusively licensed by Immunex claiming TNFR:Fc fusion proteins or DNA has its *ex parte* prosecution suspended pending declaration of an interference, Immunex shall promptly notify Roche of the fact of this suspension. Within two weeks of the giving of this notice by Immunex, both parties shall exchange the complete file wrappers of the potentially interfering patents/applications and any applications (including any non-U.S. patent applications) having a filing date for which a party believes that it is entitled to claim benefit. This exchange shall be pursuant to a secrecy/confidentiality agreement acceptable to the parties.

2. Thereafter, counsel for Immunex and Roche shall meet in a timely manner and attempt in good faith to reach an amicable agreement on a count or counts, as well as the claims of each involved application/patent that correspond to each such count. In the event such an amicable agreement is reached, but differs in any respect from the interference declaration, the parties agree to jointly propose to the APJ such agreed count or counts and the correspondence of the respective claims thereto.

3. Counsel for Immunex and Roche shall also meet in a timely manner after review of the file wrappers and attempt in good faith to reach an amicable agreement regarding any other issues, including issues of patentability or priority, that either party desires to raise in the interference. To the extent that the parties fail to reach agreement concerning an issue of substance, the parties shall endeavor to reach agreement with respect to the nature and scope of motions to be filed with respect to the disputed matter. Where such motions are filed, the parties shall attempt to agree amicably as to the relevant facts and, where such amicable agreement is reached, shall file appropriate stipulations as to relevant facts to the extent so agreed. Where such amicable agreement on factual matters cannot be reached, the parties shall attempt to agree amicably as to the general nature and scope of evidence to be adduced with respect to disputed factual matters to support or oppose such motions. The parties shall also endeavor to agree in good faith, whenever appropriate, to jointly waive their rights of cross-examination or submission of interrogatories in lieu of cross-examination.

4. If any party does not have and will not rely on acts of invention within the United States, that party shall file a stipulation upon the declaration of the interference that it will not present any priority proofs. This provision does not preclude that party from arguing that it is entitled to the benefit of the filing date of any application.

CONFIDENTIAL

AMG−ENBNJ−00132985

5.    In the event that an interference is declared between a Roche application/patent and a Lauffer application/patent, issues arising under 35 U.S.C. § 112 may be raised by either party, directly or through a grant or request for benefit. If and when any such issue is raised, but is not amicably resolved as set out above, the parties shall endeavor to limit the expert testimony to no more than two experts on each such issue. The parties shall also endeavor to agree in good faith, whenever appropriate, to jointly waive their rights of cross-examination or submission of interrogatories in lieu of cross-examination of such expert witnesses.

6.    No party shall appeal a final decision of the Board by filing an action pursuant to 35 U.S.C. § 146, nor shall any party respond to an appeal filed pursuant to 35 U.S.C. § 141 by filing notice with the Commissioner that such responding party elects to have all further proceedings conducted as provided in 35 U.S.C. § 146.

ai091102.910 9/13/99

CONFIDENTIAL

AMG-ENBNJ-00132986

# EXHIBIT 2

# ACCORD AND SATISFACTION

THIS ACCORD AND SATISFACTION ("A&S") is by and among Hoffmann-La Roche Inc., a New Jersey corporation with offices at 340 Kingsland Street, Nutley, New Jersey 07110 ("Roche Nutley"), and F. Hoffmann-La Roche Ltd, a Swiss corporation with offices at Grenzacherstrasse 124, CH-4070 Basel, Switzerland ("Roche Basel", collectively Roche Nutley and Roche Basel are referred to as "Roche"), and Wyeth, a Delaware corporation with offices at Five Giralda Farms, Madison, New Jersey, 07940 ("Wyeth"), AHP Manufacturing B.V., a Netherlands corporation, acting through its Medica Ireland Branch ("Wyeth BV," and, together with Wyeth, the "Wyeth Entities"), Amgen Inc., a Delaware corporation with offices at One Amgen Center Drive, Thousand Oaks, California 91320-1799 ("Amgen"), and Immunex Corporation, a Washington corporation with offices at One Amgen Center Drive, Thousand Oaks, California 91320-1799 ("Immunex").

WHEREAS, pursuant to a License Agreement, effective November 6, 1998 ("Roche-Immunex Agreement"), Roche granted Immunex a license under the Brockhaus Patent Rights (defined below) in consideration for which Immunex agreed to pay royalties to Roche on the sales of products comprising Etanercept in accordance with the terms of the Roche-Immunex Agreement;

WHEREAS, pursuant to a License Agreement, effective November 6, 1998 ("Genentech-Immunex Agreement"), Genentech, Inc. a Delaware corporation having offices in South San Francisco, California ("Genentech"), granted Immunex a license under, among other things, the Process Patent Rights (defined below) in consideration for which Immunex agreed to pay certain royalties to Genentech on the sales of products comprising Etanercept in accordance with the terms of the Genentech-Immunex Agreement, a portion of such royalties if attributable to the Process Patent Rights may in turn be payable by Genentech to Roche;

WHEREAS, in situations where the Process Patent Rights are jointly owned by Genentech and Roche, Roche is entitled to half of all compensation paid to Genentech under such jointly owned Process Patent Rights;

WHEREAS, Wyeth has the exclusive right to distribute products comprising Etanercept outside North America, Immunex has the exclusive right to distribute products comprising Etanercept within North America, and Immunex and Wyeth co-promote products comprising Etanercept within North America, all in accordance with the terms of the agreements between Immunex and Wyeth, and;

WHEREAS, Immunex, Amgen, which owns Immunex, and Wyeth wish to acquire all rights licensed pursuant to the Roche-Immunex Agreement and to eliminate the continuing obligations to pay royalties to Roche under the Roche-Immunex Agreement and to Genentech for the benefit of Roche under the Genentech-Immunex Agreement, and Roche is willing to sell such rights in accordance with the terms of this A&S.

NOW, THEREFORE, in consideration of the foregoing premises and the mutual covenants set forth below, the Parties (as defined below) agree, as follows:

AMGEN INC
**Attachment 3(d)(1)**
June 2004

#200415309

1

JOINT EXHIBIT

**JTX-12**

CONFIDENTIAL

AMG-ENBNJ-00015505

## Article 1    Definitions

1.1     "Affiliate", with respect to any Party, means any entity which, as of the Effective Date, controls, is controlled by, or is under common control with such Party, excluding both Genentech and Chugai Pharmaceutical Co. Ltd. ("Chugai"). For purposes of this definition, "control" and cognates thereof means (a) possession, directly or indirectly, of the power to direct the management or policies of an entity, whether through ownership of voting securities, by contract or otherwise, or (b) the ownership, directly or indirectly, of at least fifty percent (50%) of the voting securities or other ownership interest of an entity. For purposes of this A&S, Immunex will be considered an Affiliate of Amgen, and Genentech and Chugai will not be considered Affiliates of Roche.

1.2     "Brockhaus Patent Rights" means the patents and patent applications listed in Exhibit A attached hereto, and any other patent and patent application owned or controlled at any time during the term of this A&S by Roche or any Roche Affiliate that rely for priority on any one or more of the patents or patent applications listed in Exhibit A, any continuation, divisional, or continuation-in-part applications of any of the foregoing patent applications, any patents issuing on any of the foregoing patent applications, any applications for reissue, reexamination or supplemental protection of any of the foregoing patents and all reissued patents, reexamination certificates and supplemental protection certificates issuing from such applications.

1.3     "Closing Date" means (i) August 1, 2004, or, (ii) the second business day following the date on which all waiting periods associated with the HSR Act or other mandatory premerger notification law or regulations have expired or been terminated, and all required governmental agency approvals have been obtained regarding this A&S, whichever is later.

1.4     "Effective Date" means the date of signature of the last of the Parties to sign this A&S.

1.5     "Etanercept" means the recombinant molecule schematically depicted in Exhibit B attached hereto, which is a homodimer of two polypeptide chains, each chain consisting of the extracellular ligand-binding domain of p75TNFR fused at its carboxy terminus to the amino terminus of the hinge, CH2 and CH3 domains (including the first cysteine residue of the CH1 domain) of human immunoglobulin G1 and having the amino acid sequence set forth in Exhibit B, including the N-terminal and C-terminal heterogeneity accompanying the expression of the nucleic acid sequence encoding the amino acid sequence of Exhibit B (arising from, for example, post translational modifications or other cellular processing events), which recombinant molecule was commercially sold by Immunex or its Affiliates as of November 6, 1998.

1.6     "Ex-North America Brockhaus Patents" means all Brockhaus Patent Rights issued or pending at any time anywhere outside North America.

CONFIDENTIAL
AMG-ENBNJ-00015506

1.7 "Field" means the manufacture, use, sale, offer for sale or import of products comprising or the practice of methods that employ TNF inhibitors containing a biologically active portion of a p55 or a p75 TNF receptor.

1.8 "HSR Act" means the Hart-Scott-Rodino Antitrust Improvements Act of 1976, 15 U.S.C. § 18a.

1.9 "Licensed Product" means Etanercept, any glycoforms, fragments and/or formulations thereof, prodrugs, compositions, containing same, and any products the manufacture, use, sale, offer for sale or import of which, but for the rights granted in this A&S, would infringe a claim of any Brockhaus Patent Right.

1.10 "North America" means Canada, the United States, and their respective territories and possessions.

1.11 "North American Brockhaus Patents" means all Brockhaus Patent Rights issued or pending at any time in North America.

1.12 "Party" means Amgen, Immunex, Roche, Wyeth, or Wyeth BV, and "Parties" means Amgen, Immunex, Roche, Wyeth, and Wyeth BV.

1.13 "Process Patent Rights" means the patents and patent applications listed in Exhibit C attached hereto, and any other patent and patent application owned at any time during the term of this A&S by Genentech, Roche or their Affiliates that rely for priority on any one or more of the patents or patent applications listed in Exhibit C, any continuation, divisional, or continuation-in-part applications of any of the foregoing patent applications, any patents issuing on any of the foregoing patent applications, any applications for reissue, reexamination or supplemental protection of any of the foregoing patents and all reissued patents, reexamination certificates and supplemental protection certificates issuing from such applications.

## Article 2    Assignment to Wyeth BV

2.1 Roche Basel hereby agrees to assign, and will cause its Affiliates to assign, to Wyeth BV

(a) all right, title and interest in and to all Ex-North America Brockhaus Patents; and

(b) the right to sue and recover for any acts of infringement of any Ex-North America Brockhaus Patent that occurred anywhere outside North America before the Closing Date.

2.2 On the Closing Date, Roche Basel or its Affiliates will deliver to Wyeth BV properly executed assignments of the patents and patent applications within the Ex-North America Brockhaus Patents substantially in the form as attached hereto in Exhibit D. Roche Basel or its Affiliates will execute and deliver any other

CONFIDENTIAL

documents reasonably necessary to confirm and perfect Wyeth BV's ownership of all Ex-North America Brockhaus Patents.

2.3      On the Closing Date, Roche Basel will deliver or have delivered to Wyeth BV or Wyeth BV's designated agent all files in the possession of Roche, a Roche Affiliate or an agent of Roche or a Roche Affiliate that pertain to the preparation, filing, prosecution, issuance and maintenance of all Ex-North America Brockhaus Patents. Roche Basel or its Affiliates will also deliver to Wyeth BV on the Closing Date properly executed documents that transfer to Wyeth BV or Wyeth BV's designated agent control of the prosecution and maintenance of all Ex-North America Brockhaus Patents.

2.4      Roche Basel will, and will cause its Affiliates to, cooperate using reasonable efforts with Wyeth BV to the extent necessary to allow Wyeth BV to prosecute, issue, maintain, defend and enforce any Ex-North America Brockhaus Patent, including, without limitation, providing evidence and testimony in connection with any proceeding affecting the validity of or the right, title, interest, or benefit of Wyeth BV in, and regarding the conception and reduction to practice of inventions disclosed and claimed in, the Ex-North America Brockhaus Patents. Notwithstanding the above, Roche shall have no obligation to conduct experiments or other scientific activities, or solicit assistance from any third party, including former employees of Roche or its Affiliates. Wyeth BV will reimburse Roche Basel and any Roche Affiliates for the reasonable costs of any assistance provided pursuant to this Section 2.4.

2.5      Roche Basel and its Affiliates hereby acknowledge that from the Closing Date forward, Wyeth BV has succeeded to all of Roche's and its Affiliates' right, title, interest, benefit, and standing to receive all rights and benefits pertaining to the Ex-North America Brockhaus Patents, to institute and to prosecute all suits and proceedings, and to take all actions that Wyeth BV, in its sole discretion, may deem necessary or proper to collect, assert, or enforce any claim, right, or title of any kind under any and all of the Ex-North America Brockhaus Patents, whether arising before or after the Closing Date, to defend and compromise any and all such actions, suits, or proceedings relating to such transferred and assigned rights, title, interest, and benefits, and to do all other such acts in relation thereto.

### Article 3     License to Amgen

3.1      Subject only to the reservation in Section 3.2, as of the Closing Date Roche Nutley grants to Amgen and its Affiliates a paid-up, irrevocable, exclusive license, with the sole right to grant sublicenses, under the North America Brockhaus Patents to make, have made, use, sell, offer for sale and import Licensed Products for the life of such patents.

3.2      Roche Nutley reserves for itself and its Affiliates the right to practice under the North American Brockhaus Patents for internal, non-clinical research only.

#200415309                         4

CONFIDENTIAL

AMG-ENBNJ-00015508

3.3     After the Closing Date, Roche Nutley will, at Amgen's expense and sole direction, prosecute and maintain all North American Brockhaus Patents using outside counsel selected by Amgen. All costs incurred in such prosecution and maintenance shall be billed through selected outside counsel directly to Amgen and Amgen shall be solely responsible and liable for paying such costs. On the Closing Date, Roche will deliver or have delivered to the selected outside counsel all files in the possession of Roche, a Roche Affiliate or an agent of Roche or a Roche Affiliate that pertain to the preparation, filing, prosecution, issuance and maintenance of all North America Brockhaus Patents. Roche will also deliver to selected outside counsel on the Closing Date properly executed documents that transfer to Amgen and the selected outside counsel control of the prosecution and maintenance of all North America Brockhaus Patents. Since the selection of outside counsel under this Section 3.3 is solely within the control of Amgen, Amgen shall indemnify and hold harmless Roche and its Affiliates (including their officers, directors, employees, and agents) from and against any liabilities, fines, penalties, damages, expenses (including reasonable attorney's fees and expenses and expenses incurred in connection with the enforcement of this provision), actions and claims, which arise from or result through the prosecution and maintenance of the North American Brockhaus Patents. If requested by Amgen and upon the payment by Amgen of additional consideration in the amount of fifty thousand U.S. dollars ($50,000.00), Roche shall execute an assignment of North American Brockhaus Patents to Amgen.

3.4     Roche Nutley will, and will cause its Affiliates to, cooperate using reasonable efforts with Amgen to the extent necessary to allow outside counsel selected by Amgen to prosecute, issue, maintain, defend and enforce any North America Brockhaus Patent, including, without limitation, providing evidence and testimony in connection with any proceeding affecting the validity of or the right, title, interest, or benefit of Roche and/or Amgen in, and regarding conception and reduction to practice of inventions disclosed and claimed in, the North America Brockhaus Patents. Notwithstanding the above, Roche shall have no obligation to conduct experiments or other scientific activities, or solicit assistance from any third party, including former employees of Roche or its Affiliates. Amgen will reimburse Roche Nutley and any Roche Affiliates for the reasonable costs of any assistance provided pursuant to this Section 3.4.

3.5     Each of Roche and its Affiliates and Amgen will promptly notify the other of any suspected infringement of any North America Brockhaus Patent. Amgen, at its sole expense and under its sole control, will have the first right, but not the obligation, to rectify any such infringement by sublicense, by instituting suit for infringement, or by causing the alleged infringement to cease. Roche Nutley will cooperate with Amgen in any such suit, including participating as a party in the suit only to the extent required by the court in order to bring suit. Amgen may retain the entirety of any award of damages or lost profits as a result of such suit. Since the right to rectify infringement under this Section 3.5 is solely within the control of Amgen, Amgen shall indemnify and hold harmless Roche and its Affiliates (including their officers, directors, employees, and agents) from and

CONFIDENTIAL

AMG-ENBNJ-00015509

against any liabilities, fines, penalties, damages, expenses (including reasonable attorney's fees and expenses and expenses incurred in connection with the enforcement of this provision), actions and claims, which arise from or result through the actions taken by or on behalf of Amgen with regard to infringement of the North American Brockhaus Patents.

3.6   In the event Amgen fails to rectify any infringement of a North America Brockhaus Patent or initiate an action for such infringement within one hundred eighty (180) days after written request by Roche to do so, Roche at its sole discretion and under its sole control may initiate an action for such infringement, at its expense, against the alleged infringer identified in the request. Amgen will cooperate with Roche in any such suit, including participating as a party in the suit to the extent required by the court in order to bring suit. Roche may retain the entirety of any award of damages or lost profits as a result of such suit. Roche may not enter into any settlement agreement rectifying such infringement without the prior written approval of Amgen, which approval will not be unreasonably delayed or withheld. Since the right to rectify infringement under this Section 3.6 is solely within the control of Roche Nutley, Roche Nutley shall indemnify and hold harmless Amgen and its Affiliates (including their officers, directors, employees, and agents) from and against any liabilities, fines, penalties, damages, expenses (including reasonable attorney's fees and expenses and expenses incurred in connection with the enforcement of this provision), actions and claims, which arise from or result through the actions taken by or on behalf of Roche with regard to infringement of the North American Brockhaus Patents. Nothing contained herein shall obligate Roche Nutley to rectify any infringement of a North America Brockhaus Patent or initiate an action for such infringement.

### Article 4   Covenant Not to Sue Roche

4.1   Wyeth and Wyeth BV, for themselves and their Affiliates, hereby covenants not to sue Roche or its Affiliates for infringement of any of the Brockhaus Ex-North America Patents based on internal, non-clinical research activities conducted by Roche or its Affiliates outside North America.

4.2   Nothing herein will prevent Amgen, Immunex or Wyeth from instituting actions against Roche or any of its Affiliates for infringement of any of the Brockhaus Patent Rights based on any clinical activities claimed in such Patent Rights, any manufacture of products claimed in such Patent Rights, or any commercial sale to third parties of products or services claimed in such Patent Rights.

### Article 5   Covenant Not to Sue Amgen, Immunex or the Wyeth Entities

5.1   Roche, for itself and its Affiliates, to the extent of its and their the right to do so, hereby covenants not to sue Amgen, Immunex, the Wyeth Entities or any of their Affiliates, sublicensees, distributors, agents or customers under any Process Patent Rights for any activity in the Field. Nothing in this A&S shall limit in any manner Genentech's rights under the Genentech-Immunex Agreement, including

#200415309                                          6

CONFIDENTIAL

AMG-ENBNJ-00015510

their right to royalties under the Process Patent Rights, except to the extent such royalties are transferred to Roche from Genentech as provided for in Section 6.3. In particular, if it is required by the law of the forum for Roche to be a party to an action brought by Genentech to enforce the Process Patent Rights, even if against Amgen, Immunex, the Wyeth Entities or any of their Affiliates, sublicensees, distributors, agents or customers, then Roche may do so solely to the extent necessary to secure Genentech's rights and will not state a claim independent of Genentech against Amgen, Immunex, the Wyeth Entities, or any of their Affiliates, sublicensees, distributors agents, or customers in the Field. To the extent Roche is entitled to proceeds from any such action, it will promptly refund such proceeds to Amgen, Immunex, or the Wyeth Entities after taking out such minimal costs as necessary to satisfy their obligations to Genentech pursuant to this paragraph 5.1.

5.2     In addition to the covenant granted in Section 5.1, Roche, for itself and its Affiliates, hereby covenants not to sue Amgen, Immunex, or the Wyeth Entities or any of their Affiliates, sublicensees, distributors, agents or customers for infringement based on any activity in the Field of any other patent or any patent issuing from any other patent application owned or controlled by Roche as of the Closing Date. Roche, for itself and its Affiliates, hereby covenants not to sue Amgen, Immunex, or the Wyeth Entities or any of their Affiliates, sublicensees, distributors, agents or customers for infringement of any patent in-licensed after the Effective Date by Roche or its Affiliates based on any activity in the Field; except, notwithstanding the above, if Roche were to acquire after the Closing Date a patent as a part of an acquisition of a company, another business entity, or a product, then Roche shall not be precluded from asserting such patent against Amgen, Immunex, or the Wyeth Entities or any of their Affiliates, sublicensees, distributors, agents or customers for infringement based on any activity in the Field.

5.3     Roche, for itself and its Affiliates, hereby covenants not to sue Amgen, Immunex, the Wyeth Entities or any of their Affiliates, sublicensees, distributors, agents or customers for infringement of any Brockhaus Patent Right.

### Article 6     Consideration

6.1     On the Closing Date: (i) Amgen shall pay to Roche Nutley the sum of forty-five million, three hundred and seventy-five thousand U.S. dollars ($45,375,000.00) plus interest at the annual interest rate of one and a half percent (1.5%) accrued on this amount between the Effective Date and the Closing Date; (ii) Wyeth and/or any of its Affiliates shall pay to Roche Nutley the sum of thirty-seven million, one hundred twenty-five thousand U.S. dollars ($37,125,000.00) plus interest at the annual rate of one and a half percent (1.5%) accrued on this amount between the Effective Date and the Closing Date; and (iii) Wyeth BV shall pay to Roche Basel the sum of sixty-seven million, five hundred thousand U.S. dollars ($67,500,000.00) plus interest at the annual rate of one and a half percent (1.5%) accrued on this amount between the Effective Date and the Closing Date. On and

CONFIDENTIAL                                        AMG-ENBNJ-00015511

after the Closing Date, all amounts received by Roche shall be irrevocable, non-refundable, and non-creditable.

Amounts payable to Roche Basel shall be made to:

F. Hoffmann-La Roche AG, Basel
Swift code: UBSWCHZH80A
Account for USD: 230-10345032.0

Amounts payable to Roche Nutley shall be made to:

| Bank Name: | Citibank, n.a. |
| | New York, NY |
| Bank ABA Routing: | 021000089 |
| Account Name: | Hoffmann-La Roche Inc. |
| Account No.: | 30551217 |

6.2     Roche hereby irrevocably and forever waives any right it may have to any royalties or any other compensation payable by Amgen, Immunex and/or Wyeth to Genentech for activities under the Process Patent Rights in the Field.

6.3     If Roche were to receive compensation from Genentech based on activities by Amgen, Immunex and/or Wyeth under the Genentech-Immunex Agreement for activities in the Field under the Process Patent Rights, then Roche will promptly refund to Amgen any amounts received. Roche will cooperate with Amgen, Immunex and/or Wyeth and request that Genentech agree to modify the Genentech-Immunex Agreement to eliminate any requirement for such royalties to be paid to Genentech and thereby extinguish any obligation by Roche to make any refund payments. Nothing in this A&S shall be construed as an admission regarding the existence of a right for Roche to receive compensation from Genentech under the Genentech-Immunex Agreement.

6.4     Unless authorized in advance in writing by Amgen, Immunex and Wyeth, Roche will not amend or modify any agreement or relationship it has with Genentech in any way that would adversely affect Amgen's right to a refund under Section 6.3 of royalties paid to Genentech by Amgen, Immunex and/or Wyeth under the Genentech-Immunex Agreement for activities in the Field.

6.5     To the extent permitted by law, Roche and its Affiliates will, for each of the Process Patent Rights where at least one Roche inventor contributed to the claimed subject matter, (i) diligently pursue all reasonable efforts to register Roche as a co-owner of the Process Patent Rights in all countries in which Roche is not registered as a co-owner, and (ii) use all reasonable efforts to amend inventorship in all countries in which the inventorship reflected in the records of the relevant patent office in such country respecting such Process Patent Rights is

CONFIDENTIAL                                     AMG-ENBNJ-00015512

in error, provided that the relevant patent laws of such country require that the recordal of such inventorship be accurate to preserve validity.

6.6     Roche will keep books and records regarding amounts subject to Section 6.3 for at least three (3) years after any receipt or refund of any such amount. Upon at least thirty (30) days advance written notice, Roche Nutley will make such books and records and any agreement between Roche Nutley and Genentech relating to such payments available for inspection by an independent accountant, reasonable acceptable to Roche Nutley and paid for by Amgen, Immunex, and/or Wyeth, for the purpose of verifying that Roche Nutley has complied with the terms of Section 6.3. Upon thirty (30) days advance written notice, at the time of Roche Basel's annual auditing period, Roche Basel will make such books and records and any agreement between Roche Basel and Genentech relating to such payments available for inspection by an independent accountant, reasonably acceptable to Roche Basel and paid for by Amgen, Immunex, and/or Wyeth, for the purpose of verifying that Roche Basel has complied with the terms of Section 6.3. The accountant will keep all information obtained in confidence and will report to Amgen, Immunex and Wyeth only the accuracy or inaccuracy of refunds by Roche.

### Article 7     Accord, Waiver and Release

7.1     Compliance with the terms of this A&S by Amgen, Immunex and Wyeth will constitute an accord and satisfaction of all obligations owed to and all claims of Roche or its Affiliates under or relating to the Roche-Immunex Agreement, including, but not limited to, (a) any payments to Roche or an Affiliate that will have accrued as of the Closing Date but will not have been paid and (b) any rights or options granted to Roche or any of its Affiliates in the Roche-Immunex Agreement.

7.2     Compliance with the terms of this A&S by Roche will constitute an accord and satisfaction of all obligations owed to and all claims of Amgen, Immunex and/or Wyeth or their Affiliates under or relating to the Roche-Immunex Agreement, including, but not limited to, (a) any refunds of overpayments that might be due to Amgen, Immunex and/or Wyeth or their Affiliates as of the Closing Date and (b) any rights granted to Amgen, Immunex and/or Wyeth or their Affiliates in the Roche-Immunex Agreement.

7.3     Roche and its Affiliates waive any claim they may have after the Effective Date for any payment based on or arising from the manufacture, use, sale, offer for sale or import by or for Amgen, Immunex and/or Wyeth and their Affiliates of any Licensed Product under the Process Patent Rights or Brockhaus Patent Rights.

7.4     On the Closing Date, the Roche-Immunex Agreement will terminate and all rights and obligations contained therein will terminate, including all rights and obligations identified in Section 9.5 thereof as surviving termination. The only accrued obligations in the Roche-Immunex Agreement that will survive such

CONFIDENTIAL

AMG-ENBNJ-00015513

termination are (a) the obligations of confidentiality provided in Section 4.0 as to Confidential Information disclosed by one party to the other prior to the Closing Date, (b) the indemnity obligations set forth in Sections 7.1(a) and 7.2(a) solely with respect to breach of the confidentiality obligations of Section 4.0, and (c) the restrictions on publicity as set forth in Section 10.7.

7.5     Except as to such rights and obligations specifically created by this A&S, Roche, for itself, its Affiliates, and each of its and their directors, officers, employees and agents, successors and assigns, does hereby release, remise and forever discharge Amgen, Immunex and Wyeth, and each of their directors, officers, employees, customers, insurers, sureties, administrators, trustees, agents, successors and assigns, of and from all manner of action, suits, debts, claims, liabilities, damages and demands of every kind and nature whatsoever, whether in law or in equity, contract or tort, known or unknown, which they or any of them, ever had from the beginning of time to the present date, now has, or hereafter may have or claim to have against them or any of them arising out of or based upon or incidental to, in whole or in part, (a) the Roche-Immunex Agreement (except for the provisions surviving its termination as set forth in Section 7.4) or (b) any claim Roche may have for royalties under the Process Patents.

7.6     Except as to such rights and obligations specifically created by this A&S, Amgen, Immunex and Wyeth, for themselves, their Affiliates, and each of their directors, officers, employees and agents, successors and assigns, does hereby release, remise and forever discharge Roche, and each of its directors, officers, employees, customers, insurers, sureties, administrators, trustees, agents, successors and assigns, of and from all manner of action, suits, debts, claims, liabilities, damages and demands of every kind and nature whatsoever, whether in law or in equity, contract or tort, known or unknown, which they or any of them, ever had from the beginning of time to the present date, now has, or hereafter may have or claim to have against them or any of them arising out of or based upon or incidental to, in whole or in part, the Roche-Immunex Agreement (except for the provisions surviving its termination as set forth in Section 7.4).

7.7     The Parties each acknowledge that (i) they have been advised by legal counsel and (ii) they are familiar with and specifically waive, to the full extent that it may be applicable to this A&S and permitted under the laws of any applicable jurisdiction, the benefit of any provision of state or other local law providing in substance that:

> A GENERAL RELEASE DOES NOT EXTEND TO CLAIMS WHICH THE CREDITOR DOES NOT KNOW OR SUSPECT TO EXIST IN HIS FAVOR AT THE TIME OF EXECUTING THE RELEASE, WHICH IF KNOWN BY HIM MUST HAVE MATERIALLY AFFECTED HIS SETTLEMENT WITH THE DEBTOR.

CONFIDENTIAL                                        AMG-ENBNJ-00015514

7.8 Nothing in this A&S is intended to be or shall be deemed or construed to be, a release of any person, firm or corporation that is not, as of the Effective Date, a Party, a Party's Affiliate, or a director, officer, employee, customer, insurer, surety, administrator, trustee, agent of a Party or Party's Affiliate, nor is any person, firm or corporation intended to be a third party beneficiary of any part of this A&S.

## Article 8    Representations and Warranties

8.1 Each Party hereby represents, warrants and covenants to the other Parties that:

(a) the execution, delivery to any other Party and performance by it of this A&S and its compliance with the terms and provisions of this A&S does not and will not conflict, in any material respect, with or result in a breach of any of the terms or provisions of (i) any other contractual obligations of such Party, (ii) the provisions of its charter, operating documents or bylaws, or (iii) any order, writ, injunction or decree of any court or governmental authority entered against it or by which it or any of its property is bound except where such breach or conflict would not materially impact the Party's ability to meet its obligations hereunder;

(b) it has not granted and will not grant to any third party any right which would conflict in any material respect with the rights granted by it to any of the other Parties hereunder;

(c) this A&S is a legal and valid obligation binding upon such Party and enforceable in accordance with its terms except as (i) enforceability may be limited by bankruptcy, insolvency, reorganization, moratorium or similar laws affecting the enforcement of creditors' rights and (ii) equitable principles of general applicability;

(d) such Party is a corporation duly organized, validly existing and in good standing under the laws of the state or other jurisdiction of incorporation or formation and has full corporate power and authority to enter into this A&S and to carry out the provisions hereof except where failure to be in good standing would not materially impact the Party's ability to meet its obligations hereunder;

(e) such Party is duly authorized, by all requisite corporate action, to execute and deliver this A&S and the execution, delivery and performance of this A&S by such Party does not require any shareholder action or approval, and the Person executing this A&S on behalf of such Party is duly authorized to do so by all requisite corporate action; and

(f) no consent, approval, order or authorization of, or registration, qualification, designation, declaration or filing with, any federal, state or local governmental authority is required on the part of such Party in connection with the valid execution, delivery and performance of this A&S, except for (i) any filing or approval that may be required by the HSR Act and (ii) any filings that may be required under any applicable securities laws.

#200415309                                     11

CONFIDENTIAL

AMG-ENBNJ-00015515

8.2    Roche represents, warrants and covenants to the other Parties that:

(a) that it owns unencumbered, all right, title and interest in and to the Brockhaus Patent Rights;

(b) that it has the right to assign to Wyeth BV the Ex-North America Brockhaus Patents as provided in Article 2 of this A&S;

(c) that it has the right to grant to Amgen an exclusive license to the North America Brockhaus Patents as provided in Article 3 of this A&S;

(d) that they are not aware of any third party that has asserted or intends to assert a claim of ownership or other ownership or license interest in and to any Brockhaus Patent Right;

(e) that inventorship as recorded in the Brockhaus Patent Rights is accurate to the best of Roche's knowledge, and that if Roche becomes aware of any inaccuracy in inventorship as recorded in the Brockhaus Patent Rights, Roche promptly will notify Amgen and the Wyeth Entities and upon request of Amgen and/or the Wyeth Entities, Roche will, or will cause its Affiliates, to correct the inventorship or assist Amgen and/or the Wyeth Entities in all reasonable respects to effect a correction thereof in the relevant patent offices;

(f) that it is not aware of any challenge to the validity of any of the Brockhaus Patent Rights, with the exception of the pending opposition to European Patent No. 417 563 filed by Serono International S.A. (now Appeal case T 889/03-338) and the pending opposition to European Patent No. 939 121 filed by Intellectual Property Services.

(g) that it is not aware of any claim of any third party challenging Roche's right, title, and interest in the Brockhaus Patent Rights, except as noted under Section 8.2(f) above;

(h) that all patents and patent applications relating to TNFR in which Roche has or had an ownership interest and wherein Avi Ashkenazi and/or David Goeddel are named inventors, have been irrevocably abandoned.

(i) that to the best of Roche's knowledge at least one claim of the Brockhaus Patent Rights, either currently pending or that could be made in the future, has priority of invention under U.S. patent law as to any and all claims that could have been made on the basis of any patent applications relating to TNFR in which Roche had an ownership interest and wherein Avi Ashkenazi and/or David Goeddel were named inventors; and

(j) that it will be responsible for its Affiliates complying with the terms of this A&S.

CONFIDENTIAL    AMG-ENBNJ-00015516

## Article 9    Term and Termination

9.1    All terms of this A&S will be effective as of the Closing Date.  This A&S will continue in effect until expiration of the last to expire of the Brockhaus Patent Rights and Process Patent Rights.

9.2    After receipt of payment pursuant to Section 6.1, Roche will have no right to terminate this A&S for any reason.

9.3    Amgen, Immunex, Wyeth, and Wyeth BV may, by written notice to Roche signed by all four Parties, terminate this A&S without cause at any time after payment to Roche pursuant to Section 6.1.  Such termination will not relieve Amgen, Immunex, Wyeth, and Wyeth BV of their obligations under Sections 3.6, 4.1 and 7.6.

9.4    In the event of any breach by Roche of any obligation in this A&S, Amgen, Immunex, Wyeth, and Wyeth BV together or separately, may seek damages and/or specific performance if Roche does not cure the breach within sixty (60) days after written notice thereof by Amgen, Immunex, Wyeth, or Wyeth BV to Roche.  Each Party hereby agrees that (a) the obligations under Articles 2-5, Sections 6.1, 6.2, 6.3, 6.4, 6.5, 7.1, 7.2, 7.3, and Article 8 of the A&S are material; and (b) a breach of any of these obligation may cause the non-breaching Party irreparable harm.

## Article 10    HSR Act

The Parties will agree in good faith as to whether the transaction subject to this A&S must be reported under the HSR Act.  If they determine it must be reported for review, the Parties will share equally the filing fee.  Each Party will cooperate in the process and will promptly respond to any government request.

## Article 11    Miscellaneous

11.1    The licenses granted in Article 3 by Roche are, and will otherwise be deemed to be, for purposes of Section 365 (n) of the U.S. Bankruptcy Code, licenses of rights to "intellectual property" as defined under Section 101 of the U.S. Bankruptcy Code.

11.2    If the Parties are unable to resolve informally a dispute among them arising from performance of this A&S, any Party, by written notice to the other Parties, may have such dispute referred to their respective executive officers designated for attempted resolution by good faith negotiations.  Within thirty (30) days after the Closing Date, each Party will advise all other Parties of the name and title of its designated executive officer, and each Party thereafter may change the designated executive by written notice to all other Parties.  Any such dispute will be submitted to the designated executive officers no later than thirty (30) days following such request by a Party.  In the event the designated executive officers are not able to resolve any such dispute within sixty (60) days after submission of

CONFIDENTIAL

AMG-ENBNJ-00015517

the dispute to such executive officers, the aggrieved Party may pursue whatever measures are legally available to them to resolve such dispute. All negotiations pursuant to this Section 11.2 will be treated as compromise and settlement negotiations. Nothing said or disclosed, nor any document produced, in the course of such negotiations which is not otherwise independently discoverable will be offered or received as evidence or used for impeachment or for any other purpose in any current or future arbitration or litigation.

11.3    No Party will make any public announcement regarding this A&S nor release to any third party or publish in any way any non-public information with respect to the terms of this A&S or concerning their cooperation without the prior written consent of the other Parties, which consent will not be unreasonably withheld or delayed. Notwithstanding the foregoing, each Party may disclose the terms of this A&S to the extent required to comply with applicable laws, including, without limitation the rules and regulations promulgated by the United States Securities and Exchange Commission, *provided, however*, that prior to making any such disclosure, the Party intending to so disclose the terms of this A&S (i) will provide the non-disclosing Parties with written notice of the proposed disclosure and a opportunity to review and comment on the intended disclosure which is reasonable under the circumstances and (ii) will seek confidential treatment for as much of the disclosure as is reasonable under the circumstances, including, without limitation, seeking confidential treatment of any information as may be requested by the other Parties.

11.4    Neither this A&S nor any interest hereunder will be assignable by any Party without the prior written consent of the other Party; provided however, that each Party may assign this A&S; (a) to a successor, whether by merger, consolidation, reorganization or acquisition of stock or assets affecting substantially all of the assets or actual voting control; or (b) to an Affiliate of a Party. This A&S will be binding upon the successors and permitted assigns of the Parties and the name of a Party appearing herein will be deemed to include the names of such Party's successors and permitted assigns to the extent necessary to carry out the intent of this A&S. Any assignment not in accordance with this Section 11.4 will be void.

11.5    Notwithstanding the provisions of Section 11.4, Wyeth BV may freely assign any Ex-North America Brockhaus Patent.

11.6    Each Party agrees to execute, acknowledge and deliver such further instruments, and to do all such other acts, as may be necessary or appropriate in order to carry out the purposes and intent of this A&S.

11.7    No Party will be liable to the other Parties for loss or damages or will have any right to terminate this A&S for any default or delay attributable to any Force Majeure, if the Party affected will give prompt notice of any such cause to the other Parties. The Party giving such notice will thereupon be excused from such of its obligations (except obligations to make payments) hereunder as it is thereby disabled from performing for so long as it is so disabled, *provided, however*, that

CONFIDENTIAL    AMG-ENBNJ-00015518

such affected Party commences and continues to use its commercially reasonable efforts to cure such cause. Force Majeure will not excuse obligations to pay amounts due.

11.8 Notices and other communications hereunder (including, without limitation, any notice of Force Majeure, breach, termination, change of address, exercise of rights to negotiate additional agreements, etc.) will be in writing and will be deemed given if delivered personally or by facsimile transmission (receipt verified), mailed by registered or certified mail (return receipt requested), postage prepaid, or sent by nationally recognized express courier service, to the Parties at the following addresses (or at such other address for a Party as will be specified by like notice, *provided, however*, that notices of a change of address will be effective only upon receipt thereof):

**Roche Nutley**            **Roche Basel**

**Hoffmann-La Roche Inc.**    **F.Hoffmann-La Roche Ltd**

**340 Kingsland Street**       **Grenzacherstrasse 124**

**Nutley, New Jersey 07401 USA**    **CH-4070 Basel, Switzerland**

**Attn: Corporate Secretary**    **Attn: Corporate Law**


**Amgen**

**Amgen Inc.**

**One Amgen Center Drive**

**Thousand Oaks, California 91320-1799 USA**

**Attention: Corporate Secretary**


**Immunex**

**Immunex Corporation**

**One Amgen Center Drive**

**Thousand Oaks, California 91320-1799 USA**

**Attention: Corporate Secretary**


**Wyeth and Wyeth BV**

**Five Giralda Farms, 3E**

**Madison, New Jersey 07940 USA**

**Attention: General Counsel**

CONFIDENTIAL        AMG-ENBNJ-00015519

11.9    No amendment, modification or supplement of any provision of this A&S will be valid or effective unless made in writing and signed by a duly authorized officer of each Party.

11.10   No provision of this A&S will be waived by any act, omission or knowledge of a Party or its agents or employees except by an instrument in writing expressly waiving such provision and signed by a duly authorized officer of the waiving Party.

11.11   This A&S may be executed in any number of counterparts, each of which need not contain the signature of more than one Party but all such counterparts taken together will constitute one and the same agreement.

11.12   This A&S will be governed by and interpreted in accordance with the substantive laws of the State of Delaware (without regard to conflict of law principles).

11.13   This A&S constitutes and contains the complete, final and exclusive understanding and agreement of the Parties and cancels and supersedes any and all prior negotiations, correspondence, understandings and agreements, whether oral or written, among some or all of the Parties respecting the subject matter hereof and thereof.

CONFIDENTIAL                                    AMG-ENBNJ-00015520

**IN WITNESS WHEREOF,** duly authorized representatives of the Parties have duly executed this A&S to be effective as of the Effective Date.

HOFFMANN-LA ROCHE INC.

Appr'd As To Form
LAW DEPT.

By

_____
Signature

George W. Johnston
_____
Print Name

Vice President
_____
Title

June 7, 2004
_____
Date

F. HOFFMANN-LA ROCHE LTD

_____
Signature

_____
Signature

_____
Print Name

_____
Print Name

_____
Title

_____
Title

_____
Date

_____
Date

WYETH.

_____
Signature

_____
Print Name

_____
Title

_____
Date

#200415309

17

**IN WITNESS WHEREOF,** duly authorized representatives of the Parties have duly executed this A&S to be effective as of the Effective Date.

HOFFMANN-LA ROCHE INC.

_____
Signature

_____
Print Name

_____
Title

_____
Date

F. HOFFMANN-LA ROCHE LTD

_____*Noty*_____     _____*(signature)*_____
Signature                              Signature

___*Eric  Notegen*___     ___*Beat Krahenman*___
Print Name                            Print Name

_____*Direktor*_____     ___*Deputy Director*___
Title                                     Title

____*June 7, 2004*____     ___*8.6. 2004*___
Date                                     Date

WYETH.

_____
Signature

_____
Print Name

_____
Title

_____
Date

#200415309                              17

CONFIDENTIAL

AMG-ENBNJ-00015522

**IN WITNESS WHEREOF,** duly authorized representatives of the Parties have duly executed this A&S to be effective as of the Effective Date.

HOFFMANN-LA ROCHE INC.

_____
Signature

_____
Print Name

_____
Title

_____
Date

F. HOFFMANN-LA ROCHE LTD

_____          _____
Signature                                                          Signature

_____          _____
Print Name                                                      Print Name

_____          _____
Title                                                                Title

_____          _____
Date                                                               Date

WYETH.

_____
Signature

_William M. Haskel_
Print Name

_Vice President_
Title

_6/7/04_
Date

#200415309                                17

CONFIDENTIAL

AMG-ENBNJ-00015523

AHP MANUFACTURING B.V.

_____
Signature

*Jack M. O'Connor*
_____
Print Name

*Vice President & Treasurer*
_____
Title

*6/7/04*
_____
Date


AMGEN, INC.

_____
Signature

_____
Print Name

_____
Title

_____
Date


IMMUNEX CORPORATION

_____
Signature

_____
Print Name

_____
Title

_____
Date


#200415309                          18

CONFIDENTIAL                                    AMG–ENBNJ–00015524

AHP MANUFACTURING B.V.

_____
Signature

_____
Print Name

_____
Title

_____
Date

AMGEN, INC.

_____
Signature

_Richard Nanula_
Print Name

_Executive V.P. & Chief Financial Officer_
Title

_June 7, 2004_
Date

IMMUNEX CORPORATION

_____
Signature

_Richard Nanula_
Print Name

_Cheif Financial Officer_
Title

_June 7, 2004_
Date

#200415309                    18

## EXHIBIT A

| | | | | |
|---|---|---|---|---|
| Austria | 08/31/1990 | 90116707.2 | 07/05/2000 | 194384 |
| Austria | 01/15/1999 | 991900703.0 | 04/02/2003 | 0939121 |
| Austria | 07/02/2003 | 300129 | | |
| Belgium | 08/31/1990 | 90116707.2 | 07/05/2000 | 0417563 |
| Belgium | 01/15/1999 | 99100703.0 | 04/02/2003 | 0939121 |
| Belgium | 07/07/2003 | 2003C/018 | | |
| Brazil | 12/11/1996 | PI1100095.3 | | |
| Bulgaria | 02/28/1994 | 98609 | 08/31/2001 | 63284 |
| Bulgaria | 10/27/2000 | 104893 | | |
| Denmark | 08/31/1990 | 90116707.2 | 07/05/2000 | 0417563 |
| Denmark | 01/15/1999 | 99100703.0 | 04/02/2003 | 0939121 |
| Denmark | 09/24/2003 | CA200300025 | | |
| Ecuador | 12/16/1994 | 1251/94 | | |
| Europe | 08/31/1990 | 90116707.2 | 07/05/2000 | 017563 |
| Europe | 01/15/1999 | 99100703.0 | 04/02/2003 | 0939121 |
| Europe | 03/30/2001 | 01108117.1 | | |
| France | 08/31/1990 | 90116707.2 | 07/05/2000 | 0417563 |
| France | 01/15/1999 | 99100703.0 | 04/02/2003 | 0939121 |
| France | 07/11/2003 | 03C0026 | | |
| Germany | 08/31/1990 | 90116707.2 | 07/05/2000 | 59010908.1 |
| Germany | 01/15/1999 | 99100703.0 | 04/02/2003 | 59010933.2 |
| Germany | 06/26/2003 | 10399023.2 | | |
| Italy | 08/31/1990 | 90116707.2 | 07/05/2000 | 0417563 |
| Italy | 01/15/1999 | 99100703.0 | 04/02/2003 | 0939121 |
| Italy | 07/21/2003 | C-UB2003CCP | 09/30/2003 | C-UB2003CCP |
| Japan | 09/12/1990 | 240176/90 | 12/12/1997 | 2728968 |
| Japan | 08/18/1997 | 257432/97 | | |
| Japan | 08/18/1997 | 257433/97 | | |
| Netherlands | 08/31/1990 | 90116707.2 | 07/05/2000 | 0417563 |
| Netherlands | 01/15/1999 | 99100703.0 | 04/02/2003 | 0939121 |
| Netherlands | 07/02/2003 | 300129 | | |
| Switzerland | 09/12/1989 | 3319/89 | | |
| Switzerland | 03/08/1990 | 746/90 | | |
| Switzerland | 04/20/1990 | 1347/90 | | |
| Switzerland | 08/31/1990 | 90116707.2 | 07/05/2000 | 0417563 |
| Switzerland | 01/15/1999 | 99100703.0 | 04/02/2003 | 0939121 |
| Switzerland | 07/23/03 | C00939121/01 | | |
| United | 08/31/1990 | 90116707.2 | 07/05/2000 | 0417563 |
| United | 01/15/1999 | 99100703.0 | 04/02/2003 | 0939121 |
| United | 06/30/2003 | SPC/GB03/027 | | |
| USA | 09/10/1990 | 07/580013 | | |
| USA | 07/21/1993 | 08/095640 | 03/11/1997 | 5610279 |
| USA | 05/19/1995 | 08/444790 | | |
| USA | 05/19/1995 | 08/444791 | | |
| USA | 05/15/1995 | 08/444793 | 09/15/1998 | 5808029 |
| USA | 05/19/1995 | 08/444797 | | |
| USA | 11/18/2003 | 10/715609 | | |

CONFIDENTIAL                                           AMG-ENBNJ-00015526

AMG-ENBNJ-00015527

EXHIBIT B

```
LPAQVAFTPYAPEPGSTCRLREYYDQTAQMCCSKCSPGQHAKVFCTKTSDTVCDSCEDSTYTQLWNWVPECLSCG
----|----|----|----|----|----|----|----|----|----|----|----|----|----|----|
          10        20        30        40        50        60        70

SRCSSDQVETQACTREQNRICTCRPGWYCALSKQEGCRLCAPLRKCRPGFGVARPGTETSDVVCKPCAPGTFSNT
----|----|----|----|----|----|----|----|----|----|----|----|----|----|----|
    80        90       100       110       120       130       140       150

TSSTDICRPHQICNVVAIPGNASMDAVCTSTSPTRSMAPGAVHLPQFVSTRSQHTQPTPEPSTAPSTSFLLPMGP
----|----|----|----|----|----|----|----|----|----|----|----|----|----|----|
         160       170       180       190       200       210       220

SPPAEGSTGDEPKSCDKTHTCPPCPAPELLGGPSVFLFPPKPKDTLMISRTPEVTCVVVDVSHEDPEVKFNWYVD
----|----|----|----|----|----|----|----|----|----|----|----|----|----|----|
   230       240       250       260       270       280       290       300

GVEVHNAKTKPREEQYNSTYRVVSVLTVLHQDWLNGKEYKCKVSNKALPAPIEKTISKAKGQPREPQVYTLPPSR
----|----|----|----|----|----|----|----|----|----|----|----|----|----|----|
   310       320       330       340       350       360       370

EEMTKNQVSLTCLVKGFYPSDIAVEWESNGQPENNYKTTPPVLDSDGSFFLYSKLTVDKSRWQQGNVFSCSVMHE
----|----|----|----|----|----|----|----|----|----|----|----|----|----|----|
   380       390       400       410       420       430       440       450

ALHNHYTQKSLSLSPGK
----|----|----|--
   460
```

CONFIDENTIAL

**EXHIBIT C**

| Country | Filing Date | Filing Number | Grant Date | Patent No. |
|---|---|---|---|---|
| Argentina | 06.06.1996 | P960103001 | | |
| Argentina | 12.02.1998 | P980100640 | | |
| Australia | 06.06.1996 | 60952/96 | | 717847 |
| Azerbaijan | 06.06.1996 | EA-97-0364-US | 25.12.2000 | 001215 |
| Belarus | 06.06.1996 | EA-97-0364-US | 25.12.2000 | 001215 |
| Brazil | 06.06.1996 | PI9609150.9 | | |
| Bulgaria | 06.06.1996 | 102101 | 27.12.2000 | 63213 |
| Canada | 06.06.1996 | 2220684 | | |
| China | 06.06.1996 | 96194449.8 | | |
| Czech | 06.06.1996 | PV3909/97 | | |
| Eurasia | 06.06.1996 | EA-97-0364-US | 25.12.2000 | 001215 |
| Europe | 06.06.1996 | 96918251.8 | | |
| Georgia | 06.06.1996 | 2949 | 15.09.2000 | 10567 |
| Hong Kong | 06.06.1996 | 98114966.4 | | |
| Hungary | 06.06.1996 | 42722/97 | | |
| Iceland | 06.06.1996 | 4626 | | |
| India | 05.06.1996 | 979/MAS/96 | | |
| Indonesia | 06.06.1996 | P961562 | 08.03.2000 | ID0004849 |
| Israel | 06.06.1996 | 122398 | | |
| Japan | 06.06.1996 | 09-501638 | | |
| Kazakhstan | 06.06.1996 | EA-97-0364-US | 25.12.2000 | 001215 |
| Kenya | 06.06.1996 | PCT/US96/09284 | 22.03.2000 | KE 93 |
| Kyrgyzstan | 06.06.1996 | EA-97-0364-US | 25.12.2000 | 001215 |
| Macedonia | 06.06.1996 | P-120/97 | | |
| Malaysia | 06.06.1996 | PI9602265 | | |
| Mexico | 06.06.1996 | 9709452 | | |
| Moldova | 06.06.1996 | EA-97-0364-US | 25.12.2000 | 001215 |
| New Zealand | 06.06.1996 | 310202 | 08.02.2000 | 310202 |
| Norway | 06.06.1996 | 975674 | | |
| OAPI | 06.06.1996 | 70153 | 14.10.1999 | 1553 |
| Philippines | 05.06.1996 | 53298 | | |
| Poland | 06.06.1996 | P323737 | 07.01.2003 | 185484 |
| Romania | 06.06.1996 | 97-02262 | | |
| Russian | 06.06.1996 | EA-97-0364-US | 25.12.2000 | 001215 |
| Saudi Arabian | 07.10.1996 | 96170351 | | |
| Singapore | 06.06.1996 | 9705182.5 | 25.05.1999 | 46871 |
| Slovakia | 06.06.1996 | 1670-97 | | |
| South Africa | 06.06.1996 | 96/4776 | 25.02.1998 | 96/4776 |
| South Korea | 06.06.1996 | 708954/1997 | | |
| Sri Lanka | 06.06.1996 | 11346 | | |
| Taiwan*[1] | 05.06.1996 | 85106712 | 14.08.2001 | 130534 |
| Taiwan*[1] | 05.06.1996 | 89111534 | 02.06.2003 | 171272 |

#200415309

21

CONFIDENTIAL

AMG-ENBNJ-00015528

| Country | Filing Date | Filing Number | Grant Date | Reg. No. |
|---|---|---|---|---|
| Tajikistan | 06.06.1996 | EA-97-0364-US | 25.12.2000 | 001215 |
| Thailand | 05.06.1996 | 31782 | | |
| Turkey | 06.06.1996 | 1543 | 15.01.1999 | TR199701543B |
| Turkmenista | 06.06.1996 | EA-97-0364-US | 25.12.2000 | 001215 |
| Ukraine | 06.06.1996 | PCT/US96/09284 | | |
| USA*²⁾ | 06.06.1995 | 08/469348 | 06.01.1998 | 5705364 |
| USA*²⁾ | 06.06.1995 | 08/466845 | 24.02.1998 | 5721121 |
| USA*²⁾ | 06.06.1995 | 08/470849 | 02.12.2003 | 6656466 |
| USA*²⁾ | 01.11.2000 | 09/705285 | | |
| Uzbekistan | 06.06.1996 | IHAP9700969.2 | | |
| Viet Nam | 06.06.1996 | S19971087 | 10.08.2001 | 2262 |
| WIPO | 06.06.1996 | US96/09284 | | |

*¹⁾ Currently in the name of Genentech but believed to be co-owned with Roche Basel.
*²⁾ Currently in the name of Genentech but believed to be co-owned with Roche Nutley.

#200415309

CONFIDENTIAL

AMG-ENBNJ-00015529

**EXHIBIT D**

# ASSIGNMENT

**WHEREAS,** F. Hoffmann-La Roche AG., a Swiss Corporation with offices at Grenzacherstrasse 124, CH-4070, Basel, Switzerland (hereinafter called Assignor), is the owner of:

**EP 417563B, EP 939121B, and EP 1132471 and all equivalents and extensions such as Supplementary Protection Certificates thereof as well as counterpart patents and patent applications outside of European Patent Convention countries and outside of the United States, as more specifically set forth in Exhibit 1 attached hereto;**

and the inventions disclosed and claimed therein, and are entitled to the benefit of same in the following designated EPC states: Austria, Belgium, Denmark, France, Germany, Italy, Netherlands, Switzerland/Liechtenstein, and Great Britain **(hereinafter referred to as the Patent Rights);**

**WHEREAS,** Wyeth, a corporation organized under the laws of the State of Delaware, U.S.A., having a place of business at Five Giralda Farms, Madison, New Jersey 07940 United States of America and AHP Manufacturing B.V., a Netherlands corporation having a place of business at Spicalaan 31, 2132 JG Hoofddorp, The Netherlands and hereinafter referred to as Assignee, has acquired the entire right, title and interest of the Assignor in and to said inventions and any Letters Patent (including extensions such as Supplementary Protection Certificates) that may be granted thereon by operation of that certain Accord and Satisfaction Agreement dated _____, 2004, and wishes to perfect such assignment;

**NOW, THEREFORE,** in consideration of ϶1 and other valuable and good consideration as set forth in the Accord and Satisfaction Agreement, the receipt of which is hereby acknowledged, Assignor, by these presents, has sold, assigned and transferred, and does hereby sell, assign and transfer to Assignee, its successors, legal representatives and assigns the entire right, title and interest in and to the Patent Rights (including all divisions, continuations, and extensions thereof whenever filed) and in and to any Letters Patent that may be granted thereon, and the right to apply, in its own name, for Letters Patent and such other forms of protection of industrial property as may be provided by any country through affiliation with the members of the EPC or otherwise, with full benefit of such priorities as may now or hereafter be granted to Assignee by local laws or by treaty or by international convention, together with the right to extend the protection of the Patent Rights where possible and the right to undertake any proceedings in patent offices, courts or otherwise, relative thereto, for the full term for which said Patent Rights or other forms of protection may be granted. Assignor hereby authorises and directs that the Patent Rights and any and all proceedings taken with respect thereto proceed in the name of the Assignee.

#200415309                                     23

CONFIDENTIAL                                     AMG-ENBNJ-00015530

**On behalf of the ASSIGNOR:**

F. Hoffmann-La Roche AG


By_____          Date _____
Name: (Print)
Title:_____


**On behalf of the ASSIGNEE:**

AHP Manufacturing B.V.


**By** _____          **Date** _____

**Name:** Eileen M. Lach_____

Title: _____


#200415309                                        24

## EXHIBIT 1

| Country | Filing Date | Filing Number | Grant Date | Patent No. |
|---|---|---|---|---|
| Austria | 08/31/1990 | 90116707.2 | 07/05/2000 | 0417563 |
| Austria | 08/31/1990 01/15/1999 (divisional) | 991900703.0 | 04/02/2003 | 0939121 |
| Austria | 07/02/2003 | 18/2003 | | |
| Belgium | 08/31/1990 | 90116707.2 | 07/05/2000 | 0417563 |
| Belgium | 08/31/1990 01/15/1999 (divisional) | 99100703.0 | 04/02/2003 | 0939121 |
| Belgium | 07/07/2003 | 2003C/018 | | |
| Brazil | 12/11/1996 | PI1100095.3 | | |
| Bulgaria | 02/28/1994 | 98609 | 08/31/2001 | 63284 |
| Bulgaria | 10/27/2000 | 104893 | | |
| Denmark | 08/31/1990 | 90116707.2 | 07/05/2000 | 0417563 |
| Denmark | 08/31/1990 01/15/1999 (divisional) | 99100703.0 | 04/02/2003 | 0939121 |
| Denmark | 09/24/2003 | CA200300025 | | |
| Ecuador | 12/16/1994 | 1251/94 | | |
| Europe | 08/31/1990 | 90116707.2 | 07/05/2000 | 0417563 |
| Europe | 08/31/1990 01/15/1999 (divisional) | 99100703.0 | 04/02/2003 | 0939121 |
| Europe | 03/30/2001 | Pub. #1132471 | | |
| France | 08/31/1990 | 90116707.2 | 07/05/2000 | 0417563 |
| France | 08/31/1990 01/15/1999 (divisional) | 99100703.0 | 04/02/2003 | 0939121 |
| France | 07/11/2003 | 03C0026 | | |
| Germany | 08/31/1990 | 90116707.2 | 07/05/2000 | 0417563 |
| Germany | 08/31/1990 01/15/1999 (divisional) | 99100703.0 | 04/02/2003 | 0939121 |
| Germany | 06/26/2003 | 10399023.2 | | |
| Italy | 08/31/1990 | 90116707.2 | 07/05/2000 | 0417563 |
| Italy | 08/31/1990 01/15/1999 (divisional) | 99100703.0 | 04/02/2003 | 0939121 |
| Italy | 07/21/2003 | C-UB2003CCP818 | 09/30/2003 | C-UB2003CCP818 |
| Japan | 09/12/1990 | 240176/90 | 12/12/1997 | 2728968 |
| Japan | 08/18/1997 | 257432/97 | | |
| Japan | 08/18/1997 | 257433/97 | | |
| Netherlands | 08/31/1990 | 90116707.2 | 07/05/2000 | 0417563 |
| Netherlands | 08/31/1990 08/31/1990 (divisional) | 99100703.0 | 04/02/2003 | 0939121 |
| Netherlands | 07/02/2003 | 300129 | | |
| Switzerland | 09/12/1989 | 3319/89 | | |
| Switzerland | 03/08/1990 | 746/90 | | |

#200415309

25

CONFIDENTIAL

AMG-ENBNJ-00015532

| Switzerland | 04/20/1990 | 1347/90 | | |
| Switzerland/ Liechtenstein | 08/31/1990 | 90116707.2 | 07/05/2000 | 0417563 |
| Switzerland/ Liechtenstein | 08/31/1990 08/31/1990 (divisional) | 99100703.0 | 04/02/2003 | 0939121 |
| Switzerland/ Liechtenstein | 07/23/03 | C00939121/01 Note: could not verify SPC No. | | |
| Great Britain | 08/31/1990 | 90116707.2 | 07/05/2000 | 0417563 |
| Great Britain | 08/31/1990 08/31/1990 (divisional) | 99100703.0 | 04/02/2003 | 0939121 |
| Great Britain | 06/30/2003 (divisional) | SPC/GB03/027 | | |

CONFIDENTIAL

AMG−ENBNJ−00015533